**Nos. 22-2299 (L), 22-2300**

In the

# United States Court of Appeals
## For the Federal Circuit

———————————

CROWN PACKAGING TECHNOLOGY, INC.,

CARNAUDMETALBOX ENGINEERING LTD.,

*Plaintiffs-Appellants,*

v.

BELVAC PRODUCTION MACHINERY, INC.,

*Defendant-Cross-Appellant.*

———————————

Appeals from the United States District Court
for the Western District of Virginia in No. 6:18-cv-00070-NKM-RSB
before Senior Judge Norman K. Moon

———————————

**BRIEF OF CROSS-APPELLANT
BELVAC PRODUCTION MACHINERY, INC.**

———————————

Brian D. Schmalzbach
Brian C. Riopelle
David E. Finkelson
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
Facsimile: (804) 698-2304
bschmalzbach@mcguirewoods.com
briopelle@mcguirewoods.com
dfinkelson@mcguirewoods.com

*Counsel for Cross-Appellant*
*Belvac Production Machinery, Inc.*

## EXEMPLARY PATENT CLAIMS PURSUANT TO FED. CIR. R. 32(a)(3)

Claim 20 of the '982 Patent recites:

20. A horizontal beverage can necking machine for forming necked beverage can bodies suitable for forming a seam with a beverage can end, the assembly comprising:

> multiple horizontal necking stages adapted for necking at least 3000 beverage can bodies per minute, each necking stage being configured to rotate about a respective axis that is substantially parallel to a surface on which the necking machine is supported;

> the longitudinal centers of the adjacent necking stages forming an included angle with the longitudinal center of a transfer starwheel, measured with the longitudinal center of the transfer starwheel at the vertex, of no more than 170 degrees;

> each one of the necking stages including a main turret that includes: a main turret shaft, a main turret starwheel having plural pockets adapted for carrying can bodies, and a main gear mounted on the main turret shaft; each one of the pockets having a necking die at one end thereof and a pad on an opposing end;

> each necking die comprising:
> a throat portion having an inner surface that defines a cylinder having a throat portion diameter;
> a body portion having an inner surface that defines a cylinder having a body portion diameter; and
> a transition portion having an inner surface that smoothly transitions from the inner surface of the throat portion to the inner surface of the body portion, wherein the throat portion is larger than the body portion diameter; and

> each one of the pockets of each one of the necking stages having a first configuration in which the can body is spaced apart from the necking die and a second configuration in which the can

body is engaged with the necking die; in the first configuration the pad is spaced apart from the necking die by a first distance, in the second configuration the pad is spaced apart from the necking die by a second distance that is at least 1.5 inches less than the first distance;

whereby the throat portion inner surface is adapted for enhancing concentricity of the can body relative to the die.

Claims 1, 2, 4, 5, and 7 of the '784 Patent recite:

1. A horizontal beverage can necking machine for forming necked beverage can bodies suitable for forming a seam with a beverage can end, the assembly comprising:

multiple horizontal necking stages adapted for necking at least 3000 beverage can bodies per minute, each necking stage being configured to rotate about a respective axis that is substantially parallel to a surface on which the necking machine is supported;

the longitudinal centers of the adjacent necking stages forming an included angle with the longitudinal center of a transfer starwheel, measured with the longitudinal center of the transfer starwheel at the vertex, of no more than 170 degrees;

each one of the necking stages including a main turret that includes: a main turret shaft, a main turret starwheel having plural pockets adapted for carrying can bodies, and a main gear adapted for receiving torque to rotate the main turret shaft; each one of the pockets having a necking die at one end thereof and a pad on an opposing end;

each necking die comprising:

a throat portion having an inner surface that defines a cylinder having a throat portion diameter;

a body portion having an inner surface that defines a cylinder having a body portion diameter; and

a transition portion having an inner surface that smoothly transitions from the inner surface of the throat portion to the inner surface of the body portion, wherein the throat portion diameter is larger than the body portion diameter; and

each one of the pockets of each one of the necking stages having a first configuration in which the can body is spaced apart from the necking die and a second configuration in which the can body is engaged with the necking die; in the first configuration the pad is spaced apart from the necking die by a first distance, in the second configuration the pad is spaced apart from the necking die by a second distance that is at least 1.75 inches less than the first distance;

whereby the throat portion inner surface is adapted for enhancing concentricity of the can body relative to the die.


2. The horizontal beverage can necking machine of claim 1 wherein the longitudinal centers of the adjacent necking stages form the included angle with the longitudinal center of the transfer starwheel of no more than 120 degrees.


4. The horizontal can necking machine of claim 2, wherein the throat portion is at least 0.25 inches long.


5. The horizontal can necking machine of claim 4 wherein the included angel of no more than 120 degrees thereby increases the angular range available for necking the can body.

7. The horizontal beverage can necking machine of claim 5 wherein the necking stages are adapted for necking at least 3400 beverage can bodies per minute.

Claims 1, 7, and 8 of the '570 Patent recite:

1. A horizontal can necking machine assembly comprising: plural main turrets, each main turret including a main turret shaft, a main gear mounted proximate to an end of the main turret shaft, a pusher assembly, and a die; the main turret shaft is configured to rotate about an axis that is substantially parallel to a surface on which the assembly is Supported; the necking machine capable of necking a can body to prepare the can body for a flanging operation suitable for forming a double seam with a beverage can end;

the die including:

a throat portion having an inner surface that defines a cylinder having a first diameter,

a body portion having an inner surface that defines a cylinder having a second diameter; and

a transition portion having an inner surface that smoothly transitions from the inner surface of the throat portion to the inner surface of the body portion, wherein (i) the first diameter is larger than the second diameter, and (ii) the throat portion is at least 0.125 inches long; and

plural transfer starwheels located in an alternating relationship with the main turrets, each transfer starwheel including a transfer shaft and a transfer gear mounted proximate to an end of the transfer shaft;

the main gears and transfer gears are in meshed communication and positioned relative to each other such that lines that intersect centers of the main gear and centers of opposing transfer gears form an

included angle of less than 170 degrees, thereby increasing the angular range available for necking the can body;

wherein (i) the main turrets and transfer starwheels are capable of operating to neck and move at least 3000 cans per minute, and (ii) a stroke length between the pusher assembly and the die is at least 1.50 inches.

7. The horizontal can necking machine assembly of claim 1, wherein the main turrets and transfer starwheels are operative to neck and move approximately 3400 cans per minute.

8. The horizontal can necking machine assembly of claim 1, wherein the transfer gears have a larger diameter than the main gears.

<u>CERTIFICATE OF INTEREST</u>

Counsel for Cross-Appellant Belvac Production Machinery, Inc., Brian D. Schmalzbach, certifies the following:

1.    The full name of all entities represented by me in this case is Belvac Production Machinery, Inc.

2.    There are no other real parties in interest represented by the undersigned.

3.    All parent corporations and all publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Dover Engineered Systems, Inc.; Delaware Capital Holdings, Inc.; Delaware Capital Formation, Inc.; Dover Corporation.

4.    The names of all law firms, partners and associates that (a) appeared for the entities in the original court or agency or (b) are expected to appear in this court for the entities (not including those who have already entered an appearance in this case) are:

McGuireWoods LLP: George B. Davis; Matthew G. Rosendahl

5.    There are no other cases that will directly affect or be directly affected by this Court's decision in the pending appeal (not including the originating case number (s) for this case).

6.    This entity has no information on any Organization Victims or Bankruptcy cases.

Dated:  May 11, 2023

/s/ *Brian D. Schmalzbach*
Brian D. Schmalzbach

TABLE OF CONTENTS

Exemplary Patent Claims Pursuant to Fed. Cir. R. 32(a)(3) ........................... ii

Certificate of Interest ...................................................................... vii

Table of Contents ......................................................................... viii

Table of Authorities ........................................................................ xii

Table of Abbreviations .................................................................... xvii

Statement of Related Cases.............................................................xviii

Introduction .................................................................................. 1

Statement of the Issues ..................................................................... 4

Statement of the Case ...................................................................... 4

     I.     Relevant Technology................................................... 6
     II.    The Asserted Patents................................................... 8
     III.   Crown's Pre-Critical Date Sales Efforts ......................... 11
     IV.   Belvac's Accused TBN Machine.................................... 13
     V.    Procedural History ................................................... 16
           A. Claim Construction ............................................... 17
               1.   "Pusher Assembly" .................................. 17
               2.   "First Configuration" and
                    "Second Configuration" ........................... 18
           B. Summary Judgment on the On-Sale Bar .............. 18
           C. Trial and Post-Trial Motions.................................... 20
               1.   Crown's Post-Trial Motions...................... 21
               2.   Belvac's Post-Trial Motions ..................... 22

Jurisdictional Statement ................................................................. 23

Summary of Argument ................................................................... 23

Argument .................................................................................. 28

     I.     Substantial evidence supports the jury's verdict that Belvac
          does not infringe the '784 Patent.................................... 28
           A. Standard of Review ............................................... 28
           B. Substantial evidence established that the "multiple
               horizontal necking stages" accused by Crown of meeting

the throughput limitation, which included stage 1 and its associated dies, do not also practice the cylindrical limitation. ..................................................................28

    1. Substantial evidence confirms that the "multiple horizontal necking stages" adapted for meeting the throughput limitation included stage 1 and its associated dies. ..........................................................30

    2. Substantial evidence supports the jury's finding that the stage 1 dies in the TBN do not satisfy the limitation that each necking die have a throat-portion inner surface that "defines a cylinder." ...33

C. Crown's arguments for overturning the jury's verdict are unsupported by the law and the evidence. .........................35

    1. The use of "comprising" in the Asserted Claims did not permit Crown to ignore the non-infringing stage 1 dies. ................................................................35

    2. Crown's argument that stages 2-13 were "adapted for" meeting the throughput limitation relies on a waived construction and is unsupported by the evidence. ....................................................................39

        (a) Crown waived its belated construction of "adapted for." ...................................................39

        (b) Crown's belated construction is undermined by this Court's precedent. ................................40

        (c) The unrefuted evidence demonstrated that stages 2-13 were not "adapted for" meeting the throughput limitation. ...............................42

    3. The jury could rely on Gillest's testimony on the plain-and-ordinary meaning of "defines a cylinder" to find noninfringement. ........................44

        (a) Belvac offered expert testimony on the plain-and-ordinary meaning of "defines a cylinder." .........................................................44

        (b) Belvac's evidence on the plain-and-ordinary meaning of "defines a cylinder" did not contradict the record. ........................................47

II.    Substantial evidence supports the jury's verdict that Belvac
       does not infringe the '982 Patent. .....................................................48
  A.   The TBN does not infringe the '982 Patent for the same
       reasons it does not infringe the '784 Patent. .........................48
  B.   Substantial evidence supports the verdict that Belvac does
       not infringe the mounted limitation literally or under the
       doctrine of equivalents. ...............................................................49
       1.   Belvac does not literally infringe the mounted
            limitation. ...............................................................................49
       2.   Belvac does not infringe the mounted limitation
            under the doctrine of equivalents. ...........................50
  C.   Crown present no basis for overturning the jury's verdict
       on the '982 Patent. .......................................................................51
       1.   The jury properly relied on the plain-and-ordinary
            meaning of "mounted on" offered by Belvac's
            expert. .......................................................................................51
       2.   Belvac properly relied on a way and result of
            mounting the gears in the TBN that substantially
            differed from the way and result of mounting
            described in the '982 Patent. ....................................53
III.   The Asserted Patents are invalid under 35 U.S.C. § 102(b) ........56
  A.   The on-sale bar invalidates the Asserted Patents as a matter
       of law because the claimed invention was on sale more
       than one year before the earliest application date. ..............58
       1.   Standard of Review. ...................................................58
       2.   The District Court erred in denying Belvac's
            motion for summary judgment under the
            on-sale bar. .................................................................58
            (a)   Crown did not dispute that the invention
                  claimed by the Asserted Patents was "ready
                  for patenting" at the time of the November
                  2006 CPM Offer .................................................59
            (b)   The CPM Offer was a commercial offer for
                  sale. ....................................................................59
            (c)   The District Court violated this Court's
                  precedent by ignoring the binding substance
                  of the CPM Offer. ..............................................64

    i. The "Quotation" label does not trump the CPM Offer's binding terms.........................64

    ii. Crown's superficial reservation of the right to confirm a purchase order did not render the CPM Offer nonbinding. ........................67

   (d) The CPM Offer was made "in this country." 69

  B. The District Court erred in granting Crown's cross-motion of no invalidity under the on-sale bar. ..................................71

IV. The Asserted Claims are invalid for lack of a written description. ......................................................................74

  A. The lack of a written description invalidates the Asserted Claims as a matter of law. ........................................74

   1. There is undisputed clear and convincing evidence that the specification contained no disclosures for the asserted claimed necking configurations. ............................................................75

   2. Crown's post-trial arguments in rebuttal are not supported by substantial evidence.........................77

   (a) There is no substantial evidence that the specification discloses common features shared by all species.........................................78

   (b) There is no substantial evidence that the specification discloses a representative number of species.............................................79

   3. Evidence untethered from the specification provides no written description support. .............82

   (a) The knowledge of a POSITA cannot provide written description support without some basis in the specification...................................83

   (b) The "criticality" of the disputed feature cannot provide written description support without some basis in the specification. ........84

Conclusion...........................................................................................86

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,*
759 F.3d 1285 (Fed. Cir. 2014) ............................................................81

*ABT Sys., LLC v. Emerson Elec. Co.,*
797 F.3d 1350 (Fed. Cir. 2015) ............................................................77

*Amerine Nat'l Corp. v. Denver Feed Co.,*
493 F.2d 1275 (10th Cir. 1974) ...........................................................73

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).....................................................................58, 71

*AquaTex Indus., Inc. v. Techniche Solutions,*
479 F.3d 1320 (Fed. Cir. 2007) ............................................................54

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
598 F.3d 1336 (Fed. Cir. 2010) (en banc)................................*passim*

*Asetek Danmark A/S v. CMI USA Inc.,*
852 F.3d 1352 (Fed. Cir. 2016) ....................................................45, 52

*Atlanta Attachment Co. v. Legett & Platt, Inc.,*
516 F.3d 1361 (Fed. Cir. 2008) ....................................................63, 65

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.,*
28 F.4th 1247 (Fed. Cir. 2022).............................................................82

*Boston Sci. Scimed, Inc. v. Cordis Corp.,*
554 F.3d 982 (Fed. Cir. 2009) ..............................................................77

*Buildex Inc. v. Kason Indus., Inc.,*
849 F.2d 1461 (Fed. Cir. 1988) ....................................................63, 64

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
157 F.3d 1340 (Fed. Cir. 1998) ............................................................70

*Cannon v. Vill. of Bald Head Island,*
   891 F.3d 489 (4th Cir. 2018) ...................................................58

*In re Caveney,*
   761 F.2d 671 (Fed. Cir. 1985) ...............................................70

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB,*
   958 F.3d 1348 (Fed. Cir. 2020) ...........................................41

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.,*
   246 F.3d 1336 (Fed. Cir. 2001) ...........................................71

*Dippin Dots, Inc. v. Mosey,*
   476 F.3d 1337 (Fed. Cir. 2007) .......................................36, 37

*ePlus, Inc. v. Lawson Software, Inc.,*
   700 F.3d 509 (Fed. Cir. 2012) .............................................40

*Genentech, Inc. v. Chiron Corp.,*
   112 F.3d 495 (Fed. Cir. 1997) .......................................25, 36

*Gentry Gallery, Inc. v. Berkline Corp.,*
   134 F.3d 1473 (Fed. Cir. 1998) ...........................................82

*In re Giannelli,*
   739 F.3d 1375 (Fed. Cir. 2014) ...........................................41

*In re Global IP Holdings LLC,*
   927 F.3d 1373 (Fed. Cir. 2019) ...........................................85

*Hewlett-Packard Co. v. Mustek Sys., Inc.,*
   340 F.3d 1314 (Fed. Cir. 2003) ...........................................45

*Hockerson–Halberstadt, Inc. v. Avia Grp. Int'l, Inc.,*
   222 F.3d 951 (Fed. Cir. 2000) .............................................47

*Idenix Pharms. LLC v. Gilead Scis. Inc.,*
   941 F.3d 1149 (Fed. Cir. 2019) ...........................................81

*Intel Corp. v. USITC,*
   946 F.2d 821 (Fed. Cir. 1991) .......................................41, 42

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.,*
   751 F.3d 1327 (Fed. Cir. 2014) ........................................................28

*Joseph v. Krull Wholesale Drug Co.,*
   245 F.2d 231 (3d Cir. 1957) ............................................................73

*Junker v. Med. Components, Inc.,*
   25 F.4th 1027 (Fed. Cir. 2022) ..................................................*passim*

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.,*
   10 F.4th 1330 (Fed. Cir. 2021) ..................................................74, 84

*Linear Tech. Corp. v. Micrel, Inc.,*
   275 F.3d 1040 (Fed. Cir. 2001) ..................................................60, 63

*LizardTech, Inc. v. Earth Res. Mapping, Inc.,*
   424 F.3d 1336 (Fed. Cir. 2005) ..................................................*passim*

*In re Man Machine Interface Techs. LLC,*
   822 F.3d 1282 (Fed. Cir. 2016) ........................................................41

*Meds. Co. v. Hospira, Inc.,*
   827 F.3d 1363 (Fed. Cir. 2016) ........................................................57

*Meds. Co. v. Hospira, Inc.,*
   881 F.3d 1347 (Fed. Cir. 2018) ..................................................67, 68

*Merck & Cie v. Watson Lab'ies, Inc.,*
   822 F.3d 1347 (Fed. Cir. 2016) ........................................................59

*Moba, B.V. v. Diamond Automation, Inc.,*
   325 F.3d 1306 (Fed. Cir. 2003) ........................................................46

*Nystrom v. TREX Co.,*
   424 F.3d 1136 (Fed. Cir. 2005) ........................................................47

*Pennock v. Dailogue,*
   2 Pet. 1 (1829) ..............................................................................56

*In re Peters,*
   723 F.2d 891 (Fed. Cir. 1983) ........................................................85

*Pfaff v. Wells Elecs., Inc.,*
   525 U.S. 55 (1998)..............................................................................56, 57

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
   904 F.3d 965 (Fed. Cir. 2018)......................................................40

*R.A.C.C. Indus., Inc. v. Stun,-Tech, Inc.*
   178 F.3d 1309 (Fed. Cir. 1998)....................................................42

*Rivera v. Int'l Trade Comm.,*
   857 F.3d 1315 (Fed. Cir. 2017).........................................82, 83, 84

*S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.,*
   567 Fed. App'x 945 (Fed. Cir. 2014) (unpublished) ...................65

*Scaltech, Inc. v. Retec/Tetra, L.L.C.,*
   269 F.3d 1321 (Fed. Cir. 2001)...............................................62, 63

*Spectrum International, Inc. v. Sterilite Corp.,*
   164 F.3d 1372 (Fed. Cir. 1998)...............................................24, 37

*Stumbo v. Eastman Outdoors, Inc.,*
   508 F.3d 1358 (Fed. Cir. 2007)....................................................54

*SunTiger v. Scientific Research Funding Group,*
   189 F.3d 1327 (Fed. Cir. 1999)....................................................43

*United States v. Mallory,*
   988 F.3d 730 (4th Cir. 2021)........................................................28

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997)........................................................................53

**Statutes**

28 U.S.C. §§ 1291 and 1295(a)(1) ...............................................23

35 U.S.C. § 102(b)................................................................*passim*

35 U.S.C. § 112..............................................................................74

Pub. L. No. 112-29 § 3(n), 125 Stat. 284, 293 (2011) ........................................... 57

U.C.C. § 2-206 ........................................................................................ 68

**Other Authorities**

Corbin on Contracts (2018) .............................................................. *passim*

Fed. R. Civ. P. 50(b) ......................................................................... 23

Fed. R. Civ. P. 56(a) ..................................................................... 58, 71

Fed. R. Civ. P. 69 ............................................................................ 23

McCormick on Evidence, § 198 (8th ed. 2022) ................................... 82

Restatement (Second) of Contracts (1981) ................................ *passim*

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| '425 Patent | U.S. Patent No. 7,770,425 |
| '982 Patent | U.S. Patent No. 9,968,982 |
| '570 Patent | U.S. Patent No. 9,308,570 |
| '784 Patent | U.S. Patent No. 10,751,784 |
| '843 Patent | U.S. Patent No. 8,601,843 |
| AIA | Leahy-Smith America Invents Act of 2011 |
| Asserted Patents | Collectively, the '982 Patent and '784 Patent, with respect to infringement; and the '570, '982, and '784 Patents with respect to invalidity |
| Asserted Claims | Claims 1, 7, and 8 of the '570 Patent; Claims 20, 22, 24, and 26 of the '982 Patent; and Claim 7 of the '784 Patent |
| Belvac | Belvac Production Machinery, Inc. |
| Crown | Collectively, Crown Packaging Technology, Inc. and CarnaudMetalbox Engineering Ltd. |
| CMBE | CarnaudMetalbox Engineering Ltd. |
| CPM | Complete Packaging Machinery when used in discussion of the on-sale bar, or Cans Per Minute when used to describe throughput speeds in discussion of Belvac's noninfringement |
| CPM Offer or Offer | Crown's November 14, 2006 offer for a 3400 machine sent to Complete Packaging Machinery, Appx4724-4734. |

| 3400 | Crown's 3400 Die Necking Machine |
|------|----------------------------------|
| TBN | Belvac's THE BELVAC Necker machine |
| POSITA | Person of ordinary skill in the art |

### STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.  Counsel is aware of no case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

Crown's strategy for proving this patent infringement case was to breeze by the claim limitations that later proved critical. That strategy backfired when the jury returned a verdict of noninfringement. On appeal, Crown seeks to plug the holes left by its trial strategy, but to no avail. The jury cannot be faulted for not adopting arguments Crown never presented. And the District Court cannot be faulted for not adopting constructions Crown never proposed.

Under the Asserted Claims, the claimed beverage can necking machine assembly must comprise at least: (1) multiple necking stages "adapted for" necking at least 3,000 cans per minute (the "throughput limitation"), and (2) necking dies (the tooling used to add "necks" to the top of beverage cans) at "each" of those so-adapted stages that have a throat portion with an inner surface that "defines a cylinder" (the "cylindrical limitation").

Crown itself told the jury only that the TBN *as a whole* — including stage 1 and its associated dies — met the throughput limitation. Belvac's evidence likewise established that the TBN requires stage 1 and its associated necking dies to be "adapted for" necking at the claimed throughput speeds. Thus, based on the unrefuted evidence, the jury had to determine whether the dies

at stage 1 satisfied the cylindrical limitation.  To that end, Belvac established that the stage 1 dies required to achieve the claimed throughput speeds do not satisfy the cylindrical limitation because they have a tapered inner surface.

Crown now insists that the jury should have ignored stage 1 and found infringement with blinders on based on later stages.  That argument fails on the merits, but Crown did not even give the jury a chance to consider it.  It is waived.

Crown also accuses Belvac and the jury of impermissible claim construction.  But Crown chose *not* to request construction of key terms like the cylindrical limitation.  The consequence of that strategy is that Belvac could show—and the jury could rely upon—those terms' plain and ordinary meaning.    Crown's gamble did not pay off.    The judgment of noninfringement should be affirmed.

Invalidity is a different story.  Although Crown indisputably sent an offer to sell its 3400 necking machine that it claims embodies the Asserted Claims to a U.S. company over a year before the priority date of the Asserted Patents, the District Court granted summary judgment of no invalidity under the on-sale bar.  That decision ignored the quantity, price, delivery,

and other terms that this Court has found make an offer sufficiently definite under the on-sale bar.  Instead, the Court made dispositive the Offer's "quotation" label (even though it also calls itself an "offer") and Crown's superficial reservation of the right to confirm purchase orders.  That was error.  Crown's Offer triggered the on-sale bar as a matter of law, or at least created a genuine dispute of material fact requiring reversal of the judgment of no invalidity.

Last, the Asserted Claims are invalid for lack of a written description as a matter of law.  Although Crown sought and obtained constructions that applied to all configurations for creating contact between the can and the die during the necking process ("necking configurations"), Crown's own expert conceded that the specification of the Asserted Patents disclosed only one possible configuration for achieving the claimed throughput speeds of at least 3,000 cans-per-minute.  Belvac confirmed that the specification, figures, and even prior art disclosed by the Asserted Patents contained no reference to any other necking configurations.  Crown's only arguments in rebuttal are untethered from the specification and unsupported by the evidence adduced at trial.  This Court should remand for entry of judgment of invalidity.

3

**STATEMENT OF THE ISSUES**

1.      Whether substantial evidence supports the jury's verdict that Belvac does not infringe the Asserted Claims.

2.      Whether the Asserted Patents are invalid as a matter of law under the on-sale bar, 35 U.S.C. § 102(b), or whether there was at least a genuine dispute over the on-sale bar that precluded the District Court's grant of summary judgment to Crown.

3.      Whether the Asserted Claims are invalid for lack of a written description as a matter of law.

**STATEMENT OF THE CASE**

Since the 1980s, Belvac has been at the forefront of horizontal die necking machines, which add a tapered "neck" to the top of beverage cans. Appx2859:21-2860:24; Appx2862:9-2866:22; Appx2868:6-2870:21; Appx2901: 3-2903:5; Appx5313-5345; Appx4931-4964; Appx4966-5243.    From its perennial favorite the 595 to its latest machine THE BELVAC Necker, for decades, Belvac has continued to innovate its necking machines to address customer demands for quality and productivity.    *Id.*; *see also* Appx2905:15-2906:18; Appx2912:7-18.  As a testament to its reputation, Belvac has sold its

machines around the world, including to Crown, who for years was one of Belvac's top customers.  Appx2919:5-2921:14; Appx2169:8-13.

Seeing Belvac's success, and after entering the market quietly for several years, in 2007, Crown officially launched the 3400 necking machine. Appx2921:15-25.  Although touted as innovative, Crown developed the 3400 after analyzing—and hiring outside vendors to explain—the mechanics of Belvac's preexisting machines.   Appx2387:6-2412:23;  Appx5272-5276; Appx5247-5248;  Appx5249-5250;  Appx6318;  Appx5271;  Appx5251-5270; Appx4965; Appx5244-5246; Appx3142:11-3144:5.  Indeed, while the 3400 has a rated throughput speed of 3,400 cans-per-minute, Belvac sold higher-speed, 3,600-CPM machines for at least a decade before the 3400 launched. Appx2906:6-2907:19.

As any worthwhile competitor would do, in 2013, Belvac added a new high-speed machine, THE BELVAC Necker (TBN), to its catalog of offerings. Appx2869:9-2871:18; Appx2926:4-22.  But unlike Crown, Belvac did not simply repackage old technology—let alone copy Crown—to design its TBN machine.  Belvac started with a clean slate, designing a machine that achieved not only higher throughput speeds than the 3400, but did so using

new configurations that reduced can loss and allowed for easier maintenance.  Appx2837:8-2842:7.

Not content to simply compete with Belvac's TBN, Crown accused Belvac of copying the 3400 and the older technology on which it was based. But as Belvac already knew and the evidence confirmed, the TBN is a completely different machine from Crown's technology.  In fact, even though Crown obtained claim constructions that extended well beyond the written disclosures of the Asserted Patents to try to read those claims onto the TBN, it still failed to establish infringement.

## I.     Relevant Technology

This case relates to horizontal die necking machines that add tapered "necks" to the top of beverage cans to reduce the diameter of the can top, and thus the cost of producing the can.  Appx5369-5390.  Horizontal die necking machines operate by moving an open-ended can body through several turrets, or "stages," set along a horizontal axis:



Appx4930.  As a can body enters a stage, it moves around the "working arc" of the main turret in one of several "pockets" that contains an assembly that pushes the open end of the can and a "necking die" together.  Appx3240:8-11; Appx2840:13-2841:15.  Many machines such as Crown's 3400 move the can into a stationary necking die (shown below right), while Belvac's TBN moves the necking die onto a stationary can (shown below left), requiring that the assemblies be configured to one side.  Appx3305:2-25.



As the can engages the necking die, it enters the "throat" portion of the inside of the die (highlighted below), which guides the open end of the can along the "transition" portion to a "body" portion that has a smaller diameter than the throat.  Appx2225:9-2228:9.  The difference in diameter

between the throat portion and body portion of the necking die causes the open end of the can body (blue) to press inwards.



*Id.*  The necking dies at each stage have body portions with progressively smaller inside diameters such that the open end of the can incrementally forms a tapered "neck."  Appx2228:13-2229:10.

## II.     The Asserted Patents

Crown alleged infringement of the '982, '784, and '570 Patents.[1]  The Asserted Patents are continuations of, and share the same specification as their parent, the '843 Patent, which Crown filed as Application No. 12/109,176 on April 24, 2008.  Appx5369-5390.

---

[1] Crown does not appeal the non-infringement verdict on the '570 Patent. The '570 Patent is subject to Belvac's cross-appeal on invalidity.

The Asserted Patents are directed to "[a] horizontal multi-stage can necking machine configured for high speed operations." Appx5369. The specification's only embodiment for achieving "high speed operations" describes an assembly whereby a can is moved into a stationary necking die. The specification discloses Figure 2, which depicts a main turret having "a plurality of pockets 42." Appx5372. Each pocket in turn "has a pusher ram 30 on one side of the pocket 42 and a corresponding die 34 on the other side of the pocket 42." *Id.* The specification then explains that "the open end of the can body is brought into contact with the die 34 by the pusher ram 30…." *Id.*



FIG. 2

Appx5383. The specification also discloses a longer "stroke length"—the distance the can travels axially in each pocket—based on the position of "the pusher ram 30 *relative to* the die 34," confirming that there is a distance

between the pusher ram that pushes the can and the die that receives it.

Appx5372. As Crown's expert agreed, the specification describes only this

configuration and no others. Appx3614:13-17; Appx3616:7-16.

At trial, Crown asserted that Belvac infringed claims 1, 7, and 8 of the

'570 Patent, claims 20, 22, 24, and 26 of the '982 Patent, and claim 7 of the '784

Patent. Exemplary claim 20 of the '982 Patent recites:

> 20. **A horizontal beverage can necking machine** for forming necked beverage can bodies suitable for forming a seam with a beverage can end, **the assembly comprising**:
>
> > **multiple horizontal necking stages adapted for necking at least 3000 beverage can bodies per minute**, each necking stage being configured to rotate about a respective axis that is substantially parallel to a surface on which the necking machine is supported;
> >
> > the longitudinal centers of the adjacent necking stages forming an included angle with the longitudinal center of a transfer starwheel, measured with the longitudinal center of the transfer starwheel at the vertex, of no more than 170 degrees;
> >
> > **each one of the necking stages including a main turret that includes**: a main turret shaft, **a main turret starwheel having plural pockets adapted for carrying can bodies**, and **a main gear mounted on the main turret shaft**; **each one of the pockets having a necking die at one end thereof and a pad on an opposing end**;
> >
> > **each necking die comprising:**
> > **a throat portion having an inner surface that defines a cylinder** having a throat portion diameter;

a body portion having an inner surface that defines a cylinder having a body portion diameter; and

a transition portion having an inner surface that smoothly transitions from the inner surface of the throat portion to the inner surface of the body portion, wherein the throat portion is larger than the body portion diameter; and

each one of the pockets of each one of the necking stages having a first configuration in which the can body is spaced apart from the necking die and a second configuration in which the can body is engaged with the necking die; in the first configuration the pad is spaced apart from the necking die by a first distance, in the second configuration the pad is spaced apart from the necking die by a second distance that is at least 1.5 inches [or 1.75 inches in the '784 Patent] less than the first distance;

whereby the throat portion inner surface is adapted for enhancing concentricity of the can body relative to the die.

## III.    Crown's Pre-Critical Date Sales Efforts

Crown did not dispute on summary judgment that its 3400 necking machine embodies the alleged inventions of the Asserted Patents, including the '570 Patent.[2]  Appx4862-4876.  Although Crown officially launched the 3400 in 2007, Crown offered to sell its machine several times in the years before its official launch, including in a November 14, 2006 offer sent to U.S.-based company Complete Packaging Machinery (the CPM Offer), whom Crown identified as a customer at the time.  Appx4724-4734; Appx4763.

---

[2] In discussions of invalidity, "Asserted Patents" includes the '570 Patent.

The manufacturer of the 3400, CMBE,[3] sent the CPM Offer directly to CPM's representative and listed CPM's Colorado address on the first page. Appx4724.  The Offer outlined the price and technical specifications for the 3400 and promised delivery within 30 weeks of receiving CPM's order. Appx4724-4725; Appx4728-4729.  CMBE signed the Offer and also agreed to keep the Offer open for 60 days.  Appx4725.  The Offer instructed CPM to submit 50 percent of the purchase price with its order, with the remaining 50 percent due before shipment.  Appx4730.  CMBE included additional terms to govern the parties' relationship upon CPM's acceptance, including terms for the transfer of title and assignment of risk for damage or loss; a *force majeure* clause; terms outlining warranties; terms for the installation and testing of the 3400; and a choice-of-law provision.  Appx4730-4734.

Although CPM ultimately did not purchase the offered 3400, CMBE's representatives stated that CMBE treated purchase orders submitted in response to offers like the CPM Offer as binding.  Appx4849:16-4851:11, Appx4852:14-21.  Indeed, CMBE responded to purchase orders submitted in

---

[3] CMBE is Crown's engineering and manufacturing arm, responsible primarily for manufacturing metal packaging, including cans, as well as can-making machines like the 3400.  Appx2145:2-2147:24.

response to nearly identical offers by entering the orders in its system and beginning production before acknowledging receipt of the order with the customer. Appx4766-4847; Appx4737:12-4746:25; Appx4747:13-4752:1.

## IV. Belvac's Accused TBN Machine

Crown alleged that Belvac's TBN machine infringed the Asserted Patents. Appx1465-1493. Belvac has sold the TBN since 2013 as a high-speed necking machine rated for 3,600 CPM. Appx2926:4-22.

Depicted below, the TBN is a horizontal necking machine and includes up to thirteen stages (main turrets) on a common base. Appx2857:17-24. The can bodies move between each stage using transfer turrets. Appx2843:12-2845:21; Appx5287.



As with all die necking machines, the TBN uses necking dies to form a neck on the open end of a can body. But unlike most necking machines, including the 3400, the TBN pushes the necking dies onto a stationary can body, as shown below. Appx5346; Appx2849:9-2852:20; Appx2840:13-2841:15; Appx3305:2-3308:3. This configuration reduces the risk of can damage by eliminating the front-to-back movement of the can as it moves between stages. *Id.* It also consolidates the assemblies to one side of each pocket, reducing the weight borne along (and thus the deflection of) the shafts supporting those assemblies. *Id.*



Pertinent to this appeal, the dies at stage 1 (and sometimes stage 2) of the TBN have throat portions with a tapered inner surface, forming a conical shape, while the dies in later stages have throat portions with parallel inner surfaces, forming a cylindrical shape. Appx5312-5360; Appx855:20-2858:23;

Appx3317:24-3326:25.  The tapered throat portions of the stage 1 dies guide the open end of an un-necked can into the body portion of the dies without crushing the can, thereby preventing can waste.  *Id.*  As explained during trial, the TBN could not achieve throughput speeds of at least 3,000 CPM without tapered stage 1 dies.  *Id.*

| Stage 1 Dies in TBN | Stage 2+ Dies in TBN |
| --- | --- |



The TBN also features a cantilevered design whereby the gears are supported at only one end of the machine through a gear support hub attached to the machine base, as shown below.



Appx3310:10-3317:21; Appx5307; Appx2854:1-2855:11.  This design allows operators to more easily access the gears to change components and perform maintenance, and also reduces the weight carried by the main turret shafts, resulting in better gear alignment and reducing shaft deflection during operation. *Id.*

## V.    Procedural History

Crown sued Belvac in 2018 for allegedly infringing the '570 and '982 Patents and added allegations under the newly issued '784 Patent in 2020.

Appx1046-1069; Appx1465-1493.  After a two-week trial, a jury found that Belvac does not infringe the Asserted Claims.  Appx1-6.

## A.    Claim Construction

Crown sought construction of "pusher assembly" in claim 1 of the '570 Patent and "first configuration" and "second configuration" in claim 20 of the '982 Patent and claim 1 of the '784 Patent.  Appx4653-4657.  Crown did not seek construction of the key terms it now highlights on appeal: (1) the "mounted on" limitation in claim 20 of the '982 Patent; (2) the limitation requiring that the multiple necking stages (and their associated dies) be "adapted for" a minimum throughput speed; and (3) the limitation requiring that the inner surface of the throat portion of each necking die "define[] a cylinder," which appears in all of the Asserted Claims.  *Id.*  Nor did Crown seek constructions related to the structure of these limitations in relation to each other.  *Id.*

### 1.    "Pusher Assembly"

The District Court adopted Crown's proposed construction of "pusher assembly" in claim 1 of the '570 Patent as "assembly for pushing together the can body and the die."  Appx1447-1449.  Thus, the District Court found that "pusher assembly" could include either a can moving into a stationary

17

die, a die moving onto a stationary can, or a combination of the die and can moving together. *Id.* We refer collectively to these configurations for moving a can and die together as "necking configurations."

### 2. "First Configuration" and "Second Configuration"

The District Court also adopted Crown's proposed construction of "first configuration" and "second configuration," finding that the limitations had their plain-and-ordinary meaning and referred to the positions of the die relative to the can at the beginning and end of the assembly movement, regardless of direction. Appx1451-1454. Thus, the District Court found that the claimed configurations could include pushing a can into a die, pushing a die onto a can, or a combination of the die and can moving together. *Id.*

### B. Summary Judgment on the On-Sale Bar

Relevant here, the parties cross-moved for summary judgment under the on-sale bar.[4] Crown conceded that the Asserted Patents were "ready for patenting" at the time of the November 2006 CPM Offer and that the Offer

---

[4] Belvac moved to invalidate the Asserted Patents based on only the CPM Offer because pre-AIA § 102(b) requires that the offer be made "in this country." The AIA removed this requirement. Had AIA § 102(b) applied, according to Crown's own records, there would have been around thirteen additional invalidating offers. Appx4762-4764.

was made over a year before the earliest priority date of the Asserted Patents. Appx4862-4876. The only dispute was whether the CPM Offer was a commercial offer for sale made in this country. *Id.*

The District Court granted summary judgment to Crown of no on-sale bar. Appx4618-4621. After concluding that "the only disputed question" was whether the CPM Offer was a commercial offer for sale, the District Court found that the Offer was insufficiently definite because the terms of the Offer required CMBE's written approval of CPM's purchase order. *Id.* The District Court also relied on CMBE labeling the Offer a "quotation" or "quote" in some places (ignoring that it was labeled an "offer" in others). *Id.*

The District Court did not consider the other terms of the Offer. Those terms included specific price, quantity, delivery, and payment terms—as well as additional, nonessential terms—that this Court has found sufficient to trigger the on-sale bar. *Id.* Nor did the District Court address the evidence that CMBE treated purchase orders submitted in response to identical offers as binding *before* providing written acknowledgment of the orders to its customers. *Id.*

19

## C.    Trial and Post-Trial Motions

During the two-week trial, Belvac adduced evidence that it did not infringe the Asserted Claims because the accused "multiple horizontal necking stages" required at least stage 1 and its associated dies to operate at the claimed throughput speeds and those dies did not satisfy the cylindrical limitation.        Appx3320:16-3326:25;    Appx2856:7-2859:2;    Appx5313; Appx2290:1-18.    Belvac also showed that it did not infringe the Asserted Claims of the '982 Patent, either literally or under the doctrine of equivalents, because the main gears in the TBN were not "mounted on" the main turret shafts.    Instead, those gears were supported by gear support hubs attached to the base of the machine, which resulted in better gear alignment and reduced   shaft   deflection.      Appx3300:19-3301:7;   Appx3311:18-3317:21; Appx2853:1-2856:15; Appx5307.    Belvac also showed that the Asserted Claims lack sufficient written description support because the specification discloses only one configuration for marrying the can and the die, while the claims were construed to cover all possible configurations.  Appx3177:14-19; Appx3181:12-17;    Appx3287:8-3298:13;    Appx5347-5362;    Appx26-61; Appx5369-5390.

The jury returned a verdict that Belvac does not infringe any of the Asserted Claims and that the Asserted Claims are not invalid for lack of written description.  Appx3-6.

### 1.    Crown's Post-Trial Motions

Crown moved for judgment as a matter of law or a new trial on infringement of the '784 and '982 Patents (but not the '570 Patent). Appx3910-3912.  As at summary judgment and on appeal, Crown argued that the Asserted Claims required that only some of the necking stages contain dies with a cylindrical inner surface, and so there was infringement notwithstanding the TBN's tapered stage 1 dies.  Appx3921-3927.  Crown also contended that, even though the stage 1 dies were tapered, those dies satisfied the cylindrical limitation, despite not seeking a claim construction. Appx3927-3929.   Crown further argued that the jury could not find noninfringement of the mounted limitation in the '982 Patent based on Belvac's evidence.  Appx3929-3933.

The District Court denied Crown's motion.  Appx18.  The Court found that the Asserted Claims required that *each* of the multiple necking stages adapted for necking at least 3,000 CPM contain necking dies that met the cylindrical limitation, and that Crown had not adduced evidence showing

the TBN's stage 1 dies (needed to achieve the claimed throughput speeds) satisfied that limitation.  Appx9-12.  The District Court also found that Belvac had not offered an improper construction of "defines a cylinder," but provided an appropriate interpretation of the plain-and-ordinary meaning of the term to a POSITA at the time of the invention.  Appx12.  And the District Court found that substantial evidence likewise supported Belvac's plain-and-ordinary meaning of "mounted on" in the Asserted Claims and the jury's ultimate finding that the TBN did not infringe the '982 Patent either literally or under the doctrine of equivalents.  Appx12-15.

### 2.    Belvac's Post-Trial Motions

Belvac separately moved for judgment as a matter of law or a new trial on the issue of written description.  Appx3938-3941.  Belvac argued that the Asserted Patents lacked a written description for the Asserted Claims as construed because the parties' experts both agreed that the specification contained no description of necking configurations whereby a die moves onto a stationary can or the can and die both move together.  Appx3950-3954. The District Court denied Belvac's motion.  Appx15-16.  The Court entered judgment on the jury's verdict, and the parties appealed.  Appx19-25; Appx4017-4024; Appx4053-4056.

## JURISDICTIONAL STATEMENT

After the jury returned a verdict of noninfringement and before the District Court had entered its final judgment, Crown moved prematurely for judgment as a matter of law ("JMOL") or a new trial on infringement, contrary to the plain language of the Federal Rules requiring a separate judgment be entered before filing motions under Rules 50(b) and 69. Appx3910-3912. As a precaution, Belvac moved for JMOL or a new trial on written description before the Court's entry of a final judgment. Appx3938-3941. The District Court later denied the parties' motions and entered a final judgment. Appx18-25.

Within 28 days of the Court's entry of judgment, Belvac filed a renewed motion for JMOL or a new trial on written description, which the District Court denied. Appx4025-4046; Appx4051-4052. Belvac timely appealed from the final judgment. Appx4053-4056. This Court therefore has appellate jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 1295(a)(1).

## SUMMARY OF ARGUMENT

I.     Substantial evidence supports the jury's verdict that Belvac does not infringe the sole asserted claim of the '784 Patent (claim 7). The independent

claim on which claim 7 depends requires that the accused assembly have multiple necking stages adapted for achieving the claimed throughput speeds and that the necking dies in *each* of those so-adapted stages also satisfy the cylindrical limitation. To this end, Crown accused only the TBN as a whole—*including stage 1*—of meeting the throughput limitation. Belvac's evidence in turn confirmed that without stage 1, the remaining stages of the TBN could not achieve the required speeds. And Belvac further proved that the stage 1 dies in the TBN do not satisfy the plain-and-ordinary meaning of the unconstrued cylindrical limitation because they have an inner surface that is tapered.

Crown's reliance on the use of "comprising" in the Asserted Claims does not allow it to ignore this evidence. As this Court has found, "comprising" is not a "weasel word" with which patentees can abrogate limitations but requires that each of the limitations listed be present in the accused device. *Spectrum International, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379-80 (Fed. Cir. 1998). Claim 7 requires both multiple necking stages adapted for necking at the claimed throughput speeds and necking dies at each of those stages that practice the cylindrical limitation. The use of "comprising" in fact confirms that these elements are "essential" for

infringement. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Nor can Crown overcome this fact with its belated claim construction arguments related to the "adapted for" limitation which it failed to raise below and for which the evidence provides no support. And Crown's claims that Belvac engaged in improper claim construction are belied by the record. Belvac's expert opined on the plain-and-ordinary meaning of unconstrued claim terms, as Crown's own expert did, which the jury was free to credit in reaching its verdict.

II.     Substantial evidence also supports the jury's verdict that the TBN does not infringe the '982 Patent. The Asserted Claims of the '982 Patent require multiple necking stages adapted for the claimed throughput speeds and necking dies at each so-adapted necking stage that satisfy the cylindrical limitation. For the same reasons Belvac does not infringe the '784 Patent, Belvac does not infringe the '982 Patent.

Belvac also offered substantial evidence that the main gears in the TBN are supported by gear support hubs, not the main turret shafts, such that they are not "mounted on" the shafts as that term would be understood by a POSITA at the time of the invention. Crown's assertion that Belvac improperly construed "mounted on" is once more belied by the record. And

Crown's reliance on one dictionary definition—which the jury evidently rejected—does not undermine Belvac's interpretation of the plain-and-ordinary meaning of "mounted."

Crown's argument on the doctrine of equivalents is similarly lacking. Crown argues that Belvac improperly relied on a way and result of mounting the gears in the TBN that is not disclosed in the '982 Patent. But this is precisely what this Court has held should be expected when there is no equivalency in the accused component. Under the proper analysis, Belvac compared the ways and results for mounting gears described in the '982 Patent with the way and result for mounting the gears in the TBN, which are not substantially the same.

III.    The District Court erred in finding as a matter of law that the Asserted Patents are not invalid under the on-sale bar. It is undisputed that over a year before the priority date of the Asserted Patents, Crown sent an offer for the 3400 (which Crown contends embodies the Asserted Patents) to CPM in the United States. The CPM Offer contained all of the terms that this Court has found sufficient to create an invalidating offer, plus additional, nonessential terms that confirmed Crown's intent to form a contract. The District Court improperly ignored these terms in giving controlling weight

to the subjective labeling of the Offer as a "quotation" and one provision ostensibly reserving Crown's right to confirm purchase orders. At a minimum, the District Court erred in finding no genuine dispute of material fact despite evidence that Crown treated orders submitted in response to nearly identical offers as binding.

IV.    The Asserted Claims are also invalid as a matter of law for lack of written description. Although Crown obtained constructions that cover all possible configurations for bringing a can and die together, the uncontroverted evidence established that the specification of the Asserted Patents discloses only a configuration whereby the can is moved into a stationary die. Crown failed to adduce evidence to support its post-trial argument that the disclosure of a single species of necking configurations covers the entire genus. Crown's remaining arguments that the knowledge of a POSITA and alleged non-criticality of necking configurations in the abstract obviate the need for a written disclosure contradict this Court's precedent, which holds that knowledge and criticality merely inform how a POSITA would understand the actual disclosures of the specification. Crown's arguments untethered from the specification cannot support the jury's verdict.

27

The District Court's judgment of noninfringement should be affirmed, and this Court should enter judgment of invalidity under the on-sale bar and written description.

<u>**ARGUMENT**</u>

### I.   Substantial evidence supports the jury's verdict that Belvac does not infringe the '784 Patent.

#### A.   Standard of Review

This Court applies the law of the regional circuit in reviewing decisions to deny motions for JMOL.  *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014).  The Fourth Circuit reviews "the denial of a [JMOL] *de novo*, but reverse[s] only if substantial evidence does not support the jury's findings."  *United States v. Mallory*, 988 F.3d 730, 736 (4th Cir. 2021) (citation omitted).

#### B.   Substantial evidence established that the "multiple horizontal necking stages" accused by Crown of meeting the throughput limitation, which included stage 1 and its associated dies, do not also practice the cylindrical limitation.

As the evidence at trial established, the TBN does not infringe claim 7 of the '784 Patent (the only Asserted Claim of the patent) because the "multiple necking stages" of the TBN that Crown asserted are adapted for meeting the throughput limitation, which included stage 1, do not each

contain dies that satisfy the cylindrical limitation.  This position is supported by the plain language of the claims.

Claim 1 of the '784 Patent, on which claim 7 depends, recites, in relevant part:

> A horizontal beverage can necking machine for forming necked beverage can bodies suitable for forming a seam with a beverage can end, *the assembly comprising*:
>
> > *multiple horizontal necking stages adapted for necking at least 3000 beverage can bodies per minute*. . . .
> >
> > *each one of the necking stages including a main turret that includes*: . . . *a main turret starwheel having plural pockets* adapted for carrying can bodies . . . *each one of the pockets having a necking die* at one end thereof and a pad on an opposing end;
> >
> > *each necking die comprising*:
> >
> > *a throat portion having an inner surface that defines a cylinder* [.]

Appx61 at 7:37-59 (emphasis added).

Claim 1 thus claims a necking machine assembly "comprising" at least these elements:

1.     Multiple horizontal necking stages adapted for necking at least 3,000 (or 3,400 for claim 7) cans-per-minute (CPM) (the "throughput limitation"); and

2.     Necking dies at each of the so-adapted stages that have a throat portion with an inner surface that "defines a cylinder" (the "cylindrical limitation").

Based on the evidence adduced at trial, the jury could properly find that the "multiple horizontal necking stages" adapted for meeting the throughput limitation do not also contain dies that satisfy the cylindrical limitation such that the TBN practices claim 7.

### 1.     Substantial evidence confirms that the "multiple horizontal necking stages" adapted for meeting the throughput limitation included stage 1 and its associated dies.

First, under Crown's own theory, the jury had substantial evidence to find that the "multiple horizontal necking stages" adapted for meeting the throughput limitation included stage 1 and its associated dies. In fact, the only evidence Crown adduced from its technical expert regarding the throughput limitation (reproduced *in its entirety* below) accused the TBN as a whole—*including stage 1*—of meeting the throughput limitation:

Q.     Let's move down to the next part where in 1[b] where it says "adapted for necking at least 3000 beverage can bodies per minute." **Does THE BELVAC necker satisfy that language?**

A.     **Per specification, it's capable of 3600 so it exceeds the 3000, yes**.

> Q.    And what are you showing on the right-hand side of slide 25?
>
> A.    Some of the technical specs in the brochure from THE BELVAC necker.

Appx2522:11-19.  Crown's other evidence also confirmed that the multiple adapted stages included stage 1 and its associated dies.  Appx2531:8-2539:13; Appx3489:10-3493:12.  Crown's expert further admitted that if you used a stage 1 die in the TBN with no tapered throat surface, "you'd have high spoilage" and would "crush a lot of cans."  Appx2621:11-16.  And he admitted that he would never recommend installing dies with a non-tapered throat.  Appx2621:17-20.

Belvac's evidence confirmed that the "multiple horizontal necking stages" adapted for necking at the claimed throughput speeds included stage 1 and its associated dies.  After identifying the connection between the throughput limitation and the cylindrical limitation based on the claim language, Appx3320:1-18, Belvac's technical expert, Edmund Gillest, testified that under the Asserted Claims "you have to be able to neck 3000 cans per minute…And if you don't have a first stage that is tapered, a die that is tapered, you can't meet that requirement," Appx3317:24-3318:17.

31

Gillest confirmed that an operator of the TBN would "need stage 1…in order to neck at least 3000 [CPM]."  Appx3320:16-18; Appx3324:21-3325:10.  And he opined that if an operator removed stage 1 from the TBN and ran the machine starting with stage 2—*i.e.*, if the "multiple horizontal necking stages" did not include stage 1—that "the TBN would not be capable of necking at least 3000 [CPM]."  Appx3326:4-12.

Besides Gillest, the jury also heard testimony from Belvac's chief engineer on the TBN project, Harold Marshall.  Appx2835:10-14, Appx2837:8-2838:4.  Marshall testified that the reason the TBN's stage 1 dies have a tapered throat portion is because when an un-necked can enters stage 1 of the TBN, the open end has an oval shape which means that the stage 1 dies must have a taper "to help aid in the loading process when the die comes over the can."  Appx2856:7-16; *see also* Appx2856:25-2857:16 (testifying that every TBN stage 1 die has a taper); Appx5312.  And Marshall confirmed that the TBN could *not* neck at least 3,000 CPM without tapered stage 1 dies.  Appx2858:16-2859:2.

On this record, the jury could conclude that the multiple stages adapted for necking at the claimed throughput speeds included stage 1 and its associated dies, and, conversely, that stages 2 through 13 of the TBN,

alone, are not "adapted for necking at least 3000 [or 3400] beverage can bodies per minute."

> **2.    Substantial evidence supports the jury's finding that the stage 1 dies in the TBN do not satisfy the limitation that each necking die have a throat-portion inner surface that "defines a cylinder."**

With substantial evidence that the "multiple horizontal necking stages" adapted for necking at the claimed throughput speeds included stage 1, under the language of the claims, the jury needed to determine whether the dies at stage 1 of the TBN also met the cylindrical limitation.  On that question, substantial evidence likewise supported the jury's verdict.

Gillest opined that all stage 1 dies in the TBN have throat portions with an inner surface that has a two-to-three-degree taper, using a diagram of the stage 1 dies (shown below) to demonstrate the tapering to the jury. Appx3320:22-3321:18; Appx5312.




Gillest then explained that a POSITA at the time of the invention would have understood "defines a cylinder" to require that an inner surface of the throat portion be cylindrical. Appx3321:19-3324:12. Gillest opined that a POSITA would understand cylindrical to mean that the inner surface of the throat portion has "straight parallel [side] walls…on the entire surface," citing as support his experience in the industry and the definition of "cylinder" from the time of the invention. Appx3322:25-3323:18; Appx3324:3-6.

Gillest then explained that the inner surface of the throat portion in the stage 1 dies is known technically as a conical shape, which does not "define a cylinder" as the claims require. Appx3323:19-3324:12. Based on a comparison of the tapered inner surface of the TBN stage 1 dies to the plain meaning of "defines a cylinder," Gillest concluded that the TBN stage 1 dies do not have a throat-portion inner surface that defines a cylinder and thus do not satisfy the cylindrical limitation. Appx3325:20-23; Appx3326:15-25. Marshall also testified that the stage 1 dies on the TBN have a "tapered throat," while the throat portion of the dies on other stages are "cylindrical." Appx2856:10-18; Appx2857:17-2858:13; Appx5312-5313.

Together, this testimony and the supporting documents provided substantial evidence for the jury to conclude that the TBN stage 1 dies do not

satisfy the cylindrical limitation, and that the TBN thus does not infringe claim 7.  The District Court properly credited this evidence in denying Crown's JMOL motion.  Appx9-12.  The District Court's judgment that Belvac does not infringe claim 7 of the '784 Patent should thus be affirmed.

### C. Crown's arguments for overturning the jury's verdict are unsupported by the law and the evidence.

#### 1. The use of "comprising" in the Asserted Claims did not permit Crown to ignore the non-infringing stage 1 dies.

Crown argues that the jury improperly relied on the existence of tapered stage 1 dies in the TBN that do not practice the cylindrical limitation to find noninfringement of claim 7.  Opening Br. ("Br.") at 32-42.  Crown contends that because claim 1 on which claim 7 depends uses the transition phrase "comprising" before introducing the claim elements, the existence of stages without dies that satisfy the cylindrical limitation is irrelevant.  *Id.*

Crown's argument ignores the plain language and structure of claim 1, as well as this Court's precedent on "comprising" limitations.  As detailed above, that claim recites an "assembly comprising," in relevant part: (1) "multiple horizontal necking stages adapted for necking at least 3000 beverage can bodies per minute"; and (2) necking dies at each of the so-adapted necking stages further "comprising…a throat portion having an

35

inner surface that defines a cylinder having a throat portion diameter[.]" Appx61 at 7:37-59. Because the word "comprising" appears before these elements, to infringe, the accused assembly must comprise "multiple horizontal necking stages" that satisfy the throughput limitation and dies at each of those stages that satisfy the cylindrical limitation. *Genentech, Inc.*, 112 F.3d at 501 (stating elements following "comprising" are "essential").[5]

This reading follows this Court's precedent on "comprising" limitations. For example, in *Dippin Dots, Inc. v. Mosey*, this Court considered claims directed to a process for creating and storing ice-cream "beads." 476 F.3d 1337, 1342-43 (Fed. Cir. 2007). Because the district court had construed "beads" to require that the claimed process produce spherical droplets, that court found the claims could not cover the accused process that created both spheres and irregular particles. *Id.* In affirming that conclusion, this Court rejected the patentee's argument that the use of "comprising" before naming

---

[5] To be clear, Belvac did not argue that the claims must read on the TBN as a whole, including stage 1, because of the comprising language. Instead, Crown asserted, and Belvac confirmed, that the accused necking "assembly" comprised multiple necking stages inclusive of stage 1 to meet the throughput limitation. Based on the language of the claims, those stages must therefore also include dies that meet the cylindrical limitation. The use of "comprising" does not allow Crown to avoid this fact.

the process steps meant that the creation of noninfringing particles was irrelevant. *Id.* This Court explained that "[t]he presumption raised by the term 'comprising' does not reach into each of the [claimed] steps to render every word and phrase therein open-ended." *Id.* Thus, while the claimed process could include additional, unclaimed steps that produce spherical beads, the patentee could not avoid the requirement that the process produce only spherical "beads," as recited by the claims. *Id.*

Similarly, in *Spectrum Int'l, Inc.*, this Court considered claims directed to stackable crates "comprising" a bottom side that merged with the bottom of the crate's front wall. 164 F.3d at 1375-77. The district court found that the accused crate did not literally infringe because the bottom side merged with the top of the front wall, contrary to the claim language. *Id.* at 1375. On appeal, the patentee argued that the use of "comprising" to describe the elements of the claimed crate meant that the claims should be read to cover crates in which the bottom merges with the top of the front wall. *Id.* at 1376. In rejecting this argument, this Court found that "comprising" could not be used to "alter[] the scope of the particular claim at issue" or as a "weasel word with which to abrogate claim limitations." *Id.* at 1379-80. Because the patentee could not show that the claims could otherwise be construed to

apply to the accused crate, this Court affirmed the finding of noninfringement. *Id.*

As in those cases, the jury had to consider whether Crown had shown that each of the claim elements after "comprising" existed in the TBN. Accordingly, the District Court properly found that the jury could consider both (a) whether the claimed multiple necking stages "adapted for" necking at the claimed throughput speeds necessarily included stage 1 and its associated necking dies, and (b) if so, whether the stage 1 dies satisfy the cylindrical limitation.

Crown's argument that the District Court improperly framed these questions as asking whether stage 1 was "essential" to operating the TBN mischaracterizes the record. Belvac did not argue, and the District Court did not find, that there could be no infringement if the stage 1 dies were "essential" to the TBN's operation *as a machine*. Instead, the Court found that the jury could find noninfringement based on evidence that the accused "multiple horizontal necking stages" necessarily included stage 1 for purposes of the throughput limitation and that the dies at stage 1 did not satisfy the cylindrical limitation. Appx4595-4597. In other words, because a stage "essential" to meeting one limitation (the throughput limitation) did

38

not satisfy other limitations (the cylindrical limitation), there was no infringement.

> **2.    Crown's argument that stages 2-13 were "adapted for" meeting the throughput limitation relies on a waived construction and is unsupported by the evidence.**

Crown alternatively argues that stages 2-13 of the TBN were nonetheless "adapted for" necking at the claimed throughput speeds such that they alone infringed.  Br. 41 n.6.  Crown argues that "adapted for" merely requires that stages 2-13 be "capable of" the claimed throughput speeds, regardless of stage 1.  *Id.*  This argument fails for at least three reasons.

> **(a)    Crown waived its belated construction of "adapted for."**

First, Crown has waived its right to rely on its proposed construction of "adapted for" to challenge the jury's verdict.  Although Crown now argues the jury should have concluded that stages 2-13 are "adapted for" necking at the claimed throughput speeds because they are "capable of" those speeds when combined with stage 1, Crown sought no constructions related to "adapted for," let alone a construction that would support its belated "capable of" meaning.  Appx4630-4661.  Nor did Crown seek construction of "adapted for" at any point before the jury's verdict.

Accordingly, Crown waived any right to rely on its belated construction post-trial.

"It is well-settled that a party cannot reserve a new claim-construction argument for the post-trial motion stage of litigation." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 974 (Fed. Cir. 2018). Instead, if Crown wanted a construction of "adapted for" that allowed for consideration of only stages 2-13, it "could (and should) have sought a construction to that effect." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012). By failing to raise its proposed construction until now, Crown waived the right to rely on that construction to challenge the jury's verdict. *Id.*; *Power Integrations*, 904 F.3d at 974. So the jury was free to apply the plain-and-ordinary meaning of the unconstrued "adapted for" limitation based on the evidence.

### (b)    Crown's belated construction is undermined by this Court's precedent.

Second, even if Crown had not waived its proposed construction, this Court's precedent contradicts that construction. This Court has consistently found that the plain-and-ordinary meaning of "adapted to/for" means "made to," "designed to," or "configured to" when a patent claim refers to

40

structural elements that are defined by the function they perform.  *See, e.g.,*

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1356 (Fed.

Cir. 2020) (claim requiring frequencies in hearing aid that are "adapted to"

transmit vibrations in the skull required frequencies that were "designed to"

achieve claimed transmission); *In re Man Machine Interface Techs. LLC*, 822

F.3d 1282, 1286 (Fed. Cir. 2016) (claim requiring "thumb switch being

adapted for activation by a human thumb" required switch to be configured

to thumb activation); *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014)

(claim requiring a "first handle portion adapted to be moved…by a pulling

force" required handle to be "designed/configured to" movement by

pulling force).  Here, as in those cases, the '784 Patent describes structural

elements (*i.e.*, "horizontal necking stages") that are defined by the function

they perform (*i.e.*, achieving throughput speeds of at least 3,000 CPM).  This

Court's precedent requires those stages be "designed/configured to"

achieve those speeds.

Crown fails to support its proposed construction of "adapted for."

Crown relies on *Intel Corp. v. USITC*, which found that the accused device

need only be *capable* of performing in a specific mode because of claim

language not present here:  the claims required only that the device be

"programm*able*" to that mode.  946 F.2d 821, 832 (Fed. Cir. 1991) (emphasis

supplied).  Thus, "actual page mode operation in the accused device is not

required."  *Id.  R.A.C.C. Indus., Inc. v. Stun-Tech, Inc.* likewise affirmed

construction of a claim directed to a prisoner restraint belt that was "capable

of concealment" and "conceal*able* beneath said appropriate clothing" as

requiring only that the restraint be "capable of" concealment.  178 F.3d 1309,

*4 (Fed. Cir. 1998) (emphasis added).  The Asserted Claims here, by contrast,

require that the claimed stages be "adapted for" specific throughput speeds.

Even if the Court were to reach the issue, the plain-and-ordinary meaning

urged by Belvac comports with this Court's precedent.

> **(c)    The unrefuted evidence demonstrated that stages 2-13 were not "adapted for" meeting the throughput limitation.**

Finally, the evidence introduced by the parties, including Crown,

established that stages 2-13 were not "adapted for" meeting the throughput

limitation.

Belvac adduced evidence that to be configured to achieve the claimed

throughput speeds, the TBN required stage 1 and its dies.  Appx3317:24-

3318:17; Appx3320:1-18; Appx3324:21-3325:10; Appx3326:4-12; Appx2856:7-

16; Appx2856:25-2857:16; Appx2858:16-2859:2; Appx5312.  Crown did not

refute this evidence. Nor did it offer an alternative interpretation of "adapted for" that the jury could credit. In fact, Crown, who bore the burden of proof, affirmatively relied on *the TBN as a whole (including stage 1)* to establish infringement. Appx2522:11-19. Crown at no point offered evidence that stages 2-13, alone, were adapted for the throughput limitation. Crown also relied on the theory that the stage 1 dies literally infringed the cylindrical limitation, without arguing that the jury could ignore stage 1 or addressing whether stages 2-13 of the TBN would nonetheless also infringe. Appx2531:8-2539:13. By its own choice, Crown adduced evidence that the TBN could infringe only if the "multiple horizontal necking stages" included stage 1 and its associated necking dies.

For this reason, Crown's reliance on *SunTiger v. Scientific Research Funding Group* is misplaced. 189 F.3d 1327, 1329 (Fed. Cir. 1999). There, the patentee adduced evidence that a portion of the accused lens met all the claim limitations. *Id.* at 1331. Because the evidence showed that at least part of the accused device infringed, the existence of other, noninfringing elements was irrelevant. *Id.* at 1336. Here, on the other hand, Crown adduced no evidence that stages 2-13 of the TBN infringed regardless of stage 1, so there was no basis for the jury to ignore stage 1 and its dies.

43

**3.    The jury could rely on Gillest's testimony on the plain-and-ordinary meaning of "defines a cylinder" to find noninfringement.**

Recognizing that Belvac adduced substantial (and unrefuted) evidence that stage 1 and its associated dies are necessary to meet the throughput limitation, Crown resorts to mischaracterizing Belvac's testimony on the plain-and-ordinary meaning of "defines a cylinder" as improper claim construction.  Br. 43-47.  Crown also contends that the evidence contradicts Belvac's interpretation of the cylindrical limitation.  Br. 47-49.  The record belies these arguments.

**(a)    Belvac offered expert testimony on the plain-and-ordinary meaning of "defines a cylinder."**

Contrary to Crown's characterization, Belvac solicited testimony from its expert that a POSITA at the time of the invention would have understood the cylindrical limitation to require that the throat portion of each necking die have an inner surface that has "straight parallel [side] walls," meaning the inner surface is "cylindrical."  Appx3321:19-3324:12.  Gillest based this opinion on his experience in the relevant field of art and the dictionary definition of "cylinder" at the time of the invention.  Appx3322:25-3323:18; Appx3324:3-6.

Because there was no construction of the cylindrical limitation, Gillest could offer his opinion on the plain-and-ordinary meaning of the limitation, just as Crown's expert did, and the jury could rely on Gillest's opinion to reach its verdict. *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1359-60 (Fed. Cir. 2016) (holding jury could determine the "plain meaning" of an unconstrued claim term). In fact, "it is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation," as Crown attempts to do here. *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320-21 (Fed. Cir. 2003). Simply put, Gillest offered a competing opinion on the plain-and-ordinary meaning of the cylindrical limitation, and the jury properly credited Gillest's opinion.

Crown's attempt to recast Gillest's testimony as redefining "defines a cylinder" as "is a cylinder" is unavailing. Crown relies on a single line of testimony asking Gillest on cross-examination whether he "thought" the claims said "the die throat is a cylinder." Appx3491:12-17; Appx3492:4-9. Gillest responded affirmatively, consistent with his opinion that a POSITA would have understood "defines a cylinder" to require that the throat portion of each die have an inner surface that is cylindrical. Appx3321:19-

3324:12.   Gillest was not offering a new construction of the cylindrical limitation, but interpreting the plain meaning of that limitation from the contemporaneous perspective of a POSITA.

Crown's reliance on *Moba, B.V. v. Diamond Automation, Inc.*, is misplaced.   325 F.3d 1306 (Fed. Cir. 2003).   In that case, the district court instructed the jury on the "steps" involved in the claimed "guiding steps" but allowed the jury to determine whether the steps had to be performed sequentially. *Id.* at 1313.   This Court found that the district court's failure to instruct the jury on whether the claimed steps must be performed sequentially allowed the jury to include an additional limitation (sequentiality) that was not present in the claims. *Id.*  This, the Court found, amounted to an improper claim construction by the jury. *Id.*

Here, on the other hand, the jury did not need to apply additional limitations to determine infringement; it could simply credit Belvac's evidence that "defines a cylinder" would be understood by a POSITA at the time of the invention as requiring that the throat portion have a cylindrical inner surface.   Appx3321:19-3324:12.   Crown's subjective disagreement with this evidence is not a basis to reverse the jury's decision.

**(b)    Belvac's evidence on the plain-and-ordinary meaning of "defines a cylinder" did not contradict the record.**

Nor did Gillest's opinion on the plain-and-ordinary meaning of the cylindrical limitation conflict with the other evidence presented at trial, as Crown asserts.  Although Crown argues Belvac's position contradicts Figure 6B of the specification, the Asserted Patents do not themselves describe Figure 6B as showing a tapered die.  *See* Appx60 at 5:46-55.  The jury was certainly not required to rely on Figure 6B, the proportions of which are not indicated in the specification, to define the scope of the claims.  *Hockerson–Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000); *see also Nystrom v. TREX Co. Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005) ("arguments based on drawings not explicitly made to scale in issued patents are unavailing").  And even if Figure 6B showed a tapered die, Crown did not object to the District Court's instruction that "*[o]nly the claims of the patent* can be infringed. Neither the written description, nor the drawings of a patent can be infringed." *See* Appx3676.  At best, Figure 6B was one factor that the jury could consider in deciding the plain-and-ordinary meaning of the cylindrical limitation.

Likewise, although Crown argues that every necking machine, including the 3400, has tapered stage 1 dies, it presented no evidence that either (a) all necking machines have tapered stage 1 dies, or (b) the 3400's stage 1 dies satisfy the cylindrical limitation.  In fact, the sole drawing of a 3400 stage 1 die in evidence includes an "inner surface" that appears to be flat, as shown by the portion labeled ".100 FLAT," which Crown did not refute.  Appx4061.  There was therefore no evidence on which the jury could reach the conclusion Crown now asks this Court to find is the only reasonable one.

## II.    Substantial evidence supports the jury's verdict that Belvac does not infringe the '982 Patent.

Crown's arguments to reverse the jury's verdict that Belvac does not infringe the Asserted Claims of the '982 Patent also lack merit.

### A.    The TBN does not infringe the '982 Patent for the same reasons it does not infringe the '784 Patent.

Like claim 7 of the '784 Patent, the '982 Claims require "multiple horizontal necking stages adapted for necking" at the claimed throughput speeds, and that "each one of the necking stages" contain necking dies that satisfy the cylindrical limitation.  Appx43:39-10:12.  Based on this identical language, as detailed above, Belvac adduced substantial evidence that: (1)

the stage 1 dies in the TBN do not satisfy the cylindrical limitation (Appx3320:22-3324:12; Appx3325:20-23; Appx3326:15-25; Appx2856:10-18; Appx2857:17-2858:13; Appx2290:1-18; Appx5312-5313); and, (2) stage 1 and its dies are required to satisfy the throughput limitation (Appx3317:24-3318:17; Appx3320:1-18; Appx3324:21-3325:10; Appx3326:4-12; Appx2856:7-16; Appx2856:25-2857:16; Appx2858:16-2859:2; Appx5312).  Just as with the '784 Patent, therefore, the jury could rely on this evidence to find noninfringement of the '982 Claims.

### B.     Substantial evidence supports the verdict that Belvac does not infringe the mounted limitation literally or under the doctrine of equivalents.

Substantial evidence supports the jury's verdict on the '982 Claims for the independent reason that Belvac does not infringe, either literally or under the doctrine of equivalents, the limitation requiring that the main gear of each necking stage be "mounted on the main turret shaft" (the "mounted limitation").  Appx43 at 10:7.

### 1.     Belvac does not literally infringe the mounted limitation.

After opining on the plain-and-ordinary meaning of "mounted on," Gillest demonstrated to the jury that in the TBN, the main gear is not mounted on the main turret shaft but on a gear support hub, which supports

the main gear's weight and is part of the base of the machine.  Appx3300:19-3301:7; Appx3312:21-3314:16.  Based on this comparison of the TBN to the claim language, Gillest concluded that the TBN does not literally infringe the mounted limitation.  Appx3314:17-21; Appx3300:19-3301:7.

The jury also heard from Marshall that in the TBN, "[the gear support] hub…is what supports the weight of the gears."  Appx2853:1-25.  The jury saw how the gears are mounted in the TBN using a cut-away view of the shaft assembly, which depicts the gear support hub as part of the machine base.  Appx2854:1-21; Appx2855:12-15 (discussing Appx5307).  Marshall confirmed that the shaft does not support the weight of the main gear in the TBN, and that an operator can even remove the shaft without removing the gear.  Appx2854:22-2855:15.

Based on this evidence, the jury could reasonably conclude that the TBN does not literally infringe the mounted limitation.

### 2. Belvac does not infringe the mounted limitation under the doctrine of equivalents.

Belvac likewise adduced substantial evidence that the TBN does not infringe the mounted limitation by use of an equivalent component.  Gillest opined that while the '982 Claims describe main gears mounted directly on

the main turret shaft, the TBN's gears are mounted on a gear support hub,
giving the TBN "much better gear alignment" and avoiding "shaft
deflection."    Appx3316:22-3317:21.    Marshall also testified that Belvac
intentionally changed the design of the TBN's gear mounts to avoid
deflection of the shaft caused by the gears' weight.  Appx2853:1-2855:15;
Appx5307.  The TBN therefore uses a different way—mounting the gears on
a gear support hub—to achieve a different result—creating better gear
alignment and avoiding shaft deflection—than the way and result described
in the '982 Patent.    The jury could rely on this evidence to find
noninfringement under the doctrine of equivalents.

### C.    Crown present no basis for overturning the jury's verdict on the '982 Patent.

#### 1.    The jury properly relied on the plain-and-ordinary meaning of "mounted on" offered by Belvac's expert.

Crown argues that Belvac offered an improper construction of
"mounted on" beyond its plain-and-ordinary meaning.  Br. 51-54.  But
Belvac simply offered evidence of how a POSITA at the time of the invention
would interpret the unconstrued claim language.

Gillest explained that a POSITA at the time of the invention would
understand "mounted on" to mean that the main turret shaft "must support

the weight of the gear." Appx3310:23-3311:17. Gillest did not "change the meaning" of "mounted on," as Crown contends, but explained that his opinion was based on the perspective of a POSITA using his experience in the field, a contemporaneous definition of "mounted," manuals and drawings, discussions with Belvac engineers, and the specification of the '982 Patent. Appx3311:18-3312:1. The jury could credit this testimony in applying the plain meaning of the unconstrued mounted limitation. *Asetek*, 852 F.3d at 1359-60.

Crown contends that Gillest's testimony on the plain meaning of "mounted" is untenable because being "attached to a support" was not the "exclusive" definition of "mounted" in the dictionary definition introduced by Belvac. Br. 52 (citing Appx3485). But Crown ignores that Gillest did not rely solely on this definition to opine on the plain-and-ordinary meaning of "mounted on." Appx3311:18-3312:1. In any case, Crown made the same argument to the jury that it now raises here. Appx3485:14-3486:8. The jury rightly rejected that argument using its own common sense and the other evidence adduced by Belvac, as it was instructed to do without Crown's objection. Appx3670.

52

The jury thus could rely on Gillest's testimony regarding the plain meaning of "mounted on" in deciding that the TBN does not infringe the unconstrued mounted limitation.

### 2. Belvac properly relied on a way and result of mounting the gears in the TBN that substantially differed from the way and result of mounting described in the '982 Patent.

Crown argues that Belvac improperly relied on a function, way, and result for the TBN that is not supported by the claims or specification of the '982 Patent. Br. 54-57. That argument turns the doctrine of equivalents on its head. Only the function, way, and result of *the claim limitation* must be grounded in the disclosure of the patent-in-suit. There is no requirement that the function, way, or result achieved by *the relevant component(s) in the accused product* also be grounded in the same disclosure.

The doctrine of equivalents asks, for each relevant claim element, "whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Thus, as with a literal infringement analysis, the relevant comparison under the doctrine of equivalents is of the patent claims—the function, way, and result of the claim limitation described in the

patent—to the accused component—the function, way, and result of the accused component—and only the former inquiry requires consideration of the specification. In fact, this Court has found that a patent will "naturally be silent" when, as here, the accused device has a different function, way, or result. *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364-65 (Fed. Cir. 2007) (further rejecting argument that a patent's silence "makes this [extrinsic] evidence [of the accused device's function-way-result] irrelevant").

Crown's reliance on *AquaTex Indus., Inc. v. Techniche Solutions* does not alter this analysis. There, this Court faulted the district court for adopting a function, way, and result of *the disputed claim limitation* using "information taken from Plaintiff's website" that described the patentee's product. Instead, the district court should have used descriptions of the limitation's function, way, and result in the claims and specification. 479 F.3d 1320, 1327-28 (Fed. Cir. 2007). It was the district court's reliance on the *patentee's product* to determine the function, way, and result of *the claim limitation* that resulted in error. The error was not (as Crown contends) the reliance on extrinsic evidence to inform the function, way, and result of the accused component.

Consistent with this Court's precedent, Gillest opined that while the '982 Claims describe main gears mounted directly on the main turret shaft, the TBN's gears are mounted on a gear support hub, giving the TBN "much better gear alignment" and avoiding "shaft deflection." Appx3314:22-3317:21. This opinion was supported by other evidence. Appx2853:1-2855:15; Appx5307.

Additionally, Gillest's explanation of how the mounted limitation is described in the '982 Patent was based on the language of the patent's claims and specification, both of which describe and depict main gears mounted on the main turret shaft. *See* Appx30; Appx39 at 2:57-60. Consistent with these descriptions, Gillest explained to the jury that the '982 Patent describes a way of attaching the gears to the shaft (*i.e.*, direct mounting) that was different and did not accomplish the same results as the way of attaching the gears in the TBN (*i.e.*, mounting on a gear support hub). Appx3311:24-3312:15. Gillest therefore properly considered and compared the claim limitation with the accused component in the TBN, and his opinion provided substantial evidence to support the jury's verdict.[6]

---

[6] Even under Crown's errant argument, the '982 Patent provides intrinsic support for the importance of the result achieved by the non-infringing

***

Because substantial evidence supports the jury's verdict on infringement, the District Court's judgment of noninfringement should be affirmed.

## III.    The Asserted Patents are invalid under 35 U.S.C. § 102(b).

American law has long considered the "voluntary act or acquiescence in the public sale and use" of an invention as the "abandonment of [the inventor's] right [to a monopoly of that invention]."  *Pennock v. Dailogue*, 2 Pet. 1, 24 (1829).  This is because inventors would be allowed to improperly extend their monopoly over an invention if they could first commercialize and promote it before filing for patent protection.  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 64-65 (1998).  To discourage extended monopolization of ideas, since the 1800s, Congress has enacted an "on-sale bar" to invalidate patents

---

mounting arrangement of the TBN.  For example, the specification describes the importance of gear alignment to the functioning of the invention. Appx42 at 7:12-16 ("Even a small freewheeling effect in which a driven gear loses contact with its driving gear could introduce variation in rotational speed…or misalignment as the gear during operation would not be in its designed position during its rotation.").

whose inventions have been on sale for more than a specified period before the patent application is filed. *Id.*

Under the pre-AIA on-sale bar, a patent claim is invalid if "'the invention was…on sale in this country, more than one year prior to the date of the application for patent in the United States.'"[7]  *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1032 (Fed. Cir. 2022).  The "on-sale bar is triggered if, before the critical date, the claimed invention was both (1) the subject of a commercial offer for sale and (2) ready for patenting." *Id.* (citing *Pfaff,* 525 U.S. at 67-68).  "Whether the on-sale bar applies is a question of law based on underlying factual findings." *Meds. Co. v. Hospira, Inc.* (*Medicines I*), 827 F.3d 1363, 1371 (Fed. Cir. 2016).

Here, the undisputed evidence established both elements as a matter of law, and the District Court's denial of Belvac's motion for summary judgment under the on-sale bar should be reversed. *See Junker*, 25 F.4th at 1035 (reversing judgment on cross-motions in same posture).  At a

---

[7] The parties do not dispute that the pre-AIA on-sale bar applies to the Asserted Claims because the applications for the Asserted Patents were filed before March 16, 2013. *See* Pub. L. No. 112-29 § 3(n), 125 Stat. 284, 293 (2011).

minimum, the grant of summary judgment to Crown should be reversed, and the case should be remanded for further proceedings.

### A. The on-sale bar invalidates the Asserted Patents as a matter of law because the claimed invention was on sale more than one year before the earliest application date.

#### 1. Standard of Review.

This Court reviews summary judgment decisions under the law of the regional circuit. *Id.* at 1032. The Fourth Circuit reviews the grant or denial of summary judgment *de novo* under the same legal standards as the district court. *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, "there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

#### 2. The District Court erred in denying Belvac's motion for summary judgment under the on-sale bar.

The District Court erred in denying Belvac's motion for summary judgment that the Asserted Patents are invalid under the on-sale bar, because each relevant factor was satisfied as a matter of law.

**(a)    Crown did not dispute that the invention claimed by the Asserted Patents was "ready for patenting" at the time of the November 2006 CPM Offer.**

Crown does not dispute that the Asserted Patents were "ready for patenting" at the time of the CPM Offer, because, according to Crown, the offered 3400 reduced to practice the claims of the Asserted Patents. Appx4862-4863.

**(b)    The CPM Offer was a commercial offer for sale.**

The undisputed facts also establish that the CPM Offer was a commercial offer for sale.   Whether a communication constitutes a commercial offer for sale is based on the facts of each case "'apply[ing] traditional contract law principles.'"  *Junker*, 25 F.4th at 1032 (quoting *Merck & Cie v. Watson Lab'ies, Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016)).  Among the factors courts should consider in determining whether a communication is a commercial offer are "'the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom a communication is addressed.'"  *Id.* at 1033 (quoting Restatement (Second) of Contracts ("Restatement") § 26 cmt. c (1981)).[8]

---

[8] Treatises like Corbin on Contracts ("Corbin") and the Restatement provide the "traditional contract law principles" that guide the on-sale bar analysis.  *Junker*, 25 F.4th at 1032-33.

59

Applying these factors, this Court has found that communications addressed to a specific recipient that contain sufficiently definite terms regarding the proposed sales transaction constitute a commercial offer for sale. For example, in *Junker*, this Court held that a letter addressed directly to the offeree specifying the conditions of delivery, manner of shipment ("FOB Athens, Texas"), and payment terms, as well as purchase options, constituted a commercial offer, even though the letter omitted certain product specifications and quantity terms. *Junker*, 25 F.4th at 1033-34. Likewise, in *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, this Court applied the on-sale bar when the disputed offer was directed to a single recipient and contained terms governing "price, method of payment, and method of delivery," even though the offer ostensibly required the offeror's written acceptance of orders. 855 F.3d 1356, 1364-65 (Fed. Cir. 2017). And this Court has found an offer sufficiently definite based on the existence of quantity terms and a product description, alone, even without price terms. *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1052 (Fed. Cir. 2001).

The CPM Offer easily qualifies by comparison. First, the Offer specifically targeted an active buyer. CMBE sent the Offer to CPM—and only CPM—on November 14, 2006. Appx4724; Appx4722. The Offer also

listed CPM's Colorado address on the first page, and the email sending the Offer even proposed selling additional tooling to CPM once it became available. Appx4722. And CMBE listed CPM as a customer at the time of the Offer. Appx4763.

The terms of the Offer were amply definite for a sales contract. For one, the Offer included the minimum product description and quantity terms that this Court has found sufficient. Appx4728. As in *Junker* and *Helsinn*, the Offer also included price ($2,764,200.00) and delivery terms, stating that delivery would be "FCA (Shipley/Our Packers)," meaning CMBE would ship the 3400 to a specified destination or its own plant in Shipley, England. *See* Appx4724; *see also* Appx4725 (stating 3400 would be "packed, ready for despatch 30 weeks from receipt of order"); Appx4731 ("delivery shall be at [CPM's] nominated point of delivery," or if no point is nominated, at "[CMBE's] premises"). And although not required, the Offer provided terms for payment, explaining that 50 percent of the purchase price would be due with CPM's order, while the remaining amount would be due before shipment. Appx4730.

CMBE went well beyond the minimum showing of intent. For example, the CPM Offer included terms controlling the assignment of risk,

61

transfer of title, and acceptable performance; a *force majeure* clause; terms outlining the warranties Crown would provide; terms for the installation and testing of the 3400; and a clause selecting English law to govern the parties' agreement. Appx4730-4732. To confirm Crown's willingness to be bound, CMBE's sales manager signed the Offer and also provided a 60-day window during which CMBE would consider the Offer valid and binding. Appx4725. CMBE also agreed to "proceed with manufacture [of the offered 3400] immediately upon receipt of an order" and requested information from CPM to do so. Appx4725. And the Offer stated that the above terms "shall override any conflicting terms in [CPM's] order." Appx4731. Those additional terms confirm CMBE's intent to enter a sales contract. *See, e.g.*, *Junker*, 25 F.4th at 1033 (letter allocating "the risks and responsibilities of the buyer and seller" was invalidating); *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1329 (Fed. Cir. 2001) (finding quotation stating it was "firm for 90 days" invalidating); Restatement § 34 cmt. b (stating that by limiting the offeree's choice of terms, the offeror avoids indefiniteness in the final contract); *id.* § 132 cmt. d ("Thus a signed offer authenticates the acceptance invited by it.").

As summarized in the below chart, compared with terms that this Court has found establish an invalidating offer, the CPM Offer easily qualified as a commercial offer for sale as a matter of law:

| Term | Junker | Helsinn | Linear Tech. | Scaltech | Buildex [9] | Atlanta Attachment [10] | Medicines II [11] | CPM Offer |
|---|---|---|---|---|---|---|---|---|
| Shipment | X | | | | | | | X |
| Delivery | X | X | | | | X | X | X |
| Price | X | X | | | X | | X | X |
| Payment | X | X | | | | | | X |
| Quantity | | | X | X | X | X | | X |
| Product descript. | | | X | X | | | | X |
| Risk allocation | X | | | | | | | X |
| Firm offer | | | | X | | | | X |
| Offeror's signature | | | | | X | | | X |
| Promise to fulfill orders | | X | | | | | X | X |
| Transfer of title | | | | | | | X | X |

[9] *Infra*, p. 64-65.
[10] *Infra*, p. 65.
[11] *Infra*, p. 67.

The District Court's bases for denying Belvac's motion do not alter this analysis.

> **(c)    The District Court violated this Court's precedent by ignoring the binding substance of the CPM Offer.**

>> **i.    The "Quotation" label does not trump the CPM Offer's binding terms.**

The District Court erred by elevating the "quotation" label above the substance of the CPM Offer.  "While the precise label used for a given communication is relevant, it is not controlling."  *Junker*, 25 F.4th at 1035.  "Rather, the terms of the communication must be considered in their entirety to determine whether an offer was intended, or if it was merely an invitation for an offer or further negotiations."  *Id.*  To that end, while "[a] quotation typically leaves many terms necessary to a contract—such as place of delivery, payment terms, and the like—unexpressed," where a purported quotation "'contains detailed terms,'…'it may well be deemed an offer.'"  *Id.* (citing Corbin § 2.5, at 157, 161 (2018); Restatement § 26 cmt. c).

This Court has thus held that purported "quotations" are nonetheless invalidating when their terms indicate the offeror's intent to be bound.  In *Buildex Inc. v. Kason Indus., Inc.*, for example, this Court held that a two-page

"Quotation" that contained "the essential terms of quantity and price," as well as the offeror's signature, satisfied the on-sale bar.  849 F.2d 1461, 1463-64 (Fed. Cir. 1988).  Similarly, in *Atlanta Attachment Co. v. Legett & Platt, Inc.*, this Court found that a "quotation" for a specific quantity of units that provided for "anticipate[d] installation" by a certain date constituted an invalidating offer.  516 F.3d 1361, 1366 (Fed. Cir. 2008); *see also S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 567 Fed. App'x 945, 950-51 (Fed. Cir. 2014) (unpublished) ("quotation" that included price, quantity, and delivery terms constituted offer).  And most recently, in *Junker*, this Court held that a "quotation" that included terms specifying product sizes, pricing, payment terms, and delivery terms invalidated the patent-in-suit despite the offeror's labeling.  *Junker*, 25 F.4th at 1033-35.

Here, as in the above cases, the actual terms of the CPM Offer are sufficiently definite to form a contract upon acceptance, regardless of the inconsistent "quotation" label.  The District Court erred in giving such labeling controlling weight.  Indeed, the District Court ignored that the Offer also (correctly) called itself an "offer" and the prospective agreement a "contract."  Appx4725-4732; Corbin § 2.5 ("quotes" are offers when the language used suggests an intent to be legally bound).  Accordingly, under

*Junker* and the cases before it, the Offer is invalidating regardless of Crown's labeling.

Crown tried to distinguish *Junker* below because (a) the *Junker* offer specified shipment would be "FOB Athens, Texas"; (b) the invention in Junker required fewer specifications from the offeree; (c) the offer was "solicited"; and (d) the Court held that the naming of an offer was determinative.   Appx4902-4904.   None of these points holds weight. Appx4905-4908.  First, as in *Junker*, the CPM Offer specified shipment terms as "FCA (Shipley/Our Packers)."  Appx4724.  Second, *Junker* did not find that the number of additional product specifications requested from the customer controls; it stated only that requiring additional specifications ***does not*** preclude the on-sale bar.  25 F.4th at 1032.  Third, CMBE sent the Offer to a specific recipient and had identified CPM as a customer, which the Court in *Junker* found demonstrates that a communication is not "an unsolicited price quotation."  *Id.* at 1033.  And fourth, as detailed above, the Court in *Junker* explicitly found that the chosen naming of an offer is ***not determinative***, but that the substance of the offer controls.  *Id.* at 1035.  Here, the substance of the Offer clearly indicated CMBE's intent to be bound.

ii.    **Crown's superficial reservation of the right to confirm a purchase order did not render the CPM Offer nonbinding.**

The District Court also relied on a provision that the Offer was "subject to [CMBE's] written acceptance of [CPM's] order," which it thought deprived CPM of "the power of acceptance." Appx4620-4621. Again, however, the District Court violated this Court's precedent in giving talismanic significance to that language.

The reservation of the offeror's right to confirm a purchase order does not defeat the on-sale bar when the offer otherwise obligates the offeror to deliver on the order. For example, in *Helsinn*, this Court found that although the disputed offer provided that each purchase order would be "'subject to written acceptance and confirmation by [Helsinn] before becoming binding,'" the offer was nonetheless binding because it obligated Helsinn to fulfill orders submitted by the offeree. 855 F.3d 1356, 1361-62, 1365 (Fed. Cir. 2017). Likewise, in *The Medicines Company v. Hospira, Inc.* (*Medicines II*), this Court found that the offeror's reservation of the right to confirm orders did not preclude application of the on-sale bar when the terms of the offer

otherwise obligated the offeror to make "commercially reasonable efforts" to fulfill the orders. 881 F.3d 1347, 1351-52 (Fed. Cir. 2018).[12]

So too here. Although ostensibly reserving CMBE's right to confirm a purchase order, the CPM Offer otherwise obligated CMBE to make "every effort" to "carry out the contract" upon CPM's acceptance. Appx4732. Indeed, the Offer provided a timeline for delivery "30 weeks from receipt of *[an] order*," not CMBE's written acceptance. Appx4725. CMBE's vice president confirmed that this language meant that "manufacturing will be completed and [the ordered 3400 would be] ready to ship" within the specified timeframe. Appx4755:13-19; *see also* Appx4725 (referring to delivery timeline as "our delivery promise"). In fact, CMBE expressly stated its intention to "proceed with manufacture immediately upon receipt of *an order*," and asked CPM to provide certain information to allow CMBE to do so. Appx4725. The Offer also required payment of 50 percent of the purchase price "with [the] order," meaning part performance would occur *before* CMBE provided its written acceptance. Appx4730. "Under the provisions of the Restatement (Second) and U.C.C. § 2-206, commencement

---

[12] Like the CPM Offer, the *Medicines II* offer also contained terms governing price, delivery, and transfer of title to the offered goods. *Id.*

of performance that unambiguously indicates a commitment to the deal by the offeree creates a bilateral contract." Corbin § 2.32. Thus, CPM's purchase order, not CMBE's written acknowledgment, would have obligated CMBE to deliver the ordered 3400, and the District Court's finding that CPM lacked the power of acceptance based on CMBE's superficial right to confirm purchase orders is inconsistent with the plain language of the Offer.

The District Court tried to distinguish *Helsinn* and *Medicines II* as involving preexisting agreements to fulfill purchase orders. Appx4621. But the agreements in both cases were themselves the offers that triggered the fulfillment obligation, and there were no pre-offer agreements. *See Medicines II*, 881 F.3d at 1352 (explaining that in *Helsinn* "*the agreement* was an offer for sale because *it obligated* Helsinn to meet the purchase orders" and applying same logic (emphasis added)). The same is true here, as the CPM Offer obligated CMBE to fulfill purchase orders upon receipt of the orders.

### (d)    The CPM Offer was made "in this country."

The only remaining requirement under pre-AIA § 102(b) is that the disputed offer be made "in this country." The District Court did not address this factor, but there is no genuine dispute that the CPM Offer met this requirement.

69

The Offer met this requirement because it was addressed to CPM at its address in Colorado. Appx4724. CMBE's sales manager also sent the Offer directly to CPM by email. Appx4722. And CMBE listed CPM as a customer based in the "USA" in its own records. Appx4763. As this Court has found, offers directed from a foreign jurisdiction to a U.S.-based company are offers made "in this country" triggering the on-sale bar. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1375-76 (Fed. Cir. 1998) (letter sent from Swedish patentee to United States was an invalidating offer for sale); *In re Caveney*, 761 F.2d 671, 677 (Fed. Cir. 1985) ("Although Insuloid presumably made its offer from England, that offer was directed to Tyton at is place of business in the United States. Therefore, 35 U.S.C.A. § 102(b) is applicable to the facts of this case.").

As a matter of law, then, the Asserted Patents were the subject of an offer made in this country before the earliest critical date of the patents, and the alleged invention of the patents was ready for patenting at the time of the offer. The District Court thus erred in denying Belvac's motion for summary judgment of the on-sale bar. This Court should reverse with instructions to enter judgment of invalidity.

### B.    The District Court erred in granting Crown's cross-motion of no invalidity under the on-sale bar.

At a minimum, the evidence easily sufficed for a reasonable jury to find for Belvac.  *Supra* III.A.2.  So the District Court erred in granting Crown's cross-motion for summary judgment that the on-sale bar does not apply.  Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 255; *see also Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1352 (Fed. Cir. 2001) (reversing grant of judgment to patentee on on-sale bar when evidence was sufficient for jury to find for defendant).

Beyond that evidence, a reasonable jury could conclude that CMBE itself treated purchase orders submitted in response to nearly identical offers as binding.  That practice confirms CMBE's intent to be bound in making the CPM Offer.

CMBE often issued documents largely identical to the CPM Offer.  Those documents were also labeled "quotations" and likewise required CMBE's "written acceptance" of purchase orders.  Appx4766-4847.  But CMBE consistently treated purchase orders in response to those "quotations" as acceptances without the need for CMBE's written acknowledgment.  CMBE entered those orders in its system and began

71

manufacturing the ordered 3400 *before* issuing a written acknowledgment to the customer. *E.g.*, Appx4795 (May 14, 2007 offer stating, "Quotations are valid for sixty days only and are subject to our written acceptance of your order."); Appx4800-4802 (June 29, 2007 customer order); Appx4804 (July 2, 2007 order entry in CMBE system); Appx4806 (September 7, 2007 order update); Appx4808-4810 (September 10, 2007 acknowledgment to customer). CMBE's former senior vice president of business support also confirmed that "if a customer received a quotation for a 3400 Necker and responded to that quotation with an order for the 3400 Necker consistent with the terms described in that quotation," CMBE considered the order to be a binding acceptance that obligated it to deliver the ordered 3400. Appx4852:14-21.

The District Court ignored this evidence in granting Crown's motion for summary judgment. But a party's contractual practices are relevant to interpreting its contracts. The Restatement specifies that a party's conduct "may be evidence against him that he had knowledge or reason to know" of a certain meaning. *See* § 202 cmt. g. Accordingly, "it seems clear that contracts of a party with third persons may show the party's customary practice and course of dealing and thus supply useful insights into the terms of the present agreement." McCormick on Evidence, § 198 (8th ed. 2022).

72

Court have thus found that the performance of a party to a contract with others under similar terms provides evidence of that party's understanding of, and practice in response to, those terms in a disputed contract. *See, e.g.*, *Amerine Nat'l Corp. v. Denver Feed Co.*, 493 F.2d 1275, 1278 (10th Cir. 1974) (finding plaintiff's practice with its customers was probative of its contract meaning); *Joseph v. Krull Wholesale Drug Co.*, 245 F.2d 231, 231 (3d Cir. 1957) (affirming admission of evidence of the defendant's practice of hiring other officers at will in interpreting employment contract with plaintiff-officer); *see also* McCormick § 198 (collecting cases).

The same logic applies here. CMBE began fulfillment of every other purchase order submitted in response to nearly identical offers *before* providing written acknowledgment. CMBE thus treated purchase orders in response to documents just like the CPM Offer as acceptances. A reasonable jury thus could easily conclude based on CMBE's practice—not to mention the document's plain terms—that the CPM Offer was likewise an offer that could be accepted by a purchase order. So summary judgment to Crown on the on-sale bar should be reversed.

**IV.   The Asserted Claims are invalid for lack of a written description.**

**A.    The lack of a written description invalidates the Asserted Claims as a matter of law.**

The Asserted Claims are also invalid as a matter of law for lack of a written description.  35 U.S.C. § 112 provides that each patent's specification "shall contain a written description of the invention."  "[T]he hallmark of written description is disclosure."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Thus, a specification must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Id.*  A jury's determination of facts "relating to compliance with the written description requirement" must be supported by "substantial evidence."  *Id.* at 1355.  When the evidence does not support a jury's factual findings that there is an adequate written description, the verdict should be reversed and judgment of invalidity should be entered.  *See Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1336-1337 (Fed. Cir. 2021).

Crown's infringement theory required the broad construction that the Asserted Claims are directed to necking configurations that include a can moving into a stationary die, a die moving onto a stationary can, or a

74

combination of the can and the die moving together. Appx1426-1464. But the common specification of the Asserted Patents describes only one configuration: a can moving into a stationary die. Appx5369-5390. Without a description conveying the inventors' possession of the broadly construed invention necessary for Crown's infringement theory, the Asserted Patents lack the required written description.

    **1.**    **There is undisputed clear and convincing evidence that the specification contained no disclosures for the asserted claimed necking configurations.**

The undisputed evidence at trial provided clear and convincing proof that the Asserted Claims are invalid for lack of a written description. Both technical experts agreed that the specification contains no references to, or descriptions of, a necking machine configured for moving a die onto a stationary can, or for the can and die to move together. Appx5369-5390; Appx3614:13-17; Appx3616:7-16; Appx3296:20-24. Instead, Belvac's expert Gillest testified without contradiction that "the specifications [of the Asserted Patents] show only one way [of necking a can], and that's pushing the can into the die." Appx3288:3-9. Gillest explained that a POSITA at the time of the invention would find nothing in the specification's figures, text, or prior art disclosures showing that the inventors had possession of other

necking configurations.   Appx3288:22; Appx3291:23-3292:3; Appx3292:23-3296:4.  Gillest concluded that a POSITA reading the specification would not have understood that the named inventors were in possession of necking configurations that could achieve the claimed throughput speeds other than the can-into-stationary-die configuration.  Appx3296:20-24; Appx43 at 10:20-28; Appx61 at 8:4-12.

Crown's technical expert, Robert Walsh, confirmed Gillest's testimony.  Walsh conceded that to "satisfy the written description requirement the patent specification must describe each and every limitation of the patent language," and that despite this understanding, his opinion that the Asserted Patents contain an adequate written description was "not based on any quotes or excerpts or text from the asserted patents themselves."  Appx3614:13-17; Appx3616:7-16.

So both technical experts agreed that the specification of the Asserted Patents contained no disclosures from which a POSITA could understand that the invention claimed by the inventors included the full scope of the Asserted Claims as construed at Crown's behest.  Without any such disclosures, the claims are invalid for lack of written description.  *See Ariad*, 598 F.3d at 1351 (stating "the hallmark of written description is disclosure");

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (holding that the specification must demonstrate that the "inventor possesses the full scope of the invention").

## 2. Crown's post-trial arguments in rebuttal are not supported by substantial evidence.

After trial, Crown offered a new written-description argument that the specification disclosed sufficient species (*i.e.*, a configuration whereby a can moves into a stationary die) to support the alleged genus (*i.e.*, all other configurations for moving a can and die together). But disclosing an alleged species does not suffice to establish written description support for the entire genus. *Ariad*, 598 F.3d at 1350. Instead, the specification must disclose "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus that one of skill in the art can 'visualize or recognize' the members of the genus." *Id.* Crown presented no evidence—let alone substantial evidence—to the jury to support either element. Its reliance on unsupported post-trial arguments cannot sustain the jury's findings. *See ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361 (Fed. Cir. 2015) (rejecting arguments that were not supported by evidence adduced at trial in reversing verdict of no invalidity); *Boston Sci.*

*Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) (reversing denial of judgment when evidence showed invalidity and "the record did not contain substantial evidence for the jury to conclude otherwise").

> **(a)     There is no substantial evidence that the specification discloses common features shared by all species.**

Crown introduced no evidence that the specification of the Asserted Patents discloses structural features common to all configurations of moving a can and die together, and for good reason.  During trial, Crown did not refute the testimony of Gillest that the specification discloses only a mechanism for how to move a can into a stationary die.  Appx3288:3-3296:24; Appx5369-5377; Appx5360 at 3:49-52; Appx5360 at 3:65-4:2.  In fact, Walsh confirmed that his written description opinion was not based on any language or figures in the specification itself.  Appx3614:13-17; Appx3616:7-16.  So the jury could not have found that the Asserted Patents disclosed structural features from which a POSITA could "visualize or recognize" the entire genus of necking configurations.

**(b)    There is no substantial evidence that the specification discloses a representative number of species.**

Crown's after-the-fact argument that the can-into-stationary-die configuration was representative of all configurations also lacks substantial evidence.  That argument would require evidence that a POSITA reading the specification would understand that species as disclosing the inventors' possession of the entire genus.  There is no such evidence to support the jury's verdict.

The written description test asks "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  Thus, the operative question is not whether the specification standing alone discloses sufficient species, but whether a POSITA *reading the specification* would understand the inventors to be in possession of the entire genus based on the disclosed species.  *See LizardTech*, 424 F.3d at 1346 (finding a single embodiment supports a "generic claim" directed to all embodiments "only if the specification would reasonably convey to a [POSITA] that [the inventor] had possession of the claimed subject matter at the time of filing").

79

But Crown offered no evidence that the sole necking configuration disclosed in the Asserted Patents would convey to a POSITA at the time of the invention that the inventors possessed all possible configurations. So there was no evidence for the jury to conclude that the Asserted Patents' disclosure of a single species provided written description support for the entire claimed genus.

Crown pointed in vain to the testimony of Walsh that "necking machines" as a concept are understood to include all possible configurations for marrying a can and a die. Appx3578:4-15; Appx3616:7-16. That argument fails first because it contradicts Crown's argument that its disclosure of a species supports the entire genus; rather, the argument ignores the alleged species altogether by relying on necking machines generally. Second, that testimony also relies on the false premise that the general disclosure of a machine is sufficient to establish written description support for the entire genus of possible configurations for that machine. This Court has repeatedly rejected that premise. For example, in *LizardTech*, this Court explained that if "an inventor created a particular fuel-efficient automobile engine and described the engine," he could not then claim "every possible type of fuel-efficient engine" without violating the

requirement that he "correctly describe, just what he has invented." 424 F.3d at 1346; *see also Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1163-65 (Fed. Cir. 2019) (describing species disclosure as "looking for blaze marks which single out particular trees…rather than simply pointing to trees" (citation omitted)); *Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298-1302 (Fed. Cir. 2014) ("[M]erely drawing a fence around a perceived genus is not a description of the genus."). Walsh's testimony that necking machines as a concept can include other configurations therefore says nothing about what a POSITA reading the specification would understand the sole disclosed configuration to represent.

The trial evidence resembled that in *LizardTech*, where the patentee drafted claims directed to all methods for achieving image compression but disclosed only one such method in the patent-in-suit. 424 F.3d at 1345. The patentee argued that because the specification disclosed a single process for achieving the desired compression, the inventor disclosed possession of all other processes. *Id.* at 1346. In rejecting this argument, this Court found that allowing the mere disclosure of one process to claim all other processes "would entitle an inventor to a claim scope far greater than what a [POSITA] would understand the inventor to possess…." *Id.* Instead, the Court found

that where there is "nothing in the patent's specification 'to suggest that [means] other than [those disclosed] are necessarily part of the disclosure,'" there is no written description support beyond the disclosed method. *Id.* at 1346 (citation omitted). This Court has repeatedly applied this same principle to find no written description support when claims are directed to a broad array of configurations for achieving an objective, but the specification describes only one such configuration.[13] That same principle requires JMOL here.

### 3. Evidence untethered from the specification provides no written description support.

Crown also offered two excuses for the specification's failure to disclose the full scope of necking configurations: the knowledge of a POSITA and the alleged non-criticality of necking configurations. Those excuses both

---

[13] *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 28 F.4th 1247, 1269 (Fed. Cir. 2022) (finding genus claims directed to "plant cells" lacked adequate written description when specification described success in only one form of cell); *Rivera v. Int'l Trade Comm.*, 857 F.3d 1315, 1321 (Fed. Cir. 2017) (finding claims directed to "a container…adapted to hold brewing material" lacked written description to cover a container with an integrated filter because every embodiment in the specification showed the "pod" and container as physically separate); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (holding that broad claim allowing controls on a sofa to be mounted anywhere lacked support by specification describing only controls mounted on a console).

fail to support the verdict because they lack any nexus to the actual disclosures of the specification.

> **(a)    The knowledge of a POSITA cannot provide written description support without some basis in the specification.**

Crown's expert asserted that the Asserted Claims had written description support because a POSITA would understand necking machines as a concept to include all possible configurations for necking a can. Appx3578:4-15; Appx3616:7-16.   That is a categorical mistake.  A POSITA's purported free-floating knowledge is irrelevant; "the test [for written description] requires an objective inquiry into *the four corners* of the specification from the perspective of a person of ordinary skill in the art," and "it is the specification itself that must demonstrate possession." *Ariad*, 598 F.3d at 1351-52.  This Court thus rejected the argument that a POSITA's knowledge can "supplement the teaching in the specification to provide written description support."   *Rivera*, 857 F.3d at 1322.   Rather, "[t]he knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Id.*

Walsh admitted that he ignored the actual disclosures of the specification in concluding that a POSITA would understand necking machines as a concept to include the full scope of necking configurations. Appx3614:13-17; Appx3616:7-16.  He thus opined as to only the knowledge of a POSITA in the abstract, without explaining how that knowledge would inform a POSITA's understanding of this specification's disclosures.  His testimony untethered from the specification was thus irrelevant to the written description inquiry and could not support the jury's verdict.  *See Rivera*, 857 F.3d at 1322; *Juno*, 10 F.4th at 1335–40 (finding testimony that undisclosed limitations were "generally known in the field" insufficient to establish written description).

> **(b)**  **The "criticality" of the disputed feature cannot provide written description support without some basis in the specification.**

Crown also relied on evidence of the supposed non-criticality of how a can and die move together in the necking process.  Appx4920-4921 (citing Appx2361:13-2362:14;  Appx3462:5-3464:7;  Appx3577:9-16;  Appx3577:24-3578:7).  But again, that evidence fails to address a POSITA's understanding *of the actual disclosures of the specification* and so could not support the jury's verdict.

This Court has recognized that the alleged criticality of a disputed feature affects only the "'level of detail [in the specification] required to satisfy the written description requirement.'"  *In re Global IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019) (quoting *Ariad*, 598 F.3d at 1351); *see also In re Peters*, 723 F.2d 891, 893-94 (Fed. Cir. 1983) (finding the disputed feature non-critical in the context of the "disclosure" of the patent).  Thus, like knowledge of the art, the criticality of a feature informs how a POSITA would understand the disclosures of the specification; it is not a stopgap for elements that are entirely absent.  *Global IP*, 927 F.3d at 1377.

In support of its criticality argument, Crown relied on Walsh's testimony that "[t]here's nothing different as far as the necking process" however the can and die are moved, and that the configuration for moving the can and the die together "doesn't have anything to do with the quality of the can or the performance of the machine versus doing it the conventional way."  Appx2587:13-2588:14; Appx3577:9-16.  But the fact that necking configurations are allegedly noncritical to necking machines generally says nothing about how a POSITA would understand the criticality of necking configurations *to the claimed invention* of the Asserted Patents, let alone how the POSITA would apply that understanding to the

specification's disclosures.  This is especially true here, where the Asserted Patents do not claim to invent necking machines, but necking machines "configured for high speed operations."  Appx5369.  That necking configurations are noncritical to necking machines as a concept says nothing about their criticality to the high-speed machine claimed by the Asserted Patents.

***

Belvac adduced undisputed evidence that the specification of the Asserted Patents described only one necking configuration.  Crown sought to refute that showing with evidence untethered from the specification.  So as a matter of law, there was insufficient evidence for the jury's finding of no invalidity.  Judgment should be entered for Belvac.

## CONCLUSION

This Court should affirm the judgment of noninfringement.  The Court should reverse the judgment that the Asserted Patents are not invalid under the on-sale bar and for lack of written description.

86

Dated:  May 11, 2023                    Respectfully submitted,

                                       */s/ Brian D. Schmalzbach*
                                       Brian D. Schmalzbach
                                       Brian C. Riopelle
                                       David E. Finkelson
                                       McGuireWoods LLP
                                       Gateway Plaza
                                       800 East Canal Street
                                       Richmond, VA 23219
                                       Telephone: (804) 775-4746
                                       Facsimile: (804) 698-2304
                                       bschmalzbach@mcguirewoods.com
                                       briopelle@mcguirewoods.com
                                       dfinkelson@mcguirewoods.com

                                       *Counsel for Cross-Appellant*
                                       *Belvac Production Machinery, Inc.*

## CERTIFICATE OF SERVICE

I certify that on May 11, 2023, I filed the foregoing with the Clerk of this Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) because:

- This brief contains 16,490 words, excluding the parts of the brief exempted by Appellate Rule 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface and type style requirements of Appellate Rule 32(a)(5) because:

- This brief has been prepared in a proportionally spaced 14-point Book Antiqua font using Microsoft Word.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach