**22-2299, -2300**

# United States Court of Appeals
# for the Federal Circuit

CROWN PACKAGING TECHNOLOGY, INC.,
CARNAUDMETALBOX ENGINEERING LTD.,
*Plaintiffs-Appellants*

v.

BELVAC PRODUCTION MACHINERY, INC.,
*Defendant-Cross-Appellant*

Appeals from the United States District Court for the Western District of Virginia
in No. 6:18-cv-00070-NKM-RSB, Senior Judge Norman K. Moon.

## RESPONSE AND REPLY BRIEF OF PLAINTIFFS-APPELLANTS CROWN PACKAGING TECHNOLOGY, INC., CARNAUDMETALBOX ENGINEERING LTD.

**BAKER & HOSTETLER LLP**
Daniel J. Goettle
Jeffrey Lesovitz
Stephanie Hatzikyriakou
Robert Patrick Leeson
1735 Market Street
Suite 3300
Philadelphia, PA  19103-7501
(215) 568-3100

*Attorneys for Plaintiffs-Appellants*

August 21, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 22-2299, -2300 |
| **Short Case Caption** | Crown Packaging Technology, Inc. v. Belvac Production Machinery, Inc. |
| **Filing Party/Entity** | Crown Packaging Technology, Inc., CarnaudMetalBox Engineering Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/07/2023

Signature:  /s/ Daniel J. Goettle

Name:  Daniel J. Goettle

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Crown Packaging Technology, Inc. | | Crown Holdings Incorporated |
| CarnaudMetalbox Engineering Ltd. | | Crown Holdings Incorporated |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| Alaina J. Lakawicz<br>Baker & Hostetler LLP | Amanda M. Morgan<br>Gentry Locke Rakes & Moore, LLP | Glenn Walthall Pulley<br>Gentry Locke Rakes & Moore, LLP |
|---|---|---|
| Paul B. Waxler<br>formerly of Baker & Hostetler LLP | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☑ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................1

II.   JURISDICTIONAL STATEMENT ........................................3

III.  STATEMENT OF THE BELVAC-RAISED ISSUES ..................4

IV.   STATEMENT OF THE CASE AS TO BELVAC-RAISED ISSUES ..........4

    A.    The Complete Packaging Machinery Quotation. ..................4

    B.    Summary judgment of no on-sale bar. ..................6

    C.    Written Description ..................6

    D.    Belvac's JMOL motion on written description. ..................7

V.    SUMMARY OF THE ARGUMENT ........................7

VI.   STANDARD OF REVIEW ........................9

VII.  ARGUMENT ........................9

    A.    As to the '784 patent, this Court should reverse because CMB proved infringement at least based on stages 2 through 12 and also because substantial evidence does not support noninfringement where Belvac changed claim language. ..................9

        1.    Contrary to Belvac's factually wrong waiver argument, CMB proved that the Belvac Necker infringed irrespective of stage 1 and based on only stages 2 through 12 ..................10

        2.    Belvac is also wrong on the law which mandates that Belvac cannot avoid infringement of a "comprising" claim merely by including unclaimed features. ..................17

        3.    Belvac's assertion that CMB is now seeking a construction of "adapted for" is not only wrong but a red herring. ..................18

        4.    The *Dippin' Dots* and *Spectrum* cases are irrelevant. ..................19

5.   Because Belvac's expert narrowed the claim language from "defines" a cylinder to "is" a cylinder and because Belvac and the district court agree that the jury relied on this narrowing, the verdict lacks substantial evidence. ...................20

B.   As to the '982 patent, this Court should reverse because substantial evidence does not support the jury's noninfringement verdict as to either literal infringement or infringement under the doctrine of equivalents. .......................................................................25

1.   Because Belvac's expert cited no support for his narrow redefinition of "mounted on," and because Belvac and the district court agree that the jury relied on this redefinition, the '982 patent verdict lacks substantial-evidence support. .....25

2.   Because Belvac's expert did not testify as to the "function," the "way," or the "result" of the mounted limitation *in the patent*, Belvac's doctrine-of-equivalents analysis is legally flawed and the jury's verdict lacks substantial evidence. ..........28

C.   The district court did not err in finding that Belvac could not prove by clear and convincing evidence that the Asserted Patents are invalid because of an on-sale bar. .................................................33

1.   The Complete Packaging quotation was not a commercial offer for sale because it was not sufficiently definite and could not become a binding contract by simple acceptance. ....34

2.   Belvac failed to show that the quotation was an offer for sale made *in this country*, as required by pre-AIA 35 U.S.C. § 102(b). ...................................................................................42

3.   The district court did not err in granting CMB's cross-motion of no invalidity under the on-sale bar. ...........................46

D.   The Asserted Claims are not invalid as a matter of law for lack of written description under Section 112. ...............................................47

1.   Substantial evidence, much of which was uncontroverted, supported the jury's verdict on written description. .................48

2.    Not only is Belvac's "representative species" standard inapplicable, substantial evidence supported that it was met. ..54

3.    Despite Belvac's contention, it was proper for the jury to consider CMB's evidence of the knowledge of a POSITA......57

4.    The jury was properly instructed to consider evidence that whether the can or the die moves is noncritical.......................59

VIII.  CONCLUSION...............................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguayo v. Universal Instruments Corp.*,
356 F. Supp. 2d 699 (S.D. Tex. 2005) ................................................................. 4

*Ajinomoto Co. v. ITC*,
932 F.3d 1342 (Fed. Cir. 2019) ........................................................ 50, 56, 60

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .................................................... 49, 54, 55, 58

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2016) .......................................................... 22

*BASF Agro B.V. v. Makhteshim Agan of N. Am., Inc.*,
519 F. App'x 1008 ......................................................................... 20

*BASF Plant Science, LP v. Commw. Sci. and Indus. Research Org.*,
28 F.4th 1247 (Fed. Cir. 2022) .......................................................... 54

*Bilstad v. Wakalopulos*,
386 F.3d 1116 (Fed. Cir. 2004) ...................................................... 49, 60

*Board of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) .......................................................... 19

*Boston Scientific Corp. v. Johnson & Johnson*,
647 F.3d 1353 (Fed. Cir. 2011) .......................................................... 51

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) .......................................................... 44

*Capon v. Eshhar*,
418 F.3d 1349 (Fed. Cir. 2005) ............................... 3, 49, 52, 53, 56, 57, 58

*Caterpillar Inc. v. Int'l Trade Comm'n*,
837 F. App'x 775 (Fed. Cir. 2020) .................................... 42, 43, 44, 45, 46

*In re Caveney*,
    761 F.2d 671 (Fed. Cir. 1985) ..........................................................44

*Cordis Corp. v. Medtronic AVE, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003) .......................................................49

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007) ...............................................19, 20

*Elan Corp., PLC v. Andrx Pharms., Inc.*,
    366 F.3d 1336 (Fed. Cir. 2004) .......................................................40

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    276 F. Supp. 3d 629 (E.D. Tex. 2017), *aff'd*, 739 F. App'x 643
    (Fed. Cir. 2018) ..............................................................................55

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)........................................................................29

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
    109 F. App'x 387 (Fed. Cir. 2004) .................................................47

*In re Global IP Holdings LLC*,
    927 F.3d 1373 (Fed. Cir. 2019) ................................49, 54, 59, 60

*Group One, Ltd. v. Hallmark Cards, Inc.*,
    254 F.3d 1041 (Fed. Cir. 2001) .......................................................34

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*,
    726 F.3d 1370 (Fed. Cir. 2013) .............................34, 35, 37, 44

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
    855 F.3d 1356 (Fed. Cir. 2017) .............................................35, 36, 37

*Hologic, Inc. v. Smith & Nephew, Inc.*,
    884 F.3d 1357 (Fed. Cir. 2018) ...............................................51, 58

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011) ................................48, 49, 55, 57, 60

*Immunex Corp. v. Sandoz Inc.*,
    964 F.3d 1049 (Fed. Cir. 2020) .......................................................49

*Junker v. Medical Components, Inc.*,
   25 F.4th 1027 (Fed. Cir. 2022) ...................................................39, 41

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
   10 F.4th 1330 (Fed. Cir. 2021) ...........................................................55

*Linear Tech. Corp. v. Micrel, Inc.*,
   275 F.3d 1040 (Fed. Cir. 2001) ......................................35, 37, 42, 47

*Link Treasure Ltd. v. Baby Trend, Inc.*,
   809 F. Supp. 2d 1191 (C.D. Cal. 2011) .............................................44

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005) ..........................................................57

*Moba, B.V. v. Diamond*,
   325 F.3d 1306 (Fed. Cir. 2003) ..........................................................23

*In re Peters*,
   723 F.2d 891 (Fed. Cir. 1983) ......................................................52, 59

*Realtime Data, LLC v. Iancu*,
   912 F.3d 1368 (Fed. Cir. 2019) ..........................................................18

*Rivera v. Int'l Trade Comm.*,
   857 F.3d 1315, 1322 (Fed. Cir. 2017) ................................................58

*Robbins Co. v. Lawrence Mfg. Co.*,
   482 F.2d 426 (9th Cir. 1973) ..............................................................45

*Scaltech Inc. v. Retec/Tetra, LLC.*,
   269 F.3d 1321 (Fed. Cir. 2001) ....................................................41, 42

*Spectra-Physics, Inc. v. Coherent, Inc.*,
   827 F.2d 1524 (Fed. Cir. 1987) ..........................................................54

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
   164 F.3d 1372 (Fed. Cir. 1998) ....................................................19, 20

*Sunburst Prods., Inc. v. Cyrk Int'l*,
   98 F.3d 1358 (Fed. Cir. 1996) (unpublished table decision)..............3

*Syngenta Crop Prot., LLC v. Willowood, LLC,*
   944 F.3d 1344 (Fed. Cir. 2019) ............................................................9

*The Meds. Co. v. Hospira, Inc.,*
   881 F.3d 1347 (Fed. Cir. 2018) .........................................35, 36, 37

*Trading Techs. v. eSpeed, Inc.,*
   595 F.3d 1340 (Fed. Cir. 2010) ...................................................51, 60

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*
   721 F.2d 1540 (Fed. Cir. 1983) ......................................43, 44, 45, 46

*Wi-Lan, Inc. v. Apple, Inc.,*
   811 F.3d 455 (Fed. Cir. 2016) ............................................................28

*Zoltek Corp. v. U.S.,*
   815 F.3d 1302 (Fed. Cir. 2016) .........................................................49

**Statutes**

35 U.S.C. § 102(b) ................................................... 4, 5, 6, 34, 42, 43, 45

35 U.S.C. § 112.................................................................................47

**Rules**

Rule 50(b).........................................................................................3

**Other Authorities**

Restatement (Second) of Contracts § 26 (1981)...............................35, 39

Restatement (Second) of Contracts § 33(3) (1981) ................................40

Restatement (Second) of Contracts § 202 (1981)............................46, 47

vii

## I.    INTRODUCTION

Belvac's brief, while disagreeing with CMB's conclusions, largely agrees with the facts CMB described in its opening brief. Overall, as to the issues CMB raised, Belvac's approach with the jury and district court was to make legally-erroneous or factually-unsustainable contentions in the hope of prevailing. That approach cannot withstand the bright and experienced light of this Court's review.

Because the asserted claims transition with "comprising," unclaimed features in the accused necking machine do not create noninfringement even if those features are essential for machine operation. The undisputed record is that each accused machine included many more stages than merely stage 1, those many stages had a maximum rated speed of 3600 cans-per-minute, and those stages otherwise met all limitations of the asserted claims of the '784 patent. Therefore, those stages were "adapted" for running at claim-recited speeds, and the accused machines consequently infringed.

CMB proved infringement of the "mounted" limitation under the doctrine of equivalents, and there was no substantial countervailing evidence. Belvac purported to attempt to refute CMB's evidence but offered no evidence as to what the patents disclosed as the "function" of the mounted limitation. Without Belvac presenting evidence of the patents' "function," the jury had no way of determining that the machine did not implement substantially the same function in substantially

1

the same way for the same result as the patent. Belvac instead ignored the patent and focused on only the accused machine, offering vague (and insubstantial) evidence that the "way" and "result" in the machine was different from something but never said what that something was, necessary evidence to evaluate the triple-identity test.

Belvac, through its expert, rewrote the claims to narrow "defines" a cylinder to "is" a cylinder and then improperly applied this narrower and nonexistent claim language in the infringement analysis. And Belvac, through its expert, cited sources of supposed support that the mounted limitation merely meant weight-carrying where none of those sources even mention weight-carrying as the meaning of "mounted."

As for the supposed on-sale bar that Belvac raises, the quotation was no offer for sale because it explicitly stated that any purchase order following the quotation was subject to CMB's written approval. The quotation was no offer for sale also because it otherwise omitted hallmarks required for offers for sale like a definite product (CMB3400s are multi-million-dollar, highly-customizable, industrial equipment, requiring much technical customer information as the quotation made clear), final pricing, delivery location, and more. Separately, even if the quotation was an offer – it was not – there is no evidence that it was made "in this country." This Court's precedent establishes that, when an offeror is outside

the United States and the offeree is inside the United States, the law looks to the anticipated location of the use of the invention to determine the locale of the offer. Here, it is undisputed that the location for the use of the supposedly-offered machine, to be manufactured in the United Kingdom, was unknown, and therefore, there is no evidence that the supposed offer was in the United States.

Finally, as to Belvac's written-description argument, the evidence adduced at trial was more than substantial to demonstrate inventor possession. Long before the invention, the prior art disclosed that necking machines can move the can into the die, move the die over the can, or both. The evidence further well-satisfied the *Capon* factors and also established that whether the can or die moved was a noncritical feature of the invention focused on stroke length, speed, and working arc.

## II.    JURISDICTIONAL STATEMENT

Belvac wrongly asserts that CMB moved prematurely for judgment as a matter of law ("JMOL"). Belvac Brief ("Br.") 23. CMB timely filed its renewed JMOL "[n]o later than 28 days after the entry of judgment" pursuant to Rule 50(b). *See* Appx3995-3996; *Sunburst Prods., Inc. v. Cyrk Int'l*, 98 F.3d 1358 (Fed. Cir. 1996) (unpublished table decision) (finding that a renewed Rule 50(b) motion may be made prior to final judgment).

## III.   STATEMENT OF THE BELVAC-RAISED ISSUES

- Whether the district court erred in determining no invalidity under the on-sale bar of 35 U.S.C. § 102(b) (pre-AIA).

- Whether the jury finding of no invalidity for lack of written description is supported by substantial evidence.

## IV.   STATEMENT OF THE CASE AS TO BELVAC-RAISED ISSUES

### A.   The Complete Packaging Machinery Quotation.

CMB provides the following additional relevant facts. A CMB sales manager located in the United Kingdom (where CMB3400s were manufactured) emailed "terry@cp-machinery.com" attaching a quotation for a prospective CMB3400 machine addressed to an entity called Complete Packaging Machinery ("Complete Packaging"). Appx4722; Appx4724-4734. The email:

- Does not indicate the location of the recipient of the machine. Appx4722.

- States that CMB had not "quoted for tooling," because CMB was "trying to develop [its] own design . . . ." *Id.*

- States that an additional unspecified price amount would be added later for "for Knock Outs & Necking Dies once we [CMB] have something we can sell." *Id.*

As to the quotation attached to the email:

4

- It expressly stated that it was "subject to our written acceptance of your order." Appx4731.

- It identified an address for Complete Packaging in Colorado that Belvac's expert admits was a house, not a can-making plant. Appx4724; Appx1850-1851.

- Belvac's expert "assume[d]" that Complete Packaging received the quotation on behalf of an unknown can-making customer. *Id.*

- It provided that manufacturing cannot begin without the "Can Data Sheets," "Full Mechanical and Electrical Specifications," and a "Completed Questionnaire," required "to proceed with manufacture immediately upon receipt of an order." Appx4725.

- It provided "[r]ecommended [q]uantities" of "Optional Extra Equipment," the price of which was specified as "[n]ot included in price on page one of this quotation." Appx4727.

- It nowhere provided any delivery location, instead requested that the delivery location be specified and contemplated delivery be at CMB, in the European Union or "elsewhere." Appx4731-4732; Appx1853.

There is no evidence:

- of an order from Complete Packaging;

- that CMB accepted any such order;

- that Complete Packaging provided any requested information; nor

- that CMB ever sold or delivered a CMB3400 pursuant to the quotation. Appx4724-4734; Appx1852-1853.

### B.     Summary judgment of no on-sale bar.

The district court granted CMB's motion for summary judgment of no on-sale bar and denied Belvac's cross motion on this issue. Appx105-108. The district court determined that the alleged offer was "merely a quotation," and "not sufficiently definite to constitute an 'offer'" because, in part, the "quotation did not allow the recipient to create a binding contract by acceptance" but instead was a mere "invitation to make an offer, not an offer in itself." Appx107-108. The district court rejected Belvac's argument that the quotation's "written acceptance" requirement was "merely a formality." *Id.*

### C.     Written Description

There is no dispute that the prior art disclosed necking machines where the die moved over the can, as well as necking machines where the can moved into the die, or both moved. Appx2590-2591; Appx3577; Appx3465-3466; Appx2894-2895. Furthermore, the jury heard substantial evidence that which part moves in a necking machine is not critical to the invention and also that the invention was instead directed to increased stroke length, speed, and working arc. Appx2266; Appx2271; Appx2332-2333; Appx2604; Appx2590; Appx3554.

### D.    Belvac's JMOL motion on written description.

The district court denied Belvac's motion for judgment as a matter of law that the Asserted Claims were invalid for lack of written description. Appx16. The district court first noted that Belvac "relitigates an issue resolved at the summary judgment stage" and that Belvac "has not offered any authority that the Court may grant summary judgment on the written description requirement solely because [Plaintiff's] specifications do not describe the precise process in question (a die pushing [o]nto a can)." Appx15 (citing Appx111). The district court determined that the "jury had a legally sufficient evidentiary basis to find that [Belvac] had not met its burden to prove that the Asserted Claims were invalid for lack of written description." Appx15-16.

## V.    SUMMARY OF THE ARGUMENT

As to CMB's appeal, this Court should reverse the judgment of noninfringement and remand for a trial on willfulness and damages. First, Belvac is factually and legally wrong that CMB did not prove that the Belvac Necker infringed the Asserted Patents at least as to stages 2-12. The jury was presented evidence that stages 2-12 infringe irrespective of stage 1. The jury was further instructed that Belvac cannot avoid infringement of a "comprising" claim merely by including unclaimed features. Under a proper application of the law, the

7

relevant evidence supports only a finding of infringement based on stages 2 through 12, and the jury's verdict is not supported by substantial evidence.

Second, Belvac's expert erred by not identifying any function, way, or result of the mounted limitation in the patent, a necessary precursor to determining if the accused Belvac Necker's gear/shaft arrangement was substantially different.

Third, Belvac's expert erred by improperly narrowing "defines" a cylinder to "is" a cylinder and further by citing evidence he relied on for his interpretation of the "mounted" limitation that nowhere mentioned weight bearing. Thus, the jury verdict of no infringement as to both the '784 and '982 patents lacks substantial evidence under these limitations' plain and ordinary meanings.

As to Belvac's cross-appeal, this Court should affirm the district court's grant of summary judgment of no on-sale bar and denial of Belvac's cross-motion. The district court did not err in determining that the Complete Packaging quotation was not an offer for sale. The quotation included a provision reserving CMB's right to first accept any purchase order and this, along with numerous other facts, demonstrate that the quotation was insufficiently definite such that Complete Packaging could form a binding contract by simple acceptance. Moreover, the alleged offer for sale did not occur in the United States.

Finally, this Court should further affirm the district court's denial of Belvac's motion for judgment as a matter of law on written description as the

jury's verdict was supported by substantial evidence. It is undisputed that all three

configurations for necking machines were well-known in the prior art at the time of

the invention, and the inventive aspects of the claims have nothing to do with

which part moves. In any event, Belvac's argument is contrary to this Court's law

and the substantial evidence presented at trial.

## VI.    STANDARD OF REVIEW

As to written description and other JMOL rulings, this Court reviews a

district court's post-verdict JMOL decisions de novo, determining whether the

jury's verdict is supported by substantial evidence. *Syngenta Crop Prot., LLC v.*

*Willowood, LLC*, 944 F.3d 1344, 1355 (Fed. Cir. 2019).

## VII.   ARGUMENT

### A.    As to the '784 patent, this Court should reverse because CMB proved infringement at least based on stages 2 through 12 and also because substantial evidence does not support noninfringement where Belvac changed claim language.

Belvac does not dispute that its sole noninfringement defense as to the '784

patent was that stage 1 dies supposedly did not meet the "defines a cylinder"

limitation of asserted claim 7. Belvac also does not dispute that, aside from its

"adapted for" argument, CMB proved that stages 2 through 12 met all limitations

of claim 7. Belvac's primary contention is that CMB waived any argument that the

accused machine infringed based on only stages 2 through 12. Br. 30-33, 39-43.

But Belvac is wrong on the facts and also misapplies law. This Court should

reverse, enter a judgment of infringement of the '784 patent, and remand for a trial on willfulness and damages.

> **1.    Contrary to Belvac's factually wrong waiver argument, CMB proved that the Belvac Necker infringed irrespective of stage 1 and based on only stages 2 through 12.**

As to Belvac's argument that CMB somehow waived arguing infringement irrespective of stage 1 and based on only later stages in the machine, Belvac is wrong. First, that the accused machine infringes irrespective of stage 1 and based on only stages 2 through 12 has been CMB's position since before trial, as demonstrated at least in CMB's motion for summary judgment. *See* Appx2005-2026.

Second, because of Belvac's legally-erroneous noninfringement position in this regard, CMB proposed a jury instruction as to the meaning of "comprising" that the district court adopted and presented in its charge at the close of evidence. Appx6515; Appx3755 (stating that "[t]he word 'comprising' means 'including the following but not excluding others.'"). Similarly, the district court instructed the jury, "[i]f you find that [the Belvac Necker] includes all of the elements of a claim of an asserted patent, even if [the Belvac Necker] includes additional components, you must find that [the Belvac Necker] literally infringes the claim." Appx3755.

Third, the evidence CMB adduced at trial amply demonstrated infringement based on stages 2 through 12.[1] The evidence demonstrated that the accused machine and consequently every stage in the accused machine (consistent with not only the patent but also with CMB's patented machine and every prior-art machine presented to the jury) all run at the same speed. The speed of the machine is the speed of each of the stages in the machine, and therefore, a machine capable of running at speeds recited in the asserted claims necessarily includes necking stages (like stages 2 through 12) that likewise are adapted to run at those speeds. For example, the jury received undisputed evidence that all of the stages are geared together so that they all run at the same speed and also that the machine may include only a single motor to run all stages. *See, e.g.*, top image shown below from Belvac brochure, Appx4576 (stating "All modules are the same. Any module can have the drive motor gearbox on it.").

---

[1] To the extent Belvac's briefing leaves an incorrect impression that stage 1 of the accused machine somehow can run at a different speed than later stages and that for this reason, the later stages supposedly are not "adapted for" running at the recited speeds, this impression is wrong, as would be contending that the front wheels of a car somehow run at a different speed than the back wheels.





*See also* Appx4581; Appx4238-4239; Appx4240; Appx4262 (showing can path through necking machine); Appx6590 ("The Belvac systems are rated for a maximum speed of 3600 CPM (Cans Per Minute), 300 RPM (Revolutions Per Minute)."); Appx6592; Appx6554-6585 (describing the patented CMB3400); Appx41, 5:22-25, 6:24-35; Appx60, 5:9-12, 6:11-24. Belvac nowhere disputed this at trial nor on appeal.

Claim 7 (through claim 1) recites, in part, a necking machine assembly comprising "multiple horizontal necking stages adapted for necking at least [3400] beverage can bodies per minute" where each necking stage has recited characteristics. Appx61. In the trial transcript, this recitation is referenced as "1[b]." Appx2521-2522. CMB's Mr. Walsh testified that each of the necking stages in the accused machine, which necessarily included stages 2 through 12 (or 13), met all limitations of recitation "1[b]," including that each is "adapted for necking" 3400 can bodies per minute. *Id.* (testifying that the accused machine included multiple horizontal necking stages where each necking stage is "'adapted for necking at least 3000 beverage can bodies per minute'" and specifically testifying that the specified speed was actually 3600 cans per minute); *see also* Appx2558-2559 (testifying that each of the stages met the requirement of being "adapted for necking at least 3400" cans per minute, again stating that they actually neck at 3600 cans per minute). CMB's Mr. Walsh further testified that each stage of the accused machine met all other limitations of the asserted claims that lay out the requirements for each stage. Appx2520-2559. Belvac takes no issue that, aside from its "adapted for" argument, stages 2 through 12 or 13 met all other claim limitations. Appx3489-3490 (Belvac's Mr. Gillest agreeing that "that he did not "have a problem with [stages] 2 through 13" and his "problem" was only "with stage one").

Even on cross examination, and contrary to Belvac's appeal argument incorrectly contending that stages 2 through 12 are not "adapted for" necking at the recited speeds, Belvac's Mr. Gillest **admitted** without qualification that the accused machine included "***multiple*** horizontal necking stages" (that is, more than one stage whether including or excluding stage 1) where each stage is "***adapted for*** necking at least 3000 can bodies per minute. . . ." Appx3487-3488 (emphasis added). Belvac offers no rationale for its appellate contention that somehow stages 2 through 12 are not "adapted for" necking at claim 7's recited 3400 cans-per-minute but indisputably are somehow "adapted for" necking at unasserted claim 1's recited 3000 cans-per-minute.

Furthermore, as to his invalidity opinions, Belvac's Mr. Gillest wholly contradicted his noninfringement opinion as to stages 2 through 12 (or 13) supposedly not being "adapted" to run at 3400 cans-per-minute without the tapered first-stage dies. Belvac's Mr. Gillest testified that two prior-art machines each included tapered first-stage dies and yet also met the claim limitation requiring "multiple horizontal necking stages adapted for necking at least 3400 can bodies per minute." Appx3227-3229. Specifically, Belvac's Mr. Gillest testified:

> Q How would you describe the stage 1 dies on those machines?
>
> A ***Instead of it being cylindrical, it was a tapered throat for entry for the can to enter into that stage.***

> Q *And did that allow the 595 series machines, . . . the main turrets, and the transfer starwheels in those machines to be adapted to and capable of necking at certain speeds*?
>
> A *Yes.* High speeds required the tapered surface.
>
> Q And was all of what you just described also true of the [prior art] 795 when the dies were installed?
>
> A That's correct. . . .
>
> Q And in the case of the 795K, were those speeds at least 3600 cans per minute?
>
> A Yes.

Appx3228-3229 (emphasis added).

Furthermore, contrary to Belvac's "waiver" argument, CMB's Mr. Walsh focused specifically on stages 2 through 12, testifying that unlike the tapered shape of the stage 1 dies, the dies in stages 2 through 12 were actually cylindrical and therefore also met the claim limitation, "defines a cylinder." Appx2529-2531. For example, Mr. Walsh testified:

> Q Okay. And does the throat portion of the dies used for stages 2 through 12 have an inner surface that defines a cylinder having a throat portion diameter?
>
> A Yes, because that surface would contact the shoulder of the can prior to the end of the can hitting the transition. So that would make sure that that can would fit rather snugly in that -- within that die.

Appx2537-2539; *see also* 2540-2545; Appx2540-2541 ("Q . . . And in your opinion do Belvac's stage 2 through 12 necking dies satisfy the same body portion requirement in claim 1[f]? A. Yes."); Appx4111; Appx4514-4562.

Moreover, showing that CMB did not somehow "waive" its infringement contention based on only stages 2 through 12, through CMB's Mr. Walsh and other witnesses, CMB focused on various stages of the Belvac Necker – aside from stage 1 – to prove that the Belvac Necker met all claim limitations. For example, Mr. Walsh presented multiple images of a subset of stages that excluded stage 1. *See e.g.*, Appx2521-2559; Appx2521-2523 (discussing and showing *e.g.*, Appx4142 (reproduced below showing four necking turrets) and Appx4194).



*See also* Appx4581; Appx4062-4073; Appx4087; Appx4111; Appx4179; Appx4230-4264; Appx4279; Appx4572-4583.

As shown, Belvac's allegation that "[CMB] at no point offered evidence that stages 2-13, alone, were adapted for the throughput limitation" is demonstrably false. Br. 43.

> **2.    Belvac is also wrong on the law which mandates that Belvac cannot avoid infringement of a "comprising" claim merely by including unclaimed features.**

As laid out in CMB's opening brief, Belvac cannot avoid infringement of a "comprising" claim merely by including supposedly-unclaimed features even if those features are necessary for operation. Dkt. 19 at 32-42. Notably, the Court instructed the jury on the proper meaning of "comprising" without objection from Belvac. Appx3755. Therefore, even if true that stages 2 through 12 needed stage 1 to perform their duties, that is inapposite where CMB affirmatively proved that stages 2 through 12 met all claim limitations including that each stage was "adapted" to neck cans at 3400 cans per minute. Appx2521-2522; Appx2558-2559. Belvac offered no contrary proof but actually agreed. Appx3489-3490 (Belvac's Mr. Gillest agreeing that that he did not "have a problem with [stages] 2 through 13" and his "problem" was only "with stage one").

Given this proof and the jury instruction on the meaning of "comprising," stage 1 is as irrelevant in the infringement analysis as is power, a power cord, an on-switch, cans in need of necking, and so on. And to the extent Belvac is contending that the jury sided with its expert's opinion that stages 2 through 13 are

not "adapted" to neck cans at the recited speed because they needed stage 1 to do so, such adoption is legally erroneous as contrary to black-letter law on the meaning of the "comprising" transition. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The word 'comprising' does not mean that the claim can be read to require additional unstated elements, only that adding other elements to the device or method is not incompatible with the claim.").

Because the jury's noninfringement verdict as to the '784 patent is not supported by any evidence and is instead contrary to law, this Court should reverse the denial of CMB's motion for judgment as a matter of law on infringement, enter a finding of infringement, and remand for a trial on willfulness and damages.

### 3.    Belvac's assertion that CMB is now seeking a construction of "adapted for" is not only wrong but a red herring.

Belvac spends a few pages making a number of unfounded arguments regarding the "adapted for" language of the claims, including that CMB waived construction of this term. Br. 39-43. But CMB is not now and never was attempting to construe the meaning of "adapted for." As to Belvac's erroneous contention, whether the plain and ordinary meaning of "adapted for" is "capable of" as CMB contended in its opening brief, or "made to," "designed to," or "configured to" as Belvac contends (Br. 40-42), there is no dispute that the accused Belvac Necker does in fact achieve the claimed speeds and therefore, stages 2 through 12 are so adapted. *See* Dkt. 19 at 36; Appx2558-2559.

### 4. The *Dippin' Dots* and *Spectrum* cases are irrelevant.

Belvac's cited cases are distinguishable. Br. 35-39 (citing *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1342-43 (Fed. Cir. 2007) & *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1375 (Fed. Cir. 1998)).

In *Dippin' Dots*, the district court had construed the very term at issue on appeal, and this Court not only found such construction proper but also held that the patentee could not broaden the term through the "comprising" transition when the patentee had previously narrowly-defined it. Finding no error with the district court's construction, this Court stated that the "district court correctly noted that the written description specifically describes 'beads' as having a 'smooth, spherical appearance'" and the patentee previously argued that a "bead" was "a small round ball or round drop." *Dippin' Dots*, 476 F.3d at 1343. While this Court acknowledged that the use of "comprising" typically means that "the list of elements is nonexclusive," it found that "the patentee ha[d] narrowly defined the claim term it [sought] to have broadened." *Id.* For these reasons, the "district court's limitation of the claim scope to exclude processes that produce some irregularly shaped particles is correct." *Id; see also Board of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1373-73 (Fed. Cir. 2008) (stating that comprising does not render every claim term open-ended where "the patentee

has narrowly defined the claim term it now seeks to have broadened.") (citing

*Dippin' Dots*, 476 F.3d at 1343).

*Spectrum* followed the same pattern. During litigation, the patentee attempted

to expand the meaning of a limitation in light of the "comprising" transition after

narrowing the limitation during prosecution. 164 F.3d at 1379-80. This Court

rejected the patentee's broadening attempt, holding that "comprising" could not

"restore this excluded subject matter." *Id.* at 1380. *See also BASF Agro B.V. v.*

*Makhteshim Agan of N. Am., Inc.*, 519 F. App'x 1008, 1017 (stating that

"comprising" does not "counteract[] a clear disclaimer") (citing *Spectrum*, 164 F.3d

at 1379-80).

Unlike *Dippin' Dots* and *Spectrum*, CMB does not seek to expand the scope

of the claims nor had CMB ever narrowed the claims in any relevant way. To the

contrary, the preferred embodiment of the asserted patents includes tapered first-

stage dies, as shown in the patents' figure 6. *See, e.g.,* Appx54-55.

> **5.    Because Belvac's expert narrowed the claim language from "defines" a cylinder to "is" a cylinder and because Belvac and the district court agree that the jury relied on this narrowing, the verdict lacks substantial evidence.**

Belvac agrees with the district court and CMB that the jury found

noninfringement as to at least the '784 patent based on only one claim limitation –

"defines a cylinder." Br. 46; Appx12. Belvac further agrees with the district court

and CMB that the jury found noninfringement based solely on the testimony of

Belvac's Mr. Gillest. Br. 44; Appx12. Belvac now eschews as supposedly "a single line of [cross examination] testimony" that its Mr. Gillest told the jury that "defines a cylinder" and having "an inner surface [that] is cylindrical" means "is a cylinder." Br. 45. But Belvac ignores that it elicited this exact testimony on its direct examination as well:

> Q And moving to the portion of the claim that you've highlighted in blue, what does that require?
>
> A It says, "Each die" -- "Each necking die comprising a throat portion having an inner surface that defines a cylinder."
>
> Q And what does that have to do with stage 1 dies?
>
> A It says that they **_must have a cylinder_**. **_It must be cylindrical._**

Appx3319 (emphasis added). And cross examination further continued to make clear that Belvac's Mr. Gillest was narrowing the claim phrase "defines a cylinder" to "is a cylinder":

> Q You agree with me that the claims do not say the die throat **_is_** a cylinder, right? They don't say that.
>
> A I thought it did. If you want to go back and let's read the claims.
>
> \*\*\*
>
> Q And the question, Mr. Gillest, was: The claims don't say that the throat portion is a cylinder, right?
>
> A It says a throat portion having an inner surface defines a cylinder. **_So, yes, it says it is a cylinder, cylindrical._**

Appx3491 (emphasis added). Moreover, when further questioned whether the phrase "defines a cylinder" is the same as "the throat portion is a cylinder," Belvac's Mr. Gillest answered that "[b]y definition it does say that." Appx3492.

Belvac's attempt to now divorce from Mr. Gillest's actual trial testimony and contend that Mr. Gillest did not narrow "defines" a cylinder to "is" a cylinder fails, belied by the black-letter record. Belvac chose to improperly introduce this alternative, narrower claim language to the jury and cannot now walk away from it.

Furthermore, Belvac's Mr. Gillest never addressed the question of whether a tapered die "defines" a cylinder, instead irrelevantly stating that a tapered die "is" not a cylinder. Appx3228; Appx3321-3323.

Belvac now contends that it is CMB who seeks a late construction of the phrase. Br. 45. But this is false. The phrase does and was to carry its plain-and-ordinary meaning. But Belvac's Mr. Gillest improperly narrowed the claim language and then described how a tapered die does not meet this unrecited, narrow language. Appx12. Therefore, Belvac's reliance on *Asetek Danmark* is misplaced. Br. 45 (citing *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1359-60 (Fed. Cir. 2016). There, the "removably attached" phrase carried its plain and ordinary meaning, and each party's expert offered conflicting testimony as to its meaning. *Id*. at 1360. The jury then credited one expert's interpretation. *Id.* This is exactly the way it is supposed to work.

22

But here, Belvac's Mr. Gillest did not testify as to the plain-and-ordinary meaning of "defines a cylinder." Instead, he improperly testified as to the meaning of the unrecited "is" a cylinder, and the jury credited his testimony. This is wrong. The district court instructed as much: "Before you decide whether Belvac has infringed. . . you will have to understand the patent claims [that] are intended to define, in words, the boundaries of the inventor's rights." Appx3751. Here, Belvac's Mr. Gillest narrowly changed the claims of the patents and the jury found noninfringement of this imaginary narrow claim language.

And far from being misplaced, CMB's reliance on *Moba, B.V. v. Diamond Automation, Inc.* is directly on point. 325 F.3d 1306 (Fed. Cir. 2003). There, as here, the jury was to apply the meaning of a claim term to an accused device. That the jury in *Moba* was to apply a court construction and the jury here was to apply plain-and-ordinary meaning is inapposite. Br. 46. The point is that the *Moba* term and the phrase "defines a cylinder" were to be applied to their full breadth. In *Moba*, the undisputed fact was that the jury narrowed the meaning to require sequential performance of steps and on that basis, found noninfringement. 325 F.3d at 1313-15. Here, it is undisputed that the jury adopted Mr. Gillest's narrow claim revision to "is" a cylinder and, on that basis, found noninfringement. Like in *Moba*, because Mr. Gillest testified contrary to the full breadth of "defines" a cylinder and the jury credited his testimony, reversal is warranted.

Finally, as laid out in its opening brief and contrary to Belvac's arguments, CMB presented unrefuted and substantial evidence that Belvac's stage 1 dies do, indeed, define a cylinder. Dkt. 19 at 47; Br. 48. It is undisputed that all prior-art necking machines, the accused machine, and CMB's machine all included tapered dies in the first necking stage. Appx35; Appx55; Appx2289-2290; Appx2532-2533; Appx2539; Appx2546; Appx2621; Appx3325; Appx4061; Appx3497-3499. And there is no dispute that the CMB3400 is an embodiment of the invention. Appx2493; Appx3468; Appx3470. Belvac in fact relies on the CMB3400, and therefore implicitly on the machine's stage 1 tapered die, for its on-sale-bar contention, necessarily conceding that the machine practices the claims. Br. 56-59.[2]

Because the jury credited Mr. Gillest's legally improper testimony that the claim recited "is" a cylinder" and not "defines" a cylinder, the jury verdict of no infringement lacks substantial evidence under the phrase's plain and ordinary meaning. Consequently, the district court erred in denying CMB's JMOL motion, and this Court should reverse the judgment of noninfringement. Furthermore, because the only evidence of record on the proper application of the full breadth of the claim phrase, "defines a cylinder," is the undisputed testimony of CMB's Mr.

---

[2] Belvac's contention that the "sole drawing of a 3400 stage 1 die . . . appears to be flat" should be ignored as mere lawyer argument that contradicts the testimony of Belvac's expert who testified that all necking machines need tapered dies. Br. 48; Appx3228; Appx3318; Appx3321; Appx3325; Appx3498.

Walsh, this Court should find infringement of the asserted claims of the '784 patent

and remand for a trial on willfulness and damages as to this patent.

**B.    As to the '982 patent, this Court should reverse because substantial evidence does not support the jury's noninfringement verdict as to either literal infringement or infringement under the doctrine of equivalents.**

**1.    Because Belvac's expert cited no support for his narrow redefinition of "mounted on," and because Belvac and the district court agree that the jury relied on this redefinition, the '982 patent verdict lacks substantial-evidence support.**

Belvac agrees with the district court and CMB that, aside from the "defines a

cylinder" limitation addressed above, the jury found noninfringement as to the '982

patent based on only one claim limitation – the requirement that the main gear be

"mounted on the main turret shaft." Br. 49; Appx12-14.[3] Belvac further agrees with

the district court and CMB that the jury found noninfringement based solely on the

testimony of Belvac's Mr. Gillest who explained that, in his opinion, the "mounted

limitation" requires that the shaft support the weight of the main gear. Br. 49-50;

---

[3] Belvac argues that the Belvac Necker "does not infringe the '982 patent for the same reasons it does not infringe the '784 patent." Br. 48. But Belvac's arguments as to the "defines a cylinder" limitation and the comprising transition in the '982 patent fail for the same reasons already identified in § VII.A. above with respect to the '784 patent. Moreover, there can be no dispute that multiple stages of the accused machine are adapted to neck at least 3000 cans per minute as recited in asserted claim 20 of the '982 patent given its expert's admission that the accused machine included "*multiple* horizontal necking stages" (that is, more than one stage whether including or excluding stage 1) where each stage is "*adapted for* necking at least 3000 can bodies per minute. . . ." Appx3487-3488 (emphasis added).

Appx12-14. As supposed-substantial evidence for this weight-bearing interpretation, however, Belvac cites, without explanation, two pages of Mr. Gillest's testimony that nowhere stands for the proposition that "mounted" requires weight support. Br. 51-52 (citing Appx3311-3312). In the two pages of testimony, Mr. Gillest testifies that he garnered his "weight bearing" interpretation from three sources – the patent itself, information about the accused necking machine, and a dictionary. The following addresses these three sources in turn.

First, as to the patent itself, while the disclosed embodiment depicts the main bearing on the shaft, this alone is not evidence of the plain-and-ordinary meaning of the mounted limitation, particularly where (as explained below) the dictionary meaning nowhere references weight bearing as the meaning of "mounted." To the contrary, relying on the patent specification to define the term narrowly to cover only the single preferred embodiment not only smacks of never-requested claim construction but also of improperly limiting the claims to the preferred embodiment. Given the breadth of the dictionary definition of "mounted" that does not mention weight bearing, Belvac cannot achieve at trial through its expert what it could not achieve had it actually sought construction of the mounted limitation during the *Markman* phase.

Second, as for the information about the accused machine, Mr. Gillest testified that, in defining the mounted limitation, he evaluated drawings associated with, and

talked Belvac to engineers about, the accused machine. Appx3311. But of course, the accused machine is of no help in determining the meaning of the claim term, especially when Mr. Gillest is opining that the accused machine does not mount the gear in the first place.

Third, as to the dictionary definition on which Mr. Gillest relied, notably, Belvac chose to not show that definition to the jury during Mr. Gillest's direct examination. Appx3311-3312. On cross examination, Mr. Gillest admitted that he did not show the definition to the jury and also that the definition nowhere mentioned weight bearing. Appx3484-3485. He further admitted that, in the accused product, the gear/shaft arrangement met the dictionary definition on which he relied. Appx3485 ("Q You'd have to agree with me that in THE BELVAC necker the gear is assembled or equipped for use with the shaft, right? A That's correct."). In sum, the dictionary definition – the sole piece of reliable proof on the plain and ordinary meaning about which Mr. Gillest testified – is proof not only that Mr. Gillest's testimony on the mounted limitation, and therefore any jury verdict based on such testimony, lacks substantial evidence but also that CMB's Mr. Walsh's testimony that the accused machine's gear is mounted on the accused machine's shaft is undisputed. Appx2528; Appx2563-2564; Appx2566.

Because Belvac proffered no evidence that the plain-and-ordinary meaning of the mounted limitation requires weight bearing, the jury verdict of no infringement

was based on a legally improper interpretation, lacks substantial evidence, and should be reversed. Furthermore, because the only evidence of record is the testimony of Mr. Walsh that the accused machine satisfied the mounted limitation, this Court should find infringement of the asserted claims of the '982 patent and remand for a trial on willfulness and damages.

> **2.    Because Belvac's expert did not testify as to the "function," the "way," or the "result" of the mounted limitation *in the patent*, Belvac's doctrine-of-equivalents analysis is legally flawed and the jury's verdict lacks substantial evidence.**

Belvac's brief confirms CMB's contention – the record does not include substantial evidence for the jury's verdict on the mounted limitation under doctrine of equivalents because Belvac presented no evidence as to the "function," the "way," or the "result" of the mounted limitation in the patent. Br. 26, 53-56; *Wi-Lan, Inc. v. Apple, Inc*., 811 F.3d 455, 463-64 (Fed. Cir. 2016) (applying substantial evidence standard to jury finding of no infringement under the doctrine of equivalents). Therefore, the district court erred in holding that the jury "had a legally sufficient basis to find that Defendant did not infringe under the doctrine of equivalents." Appx14.

Belvac agrees that a proper equivalents analysis must start with an evaluation of the function, way, and result of a claim element *in the patent*. Br. 26 ("[T]he proper analysis" involves comparing "the ways and results for mounting gears

*described in the '982 Patent*" to the accused product) (emphasis added); Br. 53-54.[4]

But, as Belvac's brief confirms, Belvac's Mr. Gillest erred in never evaluating the patent to determine the function or the way or the result of the mounted limitation and instead focused on only the Belvac Necker's supposed "way" and "result" of mounting its gears. Because Mr. Gillest never evaluated the patent as to "function," "way," or "result," Belvac has no evidence that CMB's-alleged equivalents were "insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 733 (2002).

### (a)     Function

First, Belvac's brief does not even mention the word "function" with respect to the mounted limitation. Likewise, at no point at trial did Belvac explain the function of the mounted limitation. Br. 26, 53-56; Appx3310-3317. Belvac instead focuses on only the supposed "way and results" of the accused Belvac Necker for mounting gears without mention of function. Br. 26, 53-56.

Belvac's failure to offer any evidence of the function of the mounted limitation is not only fatal to the jury's noninfringement verdict but also reflects no oversight. First, Belvac knew better, as demonstrated for another claim limitation

---

[4] Belvac's contention that CMB relied on *AquaTex* for some other proposition is simply wrong. Br. 54. In any event, the parties agree that consideration of the patent is required in the evaluation of doctrine of equivalents.

not at issue here but also subject to the doctrine of equivalents analysis. Appx3304-3310. Second, in the face of CMB's Mr. Walsh's unchallengable testimony, Mr. Gillest could not have reasonably testified as to a different function than Mr. Walsh's function. Mr. Walsh testified that the function of the mounted limitation in the patent was for "transmitting rotation of the gear to the shaft." Appx2569. And, of course, that's the entire purpose of gears in necking machines – to transfer rotating forces from one motor to all gears to all shafts to move cans through the machine. But instead of having Mr. Gillest agree or disagree with Mr. Walsh's function that was from the patent, Belvac chose to have him duck the issue altogether.

In its briefing, Belvac appears to try to whitewash this failure and imply that it had actually elicited evidence that the function in the patent for the mounted limitation was for "attaching the gears to the shaft (i.e., direct mounting)." Br. 55. This, however, is patently false. At no point did Belvac ever elicit testimony or evidence of any function of the mounted limitation in the patent, and in fact, Mr. Gillest denied that the mounted limitation in the patent had anything to do with attaching the gear to the shaft:

> Q Now, did you hear Mr. Walsh testify that in his view, "mounting" means the same thing as simply attaching?
>
> A Yes.
>
> Q Do you agree with Mr. Walsh on that point?
>
> A No, I do not.

Appx3314.

### *(b)    Way*

As to the "way" associated with the mounted limitation in the patent,

Belvac's brief contends that Mr. Gillest testified as to how the patent discloses a

"way of attaching the gears to the shaft (direct mounting) that was different and did

not accomplish the same results as the way of attaching the gears" in the accused

machine. Br. 55. This is false. As noted above, this advocacy appears to

improperly imply that Mr. Gillest identified the function of the mounted limitation

in the patent as "attaching the gears to the shaft (direct mounting)." *Id*. But Mr.

Gillest actually disavowed this as the function, as the above-quoted testimony

demonstrates, and otherwise nowhere testified as to ***any*** function of the mounted

limitation in the patent.

Furthermore, because Belvac and its expert nowhere ascribe a function to

the mounted limitation in the patent, Belvac has established no guidepost against

which one can evaluate the "way" in the accused machine to determine whether it

is substantially the same as or different than the patent's "way." Instead, one is left

simply asking, "way of doing what?"

At best, Belvac may be attempting to leave an impression that the "way" of

performing the mounted limitation in the patent is to have the shaft carry the

weight of the gear. Br. 55. In this regard, Belvac cites only two transcript pages

31

from Mr. Gillest's direct testimony. Br. 55 (citing Appx3311-3312). But these two pages merely show Mr. Gillest's testimony as to the supposed plain and ordinary meaning of the mounted limitation itself, not any "way" associated with the phrase. Appx3311-3312. Second, even if carrying the weight of the gear is a "way" disclosed in the patent, again, Belvac presented no evidence as to what it says this "way" is for. Therefore, Belvac presents no evidence to evaluate whether, let alone support with substantial evidence that, the "way" in the accused product is substantially different than the patent's "way." Finally, even if Belvac is now saying that the function is attaching the gear to the shaft, then substantial evidence is still lacking as to the "way" this is completed in the patent. A car is not attached to a street even though the street carries its weight and, likewise, a gear is not attached to a shaft merely because the shaft carries its weight.

### (c)    Result

Like "function," nowhere in Belvac's brief can one glean what Belvac contends is the "result" of the mounted limitation in the patent. Br. 55. Even if Belvac is correct that the accused machine's gear/shaft arrangement provided for better gear alignment or avoided shaft deflection, this is irrelevant.[5] What would

---

[5] Footnote 6 of Belvac's brief mentions disclosure in the patent about "freewheeling" and through this, Belvac now appears to be attempting to contend that the patent addresses gear alignment or shaft deflection or both. Br. 55-56. But this attorney argument should be ignored because the record contains no testimony about any patent disclosure in this regard and in fact, Belvac's Mr. Gillest testified

have been relevant is the "result" of the mounted limitation *in the patent* and whether the arrangement of the accused machine's gear and shaft achieves that result. But the record contains no such evidence. *Id*.

### (d)    The only triple-identity-equivalents analysis and evidence came in through CMB's Mr. Walsh

Because the only evidence of record containing a proper doctrine of equivalents analysis is the undisputed testimony of Mr. Walsh, and because Mr. Gillest agreed that the accused machine's gear/shaft arrangement satisfied Mr. Walsh's analysis, this Court should reverse the noninfringement judgment of the asserted claims of the '982 patent under the doctrine of equivalents and remand for a trial on willfulness and damages as to this patent. Dkt. 19 at 54-55 (describing Mr. Walsh's equivalents analysis and citing Mr. Gillest's agreement that the accused machine satisfied that analysis); Appx3481-3484.

### C.    The district court did not err in finding that Belvac could not prove by clear and convincing evidence that the Asserted Patents are invalid because of an on-sale bar.

To prevail on its on-sale-bar contention, Belvac would have been and was required to prove, by clear and convincing evidence, that the claimed invention was "*on sale in this country*, more than one year prior to the date of application for

---

that the patent contained nothing about shaft deflection. Appx3487 ("Q Right. But nowhere in the patents in this case, it nowhere talks about a deflection problem, right? A No, it does not.").

patent in the United States." Pre-AIA 35 U.S.C. § 102(b) (emphasis added); *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001). But far from being able to marshal such clear-and-convincing evidence, Belvac's evidence cannot even establish a disputed issue of material fact warranting reversal of the district court's summary judgment in CMB's favor. Furthermore, even if the Complete Packaging quotation amounted to an offer for sale – it did not – Belvac has no proof that such offer that was made from outside of the United States was made "in this country" given the mystery surrounding the anticipated location of the use of the quoted machinery.

> **1.    The Complete Packaging quotation was not a commercial offer for sale because it was not sufficiently definite and could not become a binding contract by simple acceptance.**

The district court correctly found that the quotation "was not sufficiently definite to constitute an 'offer'" because it "did not allow the recipient to create a binding contract by acceptance." Appx108 (citing *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1376 (Fed. Cir. 2013)). Rather, the quotation was at best "an invitation to make an offer, not an offer in itself." *Id.*

> **(a)    *Any subsequent order was subject to CMB's written acceptance***

Notably included in the quotation – undoing any Belvac contention that Complete Packaging would have thought that it could simply accept the quotation to form a binding contract – was CMB's explicit statement that any purchase order

34

was subject to CMB's written acceptance. Appx4731. Therefore, before formation of a binding sales contract, first, Complete Packaging was required to submit a purchase order and second, CMB would have had to first accept the purchase order in writing. *Id.* Based on this reservation of rights provision, Complete Packaging could not have entered a binding contract with a "simple acceptance." *Hamilton Beach*, 726 F.3d at 1376; *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 26 (1981)) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."). This alone warrants this Court affirming the district court as to Belvac's on-sale-bar defense. Appx108.

Additionally, for this reason, Belvac is wrong to place emphasis on the quotation's language, "[p]acked, ready for despatch 30 weeks from receipt of order." Appx4725. This language refers to a guaranteed delivery date *if and only if* the purchase order has been accepted by CMB in writing. Appx4725; Appx4731.

Belvac further contends that CMB's requirement that any subsequent order was subject to CMB's written acceptance is inapposite in light of two cases, *Helsinn* and *Medicines II*. Br. 67-69. But as the district court noted, both of these cases are readily distinguishable. Appx108.

35

Distinguishing *Helsinn* from the facts of this case, Helsinn and its customer MGI had previously signed a binding supply and purchase agreement "obligat[ing] Helsinn to sell and MGI to purchase those products." *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1364 (Fed. Cir. 2017). Therefore, although the agreement specified that each purchase order would be "subject to written acceptance and confirmation by [Helsinn] before becoming binding," the parties were already contractually bound to one another regarding such orders. *Id.* at 1362. Furthermore, the agreement also provided that "in the event that Helsinn were unable to meet MGI's firm orders. . ., Helsinn would then be obligated to designate a third-party manufacturer to supply MGI with the product." *Id.* at 1362, 1365. There is no such prior agreement between CMB and Complete Packaging here. Moreover, unlike the quotation (as shown below), the agreement in *Helsinn* had definite terms, "such as price, method of payment, and method of delivery." *Id.* at 1365.

*Medicines II* is also easily distinguishable for similar reasons. There, The Medicines Company had already signed an exclusive distribution agreement with the customer, agreeing to "use 'commercially reasonable efforts' to fill the [future] purchase orders." *The Meds. Co. v. Hospira, Inc.*, 881 F.3d 1347, 1351-52 (Fed. Cir. 2018) ("*Medicines II*"). Furthermore, this Court noted that the parties' course of dealing supported that "rejecting an order would be unlikely" where Angiomax

sales "provide[d] the vast majority of The Medicines Company's revenues" and ICS was the U.S. sole purchaser for three years. *Id.*

Belvac's attempt to analogize the *Helsinn* and *Medicines II* agreements to the *force majeure* provision of the Complete Packaging quotation is unavailing. Br. 68; Appx4732. Obviously, CMB would not, on the one hand, reserve its right to accept a purchase order while, and on the other hand, create a requirement that it must perform a contract it had not agreed to enter into.

### (b)    *Hallmarks of an offer for sale are missing from the quotation*

Even aside from CMB explicitly stating that any order was subject to its written acceptance, missing from the quotation are a host of "hallmarks of a commercial contract for sale" including clear identification of the requested product, a set "price, method of payment, or method of delivery." *Helsinn*, 855 F.3d at 1364 n.4; *Medicines II*, 881 F.3d at 1352. Without specifying any of these hallmarks, the quotation could not become a binding contract by simple acceptance. *Hamilton Beach*, 726 F.3d 1370 at 1375; *Linear Tech.,* 275 F.3d at 1048. The following addresses some of these missing hallmarks.

First, the quotation does not contain a clear identification of the requested product. While the "CMB3400" is the subject of the quotation, this is no cookie-cutter or off-the shelf widget. Instead, it is highly customized, as the quotation makes abundantly clear. For example, the CMB3400 is sold subject to "Customer

37

Specified Variations," nowhere specified in the quotation. Appx4726.

Furthermore, the quotation specifically requests customer information as to "Full

Mechanical and Electrical Specifications" – namely specifications regarding the

customer's mechanical and electrical requirements, even insofar as it requests

identification of the types of cans intended to be necked by the machine.

Appx4725-4726. It further included a "Questionnaire" seeking technical

requirements to be completed by Complete Packaging. Appx4725.

Notably, even Belvac's Mr. Gillest agreed that CMB could not manufacture

a CMB3400 for Complete Packaging without even knowing in which country the

machine would be used because of, for example, geographic variations in electrical

specifications and safety requirements. Appx1852.

Second, the quotation does not contain final or even near-final pricing. It

states that "Optional Extra Equipment" is "[n]ot included in [the] price on page one

of this quotation." Appx4726-4727. It lists options along with their recommended

quantity. *Id*. Furthermore, the quotation does not even list pricing for items, instead

asserting that pricing is "TBA." *Id*. The quotation also states, "[a]ny special paint

requirement may be charged extra." Appx4730-4731. And the quotation states that

pricing is preliminary and conditional and "subject to revision in the event of any

variation in costs incurred by us after our acceptance of your order." *Id*. Finally,

the covering email from CMB containing the quotation states, "[a]dd another

38

[price] for Knock Outs and Necking Dies once we have something we can sell." Appx4722.

Third, the quotation does not specify any delivery location or method. *See, e.g.*, Appx4731; Appx1853. The quotation reads: "Delivery shall be at your nominated point of delivery which if you or your contractors collect or if no written nomination has been received by the time the goods are ready shall be our premises," and is part of the "Standard Conditions of Sale." Appx4731. While Belvac latches onto the notion that delivery is specified to be at CMB's facility in the UK if no delivery location is ever specified, it remains undisputed that CMB never knew of any location for any potential delivery. Furthermore, Belvac ignores that these are very large, complicated, and industrial-sized machines – not widgets that can be picked-up and thrown in a car's trunk, a fact behooving any customer to identify a delivery location.

Fourth, while the quotation does once refer to "this offer," CMB labeled the communication "Quotation Number" and used a variation of the word "quotation" at least ten more times in the short document and accompanying email. Appx4722; Appx4724; Appx4731; *Junker v. Medical Components, Inc.*, 25 F.4th 1027, 1035 (Fed. Cir. 2022) (stating that "quotation" label is "important fact" in determining whether communication was a definite offer) (citing Restatement (Second) of Contracts § 26 (1981)) (explaining that "[T]he word 'quote' is commonly

39

understood as inviting an offer rather than as making one, ***even when directed to a particular customer***.") (emphasis added). While such labels may not be dispositive, this Court has found them to be persuasive evidence and, given all the other missing hallmarks from the Complete Packaging quotation described above, the repeated "quotation" description supports that the quotation was not an offer for sale, distinguishing this case from all of the "quotation" cases that Belvac relies upon. Br. 64-66.

Fifth, neither the quotation nor the record identifies the can-making customer who would install the necking machine if ever delivered. Appx4732-4733; Appx1853. Belvac attempts to amplify the importance of Complete Packaging's presence as a "customer" on a list entitled "3400 Quotations." Br. 61; Appx4763. But such a label does not establish any course of conduct between CMB and Complete Packaging where there is nothing in the record of Complete Packaging ever buying anything from CMB.

For all these reasons, the quotation fails to include material and definite terms, would not lead anyone to believe that the quotation invited simple acceptance to form a contract, and is not a commercial offer for sale. *See, e.g.*, *Elan Corp., PLC v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 33(3) (1981)) (stating "[t]he fact that

one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer.").

Furthermore, Belvac's cited authorities are readily distinguishable because they involve hallmarks not present in the Complete Packaging quotation. Br. 60-63:

*Junker*, 25 F.4th at 1033-35, involved:

- Off-the-shelf, standardized "sheath sets" offered in particular sizes and quantities;

- Specific set prices for each combination;

- A letter with the "specific delivery conditions—the product will be shipped in 'bulk' and will be 'non-sterile'";

- The shipment specified as "FOB Athens, Texas"; and

- Prior conduct of the parties through multiple offers solicited by a "request for quotation."

*Scaltech Inc. v. Retec/Tetra, LLC.*, 269 F.3d 1321, 1329 (Fed. Cir. 2001) involved:

- "[F]ormal proposal documents";

- An indication that the "quotation is based on one centrifuge" (i.e., an off-the-shelf product); and

- A statement that this "offer" is firm for 90 days without mention of the offer being a quotation.

Furthermore, *Linear Tech.* supports CMB and not Belvac because in that case, this Court ***reversed*** the district court's invalidity judgment. This Court concluded that communications from sales representatives providing customers with preliminary data sheets were "merely preliminary negotiations at most designed to enable customers to submit offers" and did "not reveal the requisite intent to be bound." 275 F.3d at 1050.

For these reasons, this Court should affirm the district court.

> **2. Belvac failed to show that the quotation was an offer for sale made *in this country*, as required by pre-AIA 35 U.S.C. § 102(b).**

Even if the quotation constituted an offer for sale – it did not – Belvac failed to show that it was made ***in this country*** to trigger the on-sale bar. For this separate reason, this Court should find that the quotation was not an on-sale bar rendering the patents invalid.

This Court's precedent demonstrates that, when an on-sale-bar allegation is based on a commercial offer for sale made from outside the United States to an entity within the United States, such an offer is "in this country" only if the invention was sold for use in the United States. *Caterpillar Inc. v. Int'l Trade Comm'n*, 837 F. App'x 775, 778 (Fed. Cir. 2020) (upholding invalidity but only

after ensuring that the machine was shipped to the United States); *W.L. Gore & Assocs., Inc. v. Garlock, Inc*. 721 F.2d 1540, 1549 (Fed. Cir. 1983) (letter offer from individual in New Zealand to a company in Massachusetts did not trigger the on-sale bar where "[n]othing came of that letter" and "[t]here is no evidence and no finding that the present inventions thereby became known or used in this country."). This Court has made clear that "the mere fact that the sale was made to a United States company" is not sufficient to show that a foreign entity's offer was made in the United States. *Caterpillar*, 837 F. App'x at 778.

In *Caterpillar*, an invoice indicated that a patented machine was sold to a customer located in the United States but that the machine may have been destined for Italy. *Id.* at 777. This Court ordered supplemental briefing because "where it appears that the transfer of title occurred in Italy, our cases do not hold that the mere fact that the sale was made to a United States company is sufficient" for a finding that an offer for sale was made in the United States. *Id.* at 778. This Court stated that it instead "must analyze whether the invention was sold ***for use in the United States***." *Id.* (emphasis added). This Court then found that substantial evidence supported the lower tribunal's finding that the machine was shipped to the United States (and not Italy) and, for that reason, the court upheld the ruling of invalidity under § 102(b). *Id.* at 778-80.

The following chart summarizes on-sale-bar cases that CMB has located in which the offeror was outside of the United States, the offeree was outside of the United States, and/or the invention subject to the offer was to be used outside of the United States:

| Case Citation | Offer From U.S.? | Offer To U.S.? | Delivery "for Use" in U.S.? | **Court Finding**: Offer in this country? |
|---|---|---|---|---|
| *W.L. Gore & Assocs., Inc. v. Garlock, Inc.* 721 F.2d 1540 (Fed. Cir. 1983) | No | Yes | No | No |
| *Caterpillar, Inc. v. Int'l Trade Comm'n, 837 F. App'x 775* (Fed. Cir. 2020) | No | Yes | Yes | Yes |
| *In re Caveney*, 761 F.2d 671 (Fed. Cir. 1985) | No | Yes | Yes | Yes |
| *Hamilton Beach Brands, Inc. v. Sunbeam Prod., Inc.*, 726 F.3d 1370 (Fed. Cir. 2013) | No | Yes | Yes | Yes |
| *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998) [pre-*Pfaff*] | No | Yes | Yes | Yes |
| *Link Treasure Ltd. v. Baby Trend, Inc*., 809 F. Supp. 2d 1191 (C.D. Cal. 2011) | No | Yes | Yes | Yes |
| *Aguayo v. Universal Instruments Corp*., 356 F. Supp. 2d 699 (S.D. Tex. 2005) | Yes | Yes | No | Yes |

| Case Citation | Offer From U.S.? | Offer To U.S.? | Delivery "for Use" in U.S.? | **Court Finding**: Offer in this country? |
|---|---|---|---|---|
| *Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426 (9th Cir. 1973) | Yes | No | No, but delivered from the U.S. | Yes |

In sum, while only *W.L. Gore* has similar facts, this Court has never found an offer for sale to be "in this country" under 35 U.S.C. § 102(b) (pre-AIA) where an offeror is outside of the United States and the offer contemplates use of the offered invention outside of the United States. Furthermore, while the offered invention in *Caterpillar* was found to be for use in the United States, as explained above, the decision makes clear that the patent would not have been invalidated based on an on-sale bar had the offered invention not been shipped to the United States.

Here, there is no evidence as to where the CMB3400 envisioned in the quotation was to be delivered and therefore, even if the quotation constituted an offer for sale, there is no evidence that such evidence was, in the words of pre-AIA section 102(b), "in this country." To the contrary, there is no evidence of any prefatory activity between CMB and Complete Packaging or what Complete Packaging even is. Indeed, Belvac's Mr. Gillest testified he "assume[d]" that Complete Packaging received the quote on behalf of a customer but did not know

who that customer was or in what country its facility was located. Appx1851.

Therefore, Belvac could not have proved and cannot prove that, even if the

quotation was an offer for sale, that such offer was "in this country" because the

anticipated location for the quoted machine is unknown. *Caterpillar*, 837 F. App'x

at 778; W.*L. Gore*, 721 F.2d at 1549.

### 3. The district court did not err in granting CMB's cross-motion of no invalidity under the on-sale bar.

The district court did not err in granting CMB's cross-motion of no invalidity

under the on-sale bar.

Even if Belvac's examples purportedly showing CMB's sales process

plausibly demonstrated an offer for sale in those instances – they do not – the district

court did not err in granting CMB's motion for summary judgment for all the reasons

provided above that demonstrate that the quotation was not sufficiently definite such

that Complete Packaging could form a binding contract by simple acceptance and

because the alleged offer was not in this country. Belvac's examples do not change

this analysis. There was therefore no issue of fact for the jury to determine.

Furthermore, Belvac's reliance on various secondary sources to argue that "a

party's contractual practices are relevant to interpretating its contracts" is misplaced.

Br. 72. Contrary to Belvac's assertion, the Restatement actually says that, with

respect to "action of only one party only . . . the conduct of a party may be evidence

against him that he had knowledge or reason to know *of the other party's meaning*,

but self-serving conduct is not entitled to weight." Rest. 2d Contracts § 202 cmt. g (emphasis added). Here, it is not Complete Packaging's meaning that matters, but whether CMB manifested a willingness to enter into a contract with Complete Packaging. *See Linear Tech.*, 275 F.3d at 1048.

*Fisher-Price* squarely applies. *Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 F. App'x 387, 392 (Fed. Cir. 2004). There, this Court affirmed the jury's determination that an initial quotation was not an offer for sale because it "was only the beginning of a normally lengthy negotiation process, which would ultimately lead to the first purchase order for a commercial version of a new Fisher–Price product." *Id.* Similarly and on this record, the Complete Packaging quotation was an initial quotation, and no evidence suggests that CMB and Complete Packaging had any prior (or even subsequent) business dealings. And as shown above, the quotation itself left many terms unsettled, leaving much room for negotiation. As such, the Complete Packaging quotation would have been "the beginning of a normally lengthy negotiation process" between Complete Packaging and CMB relating to the CMB3400. *Id.*

### D.    The Asserted Claims are not invalid as a matter of law for lack of written description under Section 112.

Belvac's contention that the Asserted Claims are invalid for lack of written description under Section 112 is incorrect.

At the outset, whether the claims are supported by adequate written

description is not a question of law as Belvac suggests. Br. 74. Instead, it is a "factual inquiry" that the jury already decided. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351-52 (Fed. Cir. 2011) (noting that review "is severely circumscribed as a factual issue already decided by a jury"). Here, after proper instructions, the jury found that Belvac failed to prove by clear and convincing evidence that the Asserted Claims were invalid for lack of written description. Appx3771-3773; Appx3906-3907. Substantial evidence supports that verdict, and this Court should deny Belvac's request to overturn it.

### 1. Substantial evidence, much of which was uncontroverted, supported the jury's verdict on written description.

Belvac's sole argument is that the claims allegedly lack written description because, while they recite necking machines with dies configured to neck cans, the specification only discloses one of three possible configurations (i.e., moving the dies onto cans as opposed to also moving the cans into dies or moving both). Br. § IV.A.1. As explained below, it is undisputed that all three noncritical options were well-known in the prior art at the time of the invention, and the inventive aspects of the claims have nothing to do with whether the can or die moves. In any event, Belvac's argument is contrary to this Court's law and the substantial evidence presented at trial.

Despite Belvac's contention, a specification's description of an exemplary embodiment can be — and often has been found to be — sufficient for written

description of broader claims. "[T]here is no categorical rule that a species cannot suffice to claim the genus." *Hynix*, 645 F.3d at 1352; *see Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) ("An applicant is not required to describe . . . every conceivable and possible future embodiment of his invention"); *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049 (Fed. Cir. 2020) ("[A] patent specification need not re-describe known prior art concepts."); *Zoltek Corp. v. U.S.*, 815 F.3d 1302, 1308 (Fed. Cir. 2016). The "general rule" is "that disclosure of a species provides sufficient written description support for a later filed claim directed to the genus." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124-25 (Fed. Cir. 2004). "[S]o long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description." *Hynix*, 645 F.3d at 1352.

Notably, the Federal Circuit has identified various *Capon* factors for evaluating written description. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citing *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)). Those factors include "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue." *Id.* In addition, "the criticality or importance of an unclaimed limitation to the invention can be relevant to the written description inquiry." *In re Global IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019).

Here, the jury heard substantial evidence about the asserted patents' specification, the nature and scope of the claims, the understanding of skilled artisans and prior art at the time of the invention (that included all three options), and the criticality of the specific configuration described in the specification, all of which support the verdict and constitute substantial evidence. *See* Appx15-16; Appx3575-3578. First, it was undisputed that the specification contains a detailed description of the claimed invention in which dies are used to neck cans at increased speeds, stroke lengths, and working arcs. *E.g.*, Appx63, Abstract; Appx74, 1:55-61, 2:8-33; Appx75, 3:37-66. It does not describe all possible configurations for moving the dies and cans during necking because that aspect was noncritical to the invention and the possible configurations were already well-known in the art. Appx2590-2591; Appx3577.

Second, CMB presented ample evidence that the "nature and scope of the claims" focused on the combination of longer stroke length, higher speed, and a longer working arc — and not whether the can or the die moved in the machine. *See Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1359 (Fed. Cir. 2019) (rejecting written description argument because "genus of more potent promoters was already well explored in the relevant art" and "[the patent] makes clear that its invention was . . . not the well-known techniques for performing the . . . enhancement"). For example, the lead inventor, Mr. Dunwoody, described that combination of stroke length,

speed, and working arc as the "essence of the invention." Appx2266; Appx2271. CMB's Mr. Egerton agreed. Appx2332-2333. CMB's technical expert, Mr. Walsh, likewise explained that the invention lied not in how or which of the dies and cans move, but rather in "[t]he speed, the stroke length, and the working arc" of the necking machine. Appx2604; Appx2590; Appx3554.

Third, the jury heard undisputed evidence as to the existing knowledge in the field and the prior art's extent and content, namely, that it was well known that the die or can (or both) could move during necking. CMB's Mr. Walsh explained that it had been long known to move either component in a necking machine. Appx2590-2591; Appx3577. Belvac's Mr. Gillest agreed as well, admitting that it was known that the can or die could move, and that prior art showed a "dual ram" mechanism for moving the die rather than the can, the same mechanism used in the accused machine. Appx3465-3466; Appx2894-2895 (Belvac's Mr. Marshall explaining that prior art "Cvacho" taught the dual ram and thus the die moving rather than the can).[6]

---

[6] *See also Hologic, Inc. v. Smith & Nephew, Inc.*, 884 F.3d 1357, 1362 (Fed. Cir. 2018) (substantial evidence showed disclosure of "fibre optics bundle" and therefore provided written description for "light guide" because "various types of light guides were well-known in the art"); *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (patentee may rely on "information that is 'well-known in the art'"); *Trading Techs. v. eSpeed, Inc.*, 595 F.3d 1340, 1360-61 (Fed. Cir. 2010) (claim to "single action of a user input device" was supported by a specification disclosing "single click of a computer mouse" because an ordinarily-skilled artisan "would have known about other forms of 'single action'").

Fourth, the jury heard evidence that whether the can or die moved was noncritical — in fact, which moved was entirely irrelevant to the invention. *See In re Peters*, 723 F.2d 891, 892-94 (Fed. Cir. 1983) ("[O]ne skilled in the art would readily understand that in practicing the invention it is unimportant whether the tips are tapered"). As in *Peters*, no prior art was distinguished during prosecution of CMB's patents on the basis of whether the can or die moved. Moreover, CMB's Mr. Walsh explained that regardless of which part moves, "[t]here's nothing different as far as the necking process . . . ; it's just the way you handle the can . . . ." Appx2587. He further explained that "which part moves in the machine" is not "critical" to the invention. Appx3577 ("[I]t's just can handling. . . . [T]he reason they moved the die under the can is because you'd have to if you cantilevered the machine [like in the accused product]. . . . It [meaning the accused product's cantilevered design] doesn't have anything to do with the quality of the can or the performance of the machine versus doing it the conventional way."); Appx3577-3578 ("How you get there is irrelevant."). Belvac's Mr. Gillest even agreed with CMB's Mr. Walsh on the fundamentals of the criticality point: for a necking machine to work, the can and the die must of course come together; it could be done either way. Appx3462-3464.

Accordingly, based on the relevant *Capon* factors, Mr. Walsh testified that there was adequate written description for the full scope of the Claims. Appx3575-3578. Thus, Belvac's contention that "both technical experts agreed that the

specification . . . contained no disclosures from which a POSITA could understand that the invention . . . included the full scope of the Asserted Claims" is false. Br. 76. Equally false is Belvac's claim that Mr. Walsh supposedly failed to consider the specification. *Id.* While Mr. Walsh testified that part of his opinion was "not based on any quotes or excerpts or text from the asserted patents themselves," that testimony was solely about the specific "push a die onto the can" configuration. Appx3616. In finding that the other examples disclosed in the specification were sufficient, Mr. Walsh certainly ***did*** consider the specification. Specifically, he repeatedly testified that CMB's patents disclose examples of the "process" of necking, the noncritical aspect of moving cans into stationary dies. Appx3462; Appx3578; Appx3613. Such disclosure was enough because the invention is directed to speed, stroke length, and working arc; which part (die or can) moves not only was irrelevant to the invention (and therefore not critical) but also well known in the art. Appx3575-3578.

While Belvac's Mr. Gillest disagreed with CMB's Mr. Walsh, this is of no moment on appeal because the jury simply agreed with Mr. Walsh. Furthermore, Belvac takes no issue with the district court's jury instructions on written description, including that the jury may consider the *Capon* factors.

In summary, substantial evidence supports the jury's verdict, and this Court should not find any asserted claim invalid.

### 2. Not only is Belvac's "representative species" standard inapplicable, substantial evidence supported that it was met.

Belvac insists that, where a claim recites a genus, the specification must disclose "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus [such] that one of skill in the art can 'visualize or recognize' the members of the genus." Br. 77-82 (citing *Ariad*). While this so-called "representative species" standard does not apply to the claims here, substantial evidence showed it was met in any event.

The "representative species" standard typically applies to broad genus claims with functional properties in unpredicable fields. *See BASF Plant Science, LP v. Commw. Sci. and Indus. Research Org.*, 28 F.4th 1247, 1268 (Fed. Cir. 2022); *Ariad*, 598 F.3d at 1350. But here, the genus is narrow, the asserted claims are directed to a machine (and not to a method), and the field is predictable. Overall, mechanical arts are relatively predictable, and it is undisputed that there were only three ways to configure a necking machine (moving the can into the die, the die over the can, or both).[7] *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987).

Moreover, the Federal Circuit has clarified that "[t]here is no special rule for

---

[7] It is also questionable whether the claims even qualify as "genus" claims. They are combination claims reciting different components, rather than genus claims to numerous species. In fact, Belvac itself represented that the claims were *not* genus claims. Appx3648 ("The . . . *In re: Global* case, deals with cases when you're dealing with genus and species of products. That's . . . not the issue in this case.").

supporting a genus by the disclosure of a species[.]" *Hynix*, 645 F.3d at 1352. "[S]o long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description." *Id.*; *see Ariad*, 598 F.3d at 1351. For example, while "a patent claiming the invention of a new genus [may require] disclosing a number of representative species or a [common] structural feature," when a genus "is well understood in the art and not itself the invention but is instead a component of the claim, background knowledge may provide the necessary support[.]" *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 648 (E.D. Tex. 2017), *aff'd*, 739 F. App'x 643 (Fed. Cir. 2018); *see Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1337 (Fed. Cir. 2021) ("This is not to say . . . that a patentee must . . . disclose [representative species] . . . when such [species] are already known[.]").

Substantial evidence shows that the only-three different necking configurations were well known and understood in the art. Appx2590-2591; Appx3577; Appx3465-3466; Appx2894-2895. It also shows that which component moves (the die or the can) is not itself the invention – the invention instead focused on stroke length, speed, and working arc. Appx2266; Appx2271; Appx2332-2333; Appx2604; Appx2590; Appx3554. Belvac's proposed representative-species standard is thus inapplicable. *See Erfindergemeinschaft UroPep GbR*, 276 F. Supp.

3d at 648.

And even if Belvac's proposed representative-species standard did apply, it would not negate the jury verdict. First, Belvac turns the burden of proof on its head, arguing that "*Crown* offered no evidence that the sole necking configuration disclosed in the Asserted Patents would convey to a POSITA . . . that the inventors possessed all possible configurations." Br. 79 (emphasis added). But alleged invalidity was Belvac's burden to prove (by clear and convincing evidence)

Second, the Court has considered the same evidence found relevant under the *Capon* factors in evaluating whether a specification discloses a representative number of species. *Ajinomoto*, 932 F.3d at 1359 ("As to a representative number of species, . . . the amount of disclosure necessary . . . will necessarily vary depending on the context, considering such facts as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and the predictability of the aspect at issue.") (quotations omitted). Here, despite Belvac's contention, the evidence was not merely Mr. Walsh's testimony that "'necking machines' as a concept are understood to include all possible configurations." Br. 80-81. The jury also heard evidence that all possible configurations – the one disclosed in the patent and the two that were not specifically discussed – were well known in the prior art. Appx2590-2591; Appx3577; Appx3465-3466; Appx2894-2895; *see also Ajinomoto*, 932 F.3d at 1359

("[Because] the genus of more potent promoters was already well explored in the relevant art . . . the Commission permissibly found in the specification . . . a representative number of species . . . ."). Evidence also showed that moving dies into cans and moving cans into dies were interchangeable methods. Appx3462-3464; Appx3577-3578. And like in *Hynix* where "[t]here was substantial evidence that the invention would not be undermined by the use of a non-multiplexed bus," Mr. Walsh testified that regardless of which part moves, "[t]here's nothing different as far as the necking process."[8] 645 F.3d at 1352; Appx2587-2588; Appx3576-3577.

### 3. Despite Belvac's contention, it was proper for the jury to consider CMB's evidence of the knowledge of a POSITA.

Belvac contends that CMB's evidence as to a POSITA's knowledge was "irrelevant . . . and could not support the jury's verdict." Br. 82-86. That too is incorrect. First, what a POSITA would have known is relevant to the written description inquiry. *See, e.g., Hynix*, 645 F.3d at 1352 (relying on "testimony from

---

[8] *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) is inapposite. Br. 81. There, the Court found inadequate written description because "[a]fter reading the patent, a person of skill in the art would not understand how to make a seamless DWT generically . . . , except by 'maintaining updat[ed] sums of DWT coefficients,'" which was the limitation omitted in the claims. *Id.* But that case did not involve any of the *Capon* factors at issue here. And unlike the omitted limitation in *LizardTech*, using different necking configurations would not undermine CMB's invention. *See Hynix*, 645 F.3d at 1352 ("There was substantial evidence that the invention would not be undermined by the use of a non-multiplexed bus . . . . This testimony serves to aptly distinguish . . . *LizardTech*[.]").

Rambus's expert" that using undisclosed configurations would not undermine invention); *Hologic*, 884 F.3d at 1364 (finding relevant what "a person of ordinary skill . . . would have known"); *Ariad*, 598 F.3d at 1351 (listing *Capon* factors implicating a POSITA's knowledge).

The cases cited by Belvac do not hold otherwise. For example, Belvac suggests that *Rivera v. Int'l Trade Comm.* categorically excludes using a POSITA's knowledge to supplement the specification. Br. 83. But there, the Court merely held that a POSITA's knowledge cannot be used to "teach limitations that are not in the specification." 857 F.3d 1315, 1322 (Fed. Cir. 2017). The limitations at issue there (a container with an integral filter) were expressly recited in the claims but had no support whatsoever in the specification. But more importantly, the distinction between what was in the specification and the actual claim limitations was "fundamental." *Id.* That is not the case here. There are multiple embodiments in CMB's patents describing each claim element, and the evidence presented showed that which component moves (the die or can) is irrelevant. Appx3577-3578.

Second, Belvac repeats its false statement that Mr. Walsh supposedly conceded that he did not consider the specification in rendering his opinion. As explained above, Mr. Walsh certainly did consider the specification along with the relevant *Capon* factors. Appx3462-3464; Appx3613; Appx3575-3578. As such, the jury was free to, and presumably did, consider Mr. Walsh's testimony in reaching

its verdict.

### 4. The jury was properly instructed to consider evidence that whether the can or the die moves is noncritical.

Belvac argues that CMB's evidence of non-criticality "fails to address a POSITA's understanding *of the actual disclosures of the specification* and so could not support the jury's verdict." Br. 84. That argument ignores not only this Court's controlling law but also the trial record. Indeed, the law requires written description of the claim as a whole. But "the criticality or importance of an unclaimed limitation to the invention can be relevant to the written description inquiry." *Global IP*, 927 F.3d at 1377; *see also Peters*, 723 F.2d at 892-94. Here, the jury properly heard Mr. Walsh's testimony that the non-criticality of whether the can or the die moves supports his opinion that the examples in the specification were sufficient written description. Appx2587; Appx3462-3464; Appx3577-3578.

Belvac faults Mr. Walsh's testimony as supposedly being about necking configurations being noncritical to necking machines "generally" and not about how a POSITA would understand the criticality of necking configurations "*to the claimed invention*." Br. 84-85 (emphasis original). But Belvac ignores that Mr. Walsh testified that the invention had to do with speed, stroke length, and working arc. Appx3576. He was then specifically asked whether which part moves in the machine is critical "*to the invention*," to which he responded "no" and gave an explanation, including that it had nothing to do with "the performance of the machine." Appx3577

(emphasis added). As such, Mr. Walsh's testimony not only was tied to the claimed invention but also supported the jury's verdict.

Accordingly, the "general rule" applies here that the CMB patents provide adequate written description of machines where either the can or die moves because they disclose examples in which the can moves. *Bilstad*, 386 F.3d at 1124. The record is replete with evidence showing that the nature of the claims focuses on the inventive combination of features that has nothing to do with whether the can or die moves (e.g., *Ajinomoto*, 932 F.3d at 1359); by the time of the invention and as demonstrated in testimony and by prior art, ordinarily-skilled artisans already knew that a can or a die (or both) could move (e.g., *Trading Techs.*, 595 F.3d at 1360-61; *Hynix*, 645 F.3d at 1352); and whether the can or die moves is not critical to the invention (e.g., *Global IP*, 927 F.3d at 1377). In view of this substantial evidence, the Court should uphold the jury's verdict as to written description.

## VIII. CONCLUSION

As to CMB's appeal, this Court should reverse the district court's denial of CMB's motion for judgment as a matter of law and the district court's judgment of noninfringement of the asserted claims of the '982 and '784 patents or remand for the district court to do so. The Court furthermore should remand for trial on damages and willfulness.

As to Belvac's cross-appeal, this Court should affirm the district court's grant of CMB's motion for summary judgment of no on-sale bar, denial of Belvac's cross motion for summary judgment on on-sale bar, and denial of Belvac's JMOL motion on written description.

Date:  August 21, 2023

*/s/ Daniel J. Goettle*
Daniel J. Goettle
Jeffrey Lesovitz
Stephanie Hatzikyriakou
Robert Patrick Leeson
BAKER & HOSTETLER LLP
1735 Market Street
Suite 3300
Philadelphia, PA  19103-7501
(215) 568-3100

*Attorneys for Plaintiffs-Appellants*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  22-2299, -2300

**Short Case Caption:**  Crown Packaging Technology, Inc. v. Belvac Production Machinery, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,959  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/21/2023

Signature:  /s/ Daniel J. Goettle

Name:  Daniel J. Goettle