**Nos. 22-2299 (L), 22-2300**

In the

# United States Court of Appeals
## For the Federal Circuit

---

CROWN PACKAGING TECHNOLOGY, INC.,
CARNAUDMETALBOX ENGINEERING LTD.,
*Plaintiffs-Appellants,*

v.

BELVAC PRODUCTION MACHINERY, INC.,
*Defendant-Cross-Appellant.*

---

Appeals from the United States District Court
for the Western District of Virginia in No. 6:18-cv-00070-NKM-RSB
before Senior Judge Norman K. Moon

---

**REPLY BRIEF OF CROSS-APPELLANT
BELVAC PRODUCTION MACHINERY, INC.**

---

Brian D. Schmalzbach
Brian C. Riopelle
David E. Finkelson
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
bschmalzbach@mcguirewoods.com
briopelle@mcguirewoods.com
dfinkelson@mcguirewoods.com

*Counsel for Cross-Appellant
Belvac Production Machinery, Inc.*

# TABLE OF CONTENTS

**Page**

Table of Contents ..................................................................................i

Table of Authorities ............................................................................ ii

Table of Abbreviations ...................................................................... iv

Introduction .........................................................................................1

Argument ..............................................................................................3

I.      The Asserted Patents are invalid under 35 U.S.C. § 102(b). ..................3

     A.      The CPM Offer was an amply definite commercial offer for sale. ...............................................................................3

         1.      Crown's right to provide written acceptance did not render the Offer indefinite.....................................................4

         2.      Crown's so-called "hallmarks" are unsupported by law and belied by this record. ...............................................8

     B.      Crown's "in this country" argument flouts decades of this Court's precedent. ..........................................................12

     C.      At a minimum, there is a genuine dispute of material fact that precludes summary judgment for Crown. ..........................15

II.      The Asserted Claims are invalid for lack of a written description because factors untethered to the specification cannot satisfy the written description requirement. ............................17

Conclusion..........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguayo v. Universal Instruments Corp.*,
356 F. Supp. 2d 699 (S.D. Tex. 2005) ............................................................14

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ......................................................................19

*Atlanta Attachment Co. v. Legett & Platt, Inc.*,
516 F.3d 1361 (Fed. Cir. 2008) ......................................................................11

*Buildex Inc. v. Kason Indus., Inc.*,
849 F.2d 1461 (Fed. Cir. 1988) ......................................................................11

*Caterpillar, Inc. v. International Trade Commission*,
837 F. App'x 775 (Fed. Cir. 2020) .................................................................15

*In re Caveney*,
761 F.2d 671 (Fed. Cir. 1985) ........................................................................13

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
109 F. App'x 387 (Fed. Cir. 2004) .................................................................16

*In re Global IP Holdings LLC*,
927 F.3d 1373 (Fed. Cir. 2019) ......................................................................18

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) ......................................................................14

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*,
726 F.3d 1370 (Fed. Cir. 2013) ......................................................................13

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
855 F.3d 1356 (Fed. Cir. 2017) ................................................................5, 6, 7

*Junker v. Medical Components, Inc.*,
25 F.4th 1027 (Fed. Cir. 2022) .........................................................................9

*Lexar Media, Inc. v. Fuji Photo Film USA, Inc.,*
  2007 WL 677163 (N.D. Cal. Mar. 1, 2007) .....................................13

*Linear Tech. Corp. v. Micrel, Inc.,*
  275 F.3d 1040 (Fed. Cir. 2001) .........................................................10

*Link Treasure Ltd. v. Baby Trend, Inc.,*
  809 F. Supp. 2d 1191 (C.D. Cal. 2011).............................................13

*Rivera v. ITC,*
  857 F.3d 1315 (Fed. Cir. 2017) .........................................................18

*Robbins Co. v. Lawrence Mfg. Co.,*
  482 F.2d 426 (9th Cir. 1973).............................................................14

*S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.,*
  567 F. App'x 945 (Fed. Cir. 2014) ....................................................11

*Scaltech Inc. v. Retex/Tetra LLC,*
  269 F.3d 1321 (Fed. Cir. 2001) .........................................................11

*The Medicines Co. v. Hospira, Inc.,*
  881 F.3d 1347 (Fed. Cir. 2018)................................................5, 7, 12

*WBIP, LLC v. Kohler Co.,*
  829 F.3d 1317 (Fed. Cir. 2016) .........................................................20

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.,*
  721 F.2d 1540 (Fed. Cir. 1983) .........................................................14

**Statutes**

35 U.S.C. § 102(b)..............................................................................3, 13

**Other Authorities**

2 Anderson U.C.C. § 2-206:58 (3d ed.) ..................................................9

U.C.C. § 2-305.......................................................................................10

McCormick on Evidence, § 198 (8th ed. 2022) ....................................16

### TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| '425 Patent | U.S. Patent No. 7,770,425 |
| '982 Patent | U.S. Patent No. 9,968,982 |
| '570 Patent | U.S. Patent No. 9,308,570 |
| '784 Patent | U.S. Patent No. 10,751,784 |
| '843 Patent | U.S. Patent No. 8,601,843 |
| AIA | Leahy-Smith America Invents Act of 2011 |
| Asserted Patents | Collectively, the '570, '982, and '784 Patents |
| Asserted Claims | Claims 1, 7, and 8 of the '570 Patent; Claims 20, 22, 24, and 26 of the '982 Patent; and Claim 7 of the '784 Patent |
| Belvac | Belvac Production Machinery, Inc. |
| Crown | Collectively, Crown Packaging Technology, Inc. and CarnaudMetalbox Engineering Ltd. |
| CMBE | CarnaudMetalbox Engineering Ltd. |
| CPM | Complete Packaging Machinery |
| CPM Offer or Offer | Crown's November 14, 2006 offer for a 3400 machine sent to Complete Packaging Machinery, Appx4724-4734. |
| 3400 | Crown's 3400 Die Necking Machine |
| TBN | Belvac's THE BELVAC Necker machine |
| POSITA | Person of ordinary skill in the art |

## INTRODUCTION

The asserted beverage can necking patents are invalid under the pre-AIA on-sale bar.  Crown does not dispute that the alleged invention was "ready for patenting" and embodied in its CBM3400 necking machine more than one year before the critical date.  So the only question is whether Crown's self-styled "offer" to sell that machine to a Colorado company was a commercial offer for sale in this country.  It was.

Crown scarcely defends the form-over-substance argument the District Court found dispositive—that the Offer sometimes also referred to itself as a "quotation."  Instead, Crown leans on the notion that the Offer was "subject to [Crown's] written confirmation."  But Crown identifies no case in which such a superficial reservation undid a commercial offer for sale. And Crown's attempt to distinguish two recent cases rejecting its same argument misstates the key facts that make them indistinguishable from this Offer.

Crown also plucks a grab-bag of facts from other cases, deems them "hallmarks" of an offer, and denies that these facts were present in its own Offer.  But Crown again gets the facts of those cases wrong.  In any event,

Crown misses that many of those same factors (like product description, price, and delivery terms) are fully present here.

Last, Crown turns to an argument the District Court (with good reason) did not even mention: that the Offer directed at a Colorado-addressed company was not made "in this country." But Crown ignores binding holdings from this Court, and provides no reason for abandoning decades' worth of precedent that an offer (like this one) directed to a United States offeree is made "in this country." Thus, neither Crown nor the District Court provides any persuasive reason why this Offer does not invalidate the Asserted Patents.

Those Patents are also invalid for lack of a written description. As Belvac showed, nothing *in the specification* discloses the full scope of claimed die-and-can necking configurations. Crown now hangs its hat on the notion that a POSITA would have understood other configurations and would not have considered the differences critical. But that argument violates controlling law by divorcing the POSITA's knowledge from the only relevant inquiry: what is disclosed within the four corners of the specification. Because this Court's precedent limits that written description

2

inquiry to those four corners, there is zero evidence to support the judgment. This Court should hold that the Asserted Patents are invalid.

<u>ARGUMENT</u>

I.    **The Asserted Patents are invalid under 35 U.S.C. § 102(b).**

Crown resists the pre-AIA on-sale bar with three arguments: (1) the Offer was insufficiently definite because it was subject to CBME's written acceptance; (2) the Offer lacked other so-called "hallmarks" that this Court has never required to find an offer invalidating; and (3) the Offer sent to a Colorado offeree was not made "in this country."  None provides any reason to withhold judgment of invalidity, and certainly not to prevent a jury from even considering whether the alleged "invention was . . . on sale in this country, more than one year prior" to the critical date.  35 U.S.C. § 102(b) (pre-AIA).

A.    **The CPM Offer was an amply definite commercial offer for sale.**

CMBE's Offer to sell a CMB3400 machine to CPM was an invalidating commercial offer for sale.  It targeted a U.S. customer and proposed detailed terms—such as price ($2,764,200), shipping ("FCA (Shipley/Our Packers")"), delivery ("ready for dispatch within 30 weeks from receipt of order"), payment (50% up front), *force majeure*, warranties, installation, testing,

choice-of-law, and a 60-day firm offer window—at least as definite as other invalidating offers under Federal Circuit law.  Belvac Br. 61-62.  Crown does not dispute that most of those terms support the conclusion that the Offer is invalidating, and its immaterial quibbles with the remaining terms are meritless.

Although Crown insists that this edifice of definite contract terms does not constitute an offer, it identifies no precedent holding that any similar proposal is *not* an offer.  Instead, Crown only tries (unsuccessfully) to distinguish the many cases holding that even less obviously offer-like communications are invalidating.  That telling disparity reveals that this Court's precedent favors Belvac overwhelmingly, and Crown not at all.

### 1.  Crown's right to provide written acceptance did not render the Offer indefinite.

Crown's primary argument is that a reservation of the right to accept orders rendered the Offer indefinite.  But Crown tellingly offers no precedent holding that such a reservation undoes a commercial offer for sale.  And Crown fails to distinguish two recent cases rejecting that argument and holding that proposals with indistinguishable reservations nevertheless were invalidating offers.

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1361 (Fed. Cir. 2017), and *The Medicines Co. v. Hospira, Inc.*, 881 F.3d 1347, 1349 (Fed. Cir. 2018) ("*Medicines II*"), considered and rejected Crown's argument that the right to confirm a purchase order defeats the on-sale bar.  Belvac Br. 67.  In each case, this Court held that a *single* agreement—an agreement that both (1) contained a reservation of written acceptance clause and (2) obligated the seller to fulfill purchase orders—was an enforceable offer despite the reservation.  *Id.* at 67-68.  The same is true of the Offer to CPM here.

Crown's attempt to distinguish *Helsinn* and *Medicines II* misstates their key facts.  In Crown's telling, the offer in each case was preceded by a "prior agreement" obligating the offeror to accept orders, which supposedly overrode the subsequent reservation of acceptance clause.  Cross-Response Br. 36.  So Crown urges that the presence of a written confirmation clause *without* a preexisting fulfillment obligation from a "prior agreement" distinguishes the Offer to CPM.  *Id.*

But Crown is wrong.  Neither case addressed any prior agreement creating a preexisting fulfillment obligation.  And so this Court ascribed no relevance to any such agreements in the on-sale bar analysis.  Rather, in each

of those cases, this Court held that the single agreement containing *both* the reservation of acceptance and the fulfillment obligation was the invalidating commercial offer for sale. The same is true here. So the CPM Offer is indistinguishable from *Helsinn* and *Medicines II*.

Crown says that Helsinn "had *previously* signed a binding supply and purchase agreement obligat[ing] Helsinn to sell and MGI to purchase those products." Cross-Response Br. 36 (emphasis added). Thus "the parties were *already* contractually bound to one another regarding such orders." *Id.* (emphasis added). And Crown argues that "[t]here is no such *prior* agreement between CMB and Complete Packaging here." *Id.* (emphasis added).

But there was no "prior agreement" in *Helsinn* relevant to the holding. Instead, it was the same Supply and Purchase Agreement that both contained the reservation of acceptance *and* constituted the commercial offer of sale. *Helsinn*, 855 F.3d at 1361. Under the Supply and Purchase Agreement, "MGI agreed to purchase exclusively from Helsinn," though the Agreement subjected MGI's purchase orders to Helsinn's "written acceptance." *Id.* at 1361-62. The Supply and Purchase Agreement also obligated Helsinn to fulfill any purchase orders. *Id.* It was this Supply and

Purchase Agreement—not the License Agreement or any other "preexisting agreement"—that the Court found "bears all the hallmarks of a commercial contract for sale." *Id.* at 1364.

Crown misstates *Medicines II* "for similar reasons." Cross-Response Br. 36. It tries to distinguish that case on the grounds that "The Medicines Company had already signed an exclusive distribution agreement with the customer," *id.*, implying that some separate subsequent proposal was the invalidating offer for sale. But again, it was *the Distribution Agreement itself*—not any separate agreement—that the Court found constituted an invalidating offer for sale despite the superficial reservation of The Medicines Company's right to reject purchase orders. *Medicines II*, 881 F.3d at 1352.

Crown also tries to distinguish *Helsinn* (but not *Medicines II*) on the ground that the agreement imposed obligations even if Helsinn ultimately declined to accept an order. Cross-Response Br. 36. But so too here. Before CMBE could exercise its reservation, the Offer obliged it to make "every effort" to "carry out the contract" once CPM accepted. Appx4732; *see also Medicines II*, 881 F.3d at 1352 ("[D]espite The Medicines Company's reliance

on its apparent blanket ability to reject all purchase orders, the agreement actually required it to make reasonable efforts.").

If anything, this Offer is even more clearly a commercial offer for sale than the analogous agreements in *Helsinn* and *Medicines II*.  This Offer pegged CMBE's delivery obligation to CPM's order—not CMBE's written acceptance—and required CPM's first payment up front with that order.  *See* Belvac Br. 68.  Crown insists that those CMBE obligations apply "***if and only if*** the purchase order has been accepted in writing."  Cross-Response Br. 35 (emphasis in original).  But the emphasized language that Crown's argument depends on simply is not in the Offer.  Based on the plain language actually in the Offer itself, CPM could have accepted and created a binding contract.

## 2. Crown's so-called "hallmarks" are unsupported by law and belied by this record.

Crown asserts that the Offer lacked "hallmarks" of an offer for sale because it (i) omits "a clear identification of the requested product"; (ii) lacks "final or even near-final pricing"; (iii) does not "specify any delivery location or method"; (iv) was labeled a "Quotation"; and (v) does not identify "the can-making customer who would install the necking machine if ever

8

delivered." Cross-Response Br. 37-40. But none of those so-called "hallmarks" are required by this Court's precedent. And the Offer has many of those characteristics in any event.

First, the Offer amply identifies the CMB3400 for sale. Crown asserts without citation that the "customized" nature of the product means CPM could not have accepted the Offer. Cross-Response Br. 37. Not so: this Court held in *Junker v. Medical Components, Inc.* that another customizable product was the subject of an offer. 25 F.4th 1027, 1030 (Fed. Cir. 2022) ("If you should have any specific dimensional requirements this product could generally be tailored to your specifications."); *contra* Cross-Response Br. 41 (asserting that *Junker* involved only "off-the-shelf, standardized" products). And this Offer explains precisely how CPM could accept it in light of the machine's custom nature: by providing the requested "Full Mechanical and Electrical Specifications" and technical requirements Questionnaire. Appx4725-26; *see also* 2 Anderson U.C.C. § 2-206:58 (3d ed.) ("An offer may specify a particular manner in which the offer may be accepted."). Those requests confirm that CPM's acceptance would create a binding contract with all necessary specificity.

9

Second, the Offer has more than sufficient pricing info.  Although price is not a necessary term for an offer anyway, *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1052 (Fed. Cir. 2001) (citing U.C.C. § 2-305), this Offer contained a very specific price term: $2,764,200.    Appx4724.    Crown nevertheless insists that the price term is not "final" because it does not price "Optional Extra Equipment," "special paint," and the like.  Cross-Response Br. 38-39.  At best, that argument may show that there was no offer for those *optional* add-ons.  But the Offer of course prices the CMB3400 *itself*, and Crown does not dispute that the CMB3400 practiced the asserted claims without those add-ons.[1]

Third, the Offer does "specify [a] delivery location," as Crown reluctantly acknowledges in the very next sentence.  Cross-Response Br. 39; *see also* Appx4724 (delivery term "FCA (Shipley/Our Packers)").    Crown denies that this promise qualifies because "CMB never knew of any location for any potential delivery," Cross-Response Br. 39, but that is irrelevant: the Offer committed to deliver the CMB3400 at the "nominated point of

---

[1] Crown also asserts that the Offer lacked a "method of payment" term. Cross-Response Br. 36 & 37.  But Crown ignores the Offer's "payment terms" requiring "50% with order" and 50% "before dispatch."  Appx4730; Belvac Br. 61.

delivery." Appx4731. Crown cites no authority (and we are aware of none) prohibiting a party from offering to deliver a product where its customer wants it.

Fourth, Crown gives a perfunctory nod to the District Court's primary rationale that the "quotation" label is sometimes used in the Offer. Cross-Response Br. 39-40. Crown, however, admits that the label is not dispositive. *Id.* at 40. And Crown makes no attempt to distinguish most of Belvac's cases holding that a self-styled "quotation" was in fact an offer. *See* Belvac Br. 64-65 (citing *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463-64 (Fed. Cir. 1988); *Atlanta Attachment Co. v. Legett & Platt, Inc.*, 516 F.3d 1361, 1366 (Fed. Cir. 2008); *S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 567 F. App'x 945, 950-51 (Fed. Cir. 2014)). Indeed, Crown itself offers another. Although it tries to distinguish *Scaltech Inc. v. Retex/Tetra LLC*, 269 F.3d 1321, 1329 (Fed. Cir. 2001), as lacking any "mention of the offer being a quotation," Cross-Response Br. 42, the Scaltech proposal (as quoted by Crown on the previous page) describes itself as a "'quotation,'" *id.* at 41 (quoting 269 F.3d at 1329 (emphasis added)). Thus, this Court's precedent confirms that the label sometimes used in this Offer does not trump its substance.

Fifth, Crown asserts that "the can-making customer who would install the necking machine" is unidentified. But that assertion is beside the point. The only question is whether *CPM* could have accepted the Offer. There is no authority requiring a past "course of conduct" with the offeree, Cross-Response Br. 40, and Crown cites none. Nor is there any precedent that a hypothesized subsequent transfer to a different "can-making customer" would disqualify the Offer. To the contrary, this Court recognizes that sales proposals to customers who are certainly not the end user remain commercial offers for sale. *See, e.g.*, *Medicines II*, 881 F.3d at 1353.

Crown's so-called "hallmarks" thus provide no reason to doubt that this Offer is a commercial offer for sale. Each hallmark is either unsupported by precedent, satisfied here in any event, or both.

### B.    Crown's "in this country" argument flouts decades of this Court's precedent.

Unlike the District Court, Crown also contends that the Offer was not made "in this country" under pre-AIA § 102(b). Crown's theory is that an offer from outside the United States to a domestic offeree requires that "the invention was sold for use in the United States." Cross-Response Br. 42. But this Court's precedent requires no such thing. Instead, it is sufficient to be

12

"in this country" that an offer is directed at an offeree in the United States. And there is no dispute that the CPM Offer satisfies *that* standard.

This Court's published decisions hold that an offer "directed" at an offeree in the United States suffices. *In re Caveney* illustrates the straightforward analysis: "Although Insuloid presumably made its offer from England, that offer was directed to Tyton at its place of business in the United States. Therefore, 35 U.S.C. § 102(b) is applicable to the facts of this case." 761 F.2d 671, 677 (Fed. Cir. 1985). And *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.* confirms that "a commercial offer for sale made by a foreign entity that is directed to a United States customer at its place of business in the United States may serve as an invalidating activity." 726 F.3d 1370, 1375 (Fed. Cir. 2013) (citing *Caveney*, 761 F.2d at 677).[2] Because it is undisputed that CMBE directed the Offer to a U.S. company at a U.S. address, Belvac Br. 70, the Offer satisfies this requirement as a matter of law.

---

[2] *Accord Lexar Media, Inc. v. Fuji Photo Film USA, Inc.*, 2007 WL 677163, at *3 (N.D. Cal. Mar. 1, 2007) ("[T]here is no requirement that the offer for sale take place in the United States. Rather, the offer must just be directed to an entity in the United States."); *Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1200-01 (C.D. Cal. 2011) (finding offer for sale was made "in this country" when Chinese company directed correspondence to California-based purchaser).

Crown asks this Court to discard that straightforward test under *Caveney* and *Hamilton Beach*. Instead, it would require an inquiry into whether "the invention was sold for use in the United States." Cross-Response Br. 43.

But Crown offers no precedential support for that new inquiry. Crown ignores the holdings of *Caveney* and *Hamilton Beach*, which omit the analysis Crown claims is necessary. *C.R. Bard, Inc. v. M3 Systems, Inc.* affirmed invalidity under the on-sale bar without addressing any evidence (beyond the offeree's Alabama address) that the offered product was for the offeree's domestic use. 157 F.3d 1340, 1376 (Fed. Cir. 1998) (opinion of Mayer, C.J.). And nothing in *W.L. Gore & Assocs., Inc. v. Garlock, Inc.* suggests that the "letter to a company in Massachusetts" would not have been for the product's use in the United States. 721 F.2d 1540, 1549 (Fed. Cir. 1983).[3]

---

[3] Crown relies on the absence in *Garlock* of any "'finding that the present inventions thereby became known or used in this country.'" Cross-Response Br. 43 (quoting 721 F.2d at 1549). But that refers to a separate basis of invalidity under pre-AIA § 102(a)—not the § 102(b) on-sale bar. And none of the other decisions cited by Crown support any requirement of use in the United States either. *See Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426, 434 (9th Cir. 1973) (invention shipped to Australia was on sale in the United States because "offer for sale" was made in Seattle); *Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 743 (S.D. Tex. 2005) (product manufactured in Holland and shipped to Canada was on sale in this country

Crown relies primarily on the nonprecedential *Caterpillar, Inc. v. International Trade Commission*, 837 F. App'x 775 (Fed. Cir. 2020). But even *Caterpillar* contradicts Crown's theory by acknowledging that "under the pre-AIA on-sale bar, if the 'offer for sale' was 'made in this country,' then the invention would be 'on sale' in this country even if the invention was sold for use outside of the United States." *Id.* at 777-78. Any in any event, *Caterpillar* addresses a completed *sale*—not an invalidating *offer* for sale. *Id.* Since the pre-AIA on-sale bar did not require a completed sale—or even an accepted offer—an invalidating offer for sale does not require proof of where the product of an inchoate sale would be used. Rather, it is sufficient under this Court's precedent that the offer was directed inside the United States.

### C.    At a minimum, there is a genuine dispute of material fact that precludes summary judgment for Crown.

In any event, it was error to grant summary judgment *to Crown* because, as Belvac showed, CMBE treated purchase orders in response to offers like this one as binding acceptances. Belvac Br. 71-73. A reasonable jury thus could conclude based on such evidence that CMBE had shown its

---

because "the offer to sell and acceptance of the [product] occurred and were exchanged within the United States").

15

intent to be bound in making this Offer.  Like the District Court, Crown does not meaningfully dispute that the evidence confirms its intent to be bound. *See* Cross-Response Br. 46.

Instead, Crown denies that a party's practice of treating identical offers as binding is relevant to whether this Offer was binding.  *Id.* at 46.  But Crown ignores the McCormick treatise, which confirms "that contracts of a party with third persons may show the party's customary practice and course of dealing and thus supply useful insights into the terms of the present agreement."  McCormick on Evidence, § 198 (8th ed. 2022).  And Crown's own primary authority confirms the relevance of the offeror's contracting practices.  *Fisher-Price, Inc. v. Safety 1st, Inc.* relied on the party's historical pattern of negotiating and accepting purchase orders, and noted that there was "no evidence in the record that bears directly on whether the vendors intended or understood that they would be bound."  109 F. App'x 387, 392 (Fed. Cir. 2004).  Here, by contrast, the record evidence confirms that CMBE understood purchase orders in response to documents like the Offer to be binding acceptances.  At a minimum, that evidence creates a genuine dispute for a jury.

**II.    The Asserted Claims are invalid for lack of a written description because factors untethered to the specification cannot satisfy the written description requirement.**

The Asserted Claims also remain invalid for lack of a written description because Crown outkicked its coverage at the *Markman* stage. Crown obtained broad constructions covering all manner of bringing a can and die together, but the trial evidence confirmed that the specification discloses *no* configuration other than moving a can into a stationary die. Belvac Br. 75.

Crown's response brief confirms its failure of proof at trial:  Crown failed to connect the knowledge of a POSITA *generally* to a POSITA's understanding of the disclosures *in the Asserted Patents' common specification*. Instead, as Crown points out in its brief, Crown relied on the knowledge of a POSITA and criticality as factors *independent from* the specification and expected the jury to connect the dots.  Cross-Response Br. 48-53.  That reliance on a POSITA's understanding divorced from the specification fails as a matter of law.

Crown's brief never identifies any testimony or evidence from which the jury could connect the supposed knowledge of POSITAs and criticality of necking configurations generally to the actual disclosures of the Asserted

Patents.   Instead, Crown lists independent silos of evidence: (1) the specification's "detailed description" of one embodiment; (2) the "nature and scope of the claims"; (3) the knowledge of POSITAs generally; and (4) the criticality of necking configurations.  Cross-Response Br. 50-53.  It then concludes that it satisfied the *Capon* factors — and thus the written description requirement — simply by marshaling evidence *independent* of the specification.  *Id.* at 52-53.

But Federal Circuit precedent rejects that theory.  This Court has explicitly held that a POSITA's free-floating knowledge cannot "supplement the teaching in the specification to provide written description support." *Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017).  Rather, "[t]he knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification."   *Id.*   In the same vein, this Court has explained that the criticality of a feature merely affects "'level of detail [in the specification] required to satisfy the written description requirement.'"  *In re Global IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019) (citation omitted).  The *Capon* factors are thus not independent of the specification; they merely

18

inform a POSITA's understanding of what *the specification* discloses. After all, the written description test is ultimately "an objective inquiry into *the four corners* of the specification from the perspective of a person of ordinary skill in the art," and "it is the specification itself that must demonstrate possession." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351-52 (Fed. Cir. 2010). Crown's argument would require this Court to undo that four-corners inquiry.

Without explaining how a POSITA's knowledge of the art or understanding of the criticality of necking configurations generally would inform her understanding of the specific disclosures in the Asserted Patents, Crown's evidence of the *Capon* factors amounted to unhelpful suppositions about the abstract knowledge of skilled artisans in the field of can necking. These suppositions say nothing about whether a POSITA *reading the specification* would have understood the inventors to be in possession of the full scope of the Asserted Claims. They are beside the point.

Nor could Crown rely on the jury to reach the conclusion of adequate written description support based on Crown's disconnected evidence of the *Capon* factors. Juries cannot be expected to connect dots that a party never asks them to connect. For this reason, this Court has repeatedly rejected

19

arguments that litigants failed to present to the jury in the first instance. *See, e.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1338-39 (Fed. Cir. 2016) (rejecting challenge to jury verdict on written description based on argument never raised to the jury). Instead, this Court limits its review to "the record presented below." *WBIP*, 829 F.3d at 1338. On the record here, the jury had no basis to connect a POSITA's knowledge of necking configurations and understanding of the criticality of necking configurations to necking machines with how a POSITA would understand the disclosures of the specification.

In fact, Crown's technical expert, Walsh, testified that his written description opinions were *not* based on any disclosures in the specification at all. *See* Appx3329, Appx3331. So Crown now tries to limit Walsh's testimony to a single necking configuration: pushing a die onto a stationary can. Cross-Response Br. 53. Crown then claims that Walsh otherwise relied on the specification to find adequate disclosure of the one configuration that both parties agree was disclosed: pushing a can into a stationary die. *Id.* But this argument is beside the point. That the specification *disclosed* only one configuration for necking cans while *claiming* (under Crown's own

construction) all other configurations is precisely why there is inadequate written description support for the construed scope of the Asserted Claims.

On the pertinent question the jury had to answer—whether the specification adequately disclosed possession of all other necking configurations, as claimed—Walsh agreed with Belvac that his opinion was not based on anything in the specification itself. *See* Appx3329, Appx3331. Walsh instead relied on the knowledge of a POSITA and the alleged non-criticality of necking configurations, without any explanation or opinion on how these factors affected a POSITA's understanding of the specification.

Without any logical connection between knowledge and criticality, on the one hand, and the four corners of the specification, on the other hand, Crown's rebuttal evidence was legally insufficient. The jury was thus left with the unrebutted evidence that the specification disclosed only one necking configuration for accomplishing high throughput speeds while claiming all possible configurations to do so. On this evidence, the only reasonable conclusion was that the Asserted Claims lacked written description support.[4]

---

[4] Crown now does not dispute that it never raised to the jury the argument that the specification disclosed a "representative species" of necking

<u>CONCLUSION</u>

In addition to affirming the judgment of noninfringement for the reasons in Belvac's response brief, the Court should reverse the judgment that the Asserted Patents are not invalid under the on-sale bar and for lack of written description.

Dated:  October 11, 2023             Respectfully submitted,

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach
Brian C. Riopelle
David E. Finkelson
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
Facsimile: (804) 698-2304
bschmalzbach@mcguirewoods.com
briopelle@mcguirewoods.com
dfinkelson@mcguirewoods.com

*Counsel for Cross-Appellant*
*Belvac Production Machinery, Inc.*

---

configurations, so the parties agree that this argument provides no basis for affirming the judgment of no invalidity.  Cross-Response Br. 54.  (Though Crown is wrong that it never raised that argument in post-trial briefing.  *See* Appx4915.)

22

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 11, 2023, I filed the foregoing with the Clerk of this Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) because:

- This brief contains 4,396 words, excluding the parts of the brief exempted by Appellate Rule 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface and type style requirements of Appellate Rule 32(a)(5) because:

- This brief has been prepared in a proportionally spaced 14-point Book Antiqua font using Microsoft Word.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach